**NEUPERT & PARTNER**
ATTORNEYS AT LAW

Arbitration procedure in re Armin Mattli, Clinique La Prairie S.A. and CT-Holding SA
vs.
Laboratoires La Prairie S.A. and La Prairie Inc.

## <u>LIST OF ABBREVIATIONS AND DEFINITIONS</u>

| | |
|---|---|
| AM | According to the definition of the Agreement dated 02 June 1995:<br>Mr. Armin Mattli, Clinique La Prairie S.A. and CT-Holding SA. |
| A. Mattli | Mr. A. Mattli |
| Aviatrix | Aviatrix Corporation, New Jersey, renamed into «La Prairie Inc» on 30 December 1982. |
| Clinique La Prairie, Clinique, the Clinic | The clinic operated by La Prairie S.A. in Clarens - Montreux, which offers, in addition to purely medical services, also a spa and wellness area as well as beauty care. |
| Clp SA | Clinique La Prairie S.A., 1815 Clarens |
| Clp F SA | Clinique La Prairie Franchising S.A., Clinique La Prairie Franchising Ltd., a 100 % owned subsidiary of CT-Holding SA |
| CT-Holding | CT-Holding SA, 1796 Courgevaux |
| i.c. | in combination |
| LP | According to the definition of the Agreement dated 02 June 1995:<br>Laboratoires La Prairie SA and La Prairie Inc. |

Translation from the German original

A

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

Lp Inc.                     La Prairie Inc., 10019 New York, N.Y. (formerly «Aviatrix
                            Corp.»)

Lp SA                       Laboratoires La Prairie S.A. c/o Fiduciaire Winkler,
                            1815 Clarens

the Agreement               The Agreement concluded between the parties on 02 June
                            1995 (enclosure K3)

Translation from the German original                                                              B

# Arbitration procedure

**Armin Mattli**

**Clinique La Prairie S.A.**

**CT-Holding SA**

versus

**Laboratoires La Prairie S.A.**

and

**La Prairie Inc.,**

enclosures K53/ 1-59

NEUPERT & PARTNER
ATTORNEYS AT LAW

# INDEX

| | | |
|---|---|---|
| List of abbreviations | | A-B |
| | **SUBSTANTIATION** | 9 |
| I. | **PROCEDURAL ASPECTS** | 9 |
| 1.1 | **AUTHORIZATION OF THE ATTORNEYS** | 9 |
| 1.2 | **COMPETENCE OF THE COURT OF ARBITRATION** | 9 |
| | | |
| II | **FACTS OF THE CASE** | 10 |
| 2.1 | **INTRODUCTION** | 10 |
| 2.2 | **CASE HISTORY** | 12 |
| 2.2.1 | **Period prior to 31 Dec. 1982** | 12 |
| 2.2.2 | **Sale of the cosmetics business on 03 Dec. 1982** | 13 |
| 2.2.3 | **Period from 04 Dec. 1982 - 01 June 1995** | 14 |
| 2.2.4 | **The Agreement of 02 June 1995** | 17 |
| 2.2.5 | **The development of the relationship between the parties after 02 June 1995** | 17 |
| 2.2.5.1 | The Thalassomed case | 17 |
| 2.2.5.2 | The battle for the "La Prairie" trademark for beverages | 18 |
| 2.2.5.3 | The beauty salon in Mexico City | 19 |
| 2.2.5.4 | The spa on the "World Resident Sea" | 20 |
| 2.2.5.5 | The "Art of Beauty" "la prairie Switzerland Daily Spa" | 21 |
| 2.2.5.6 | Spas operated under the designation "La Prairie" in New York (Ritz Carlton), in Grand Cayman, as well as in the Beverly Hills Hotel, California | 22 |
| 2.2.5.7 | Further escalation of the differences of opinion between the parties | 27 |
| 2.3 | **THE PRESENT SITUATION** | 28 |

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

| III. | **LEGAL CONSIDERATIONS** | 35 |
|---|---|---|
| 3.1 | **THE AGREEMENT OF THE 02 JUNE 1995** | 35 |
| 3.1.1 | **Division into areas within which each party may use the designation "La Prairie"** | 35 |
| 3.1.1.1 | The distribution according to items 1, 2, and 3 of the Agreement | 35 |
| 3.1.1.2 | Confirmation of the above-mentioned distribution | 38 |
| 3.1.1.3 | The importance of Annexes A, E, F, and G | 39 |
| 3.1.1.4 | The scope of the provisions of items 5.5 and 5.6 of the Agreement | 42 |
| 3.1.2 | Buffer zone | 46 |
| 3.1.3 | Right of LP to link cosmetic products with Clinique La Prairie in its publicity for cosmetic products | 47 |
| 3.1.4 | Right to use the device mark with the picture of the old Clinique La Prairie | 49 |
| 3.1.5 | The interpretation of the Agreement | 50 |
| 3.1.5.1 | Cooperation of the parties as one of the objectives of the Agreement | 50 |
| 3.1.5.2 | Further Objective of the Agreement: Prevention of disputes | 52 |
| 3.1.5.3 | Interpretation based on name and company law | 52 |
| 3.2 | PROTECTION OF THE NAME 'CLINIQUE LA PRAIRIE' | 52 |
| 3.3 | THE TERMS "MEDICAL CLINIC" AND "HEALTH CLINIC" | 57 |
| 3.3.1 | Services offered at Clinique La Prairie at the time the Agreement was signed | 57 |
| 3.3.2 | Objectified interpretation of the terms medical and health clinic | 58 |
| 3.3.3 | The generally used terms "medical and health clinic" | 60 |
| 3.3.4 | The corporate purpose of the parties and their compatibility with medical and health clinics | 61 |
| 3.3.5 | Meaning of the term "medical and health clinics" (plural) | 61 |
| 3.4 | CONTRACTUAL COMMITMENT OF THE RESPONDENTS NOT TO PROVIDE ANY SERVICES UNDER THE DESIGNATION "LA PRAIRIE" | 62 |
| 3.4.1 | Contractual obligation of the respondents not to provide services of any kind | 62 |

Translation from the German original

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

| | | |
|---|---|---|
| 3.4.2 | Contractual obligation of the respondents, in particular not to provide any services in the area of health and physical and mental well-being | 62 |
| 3.4.3 | Contractual obligation to loyalty | 63 |
| 3.4.4 | Contractual prohibition to use the device mark of the old clinic La Prairie for services | 64 |
| 3.4.5 | Contractual prohibition to establish a reference between services and Clinique La Prairie | 64 |
| 3.5 | VIOLATIONS OF THE AGREEMENT BY THE RESPONDENTS | 64 |
| 3.6 | UNFAIR COMPETITION | 66 |
| 3.6.1 | Unfair actions | 66 |
| 3.6.2 | Violation of the economic interests of the claimants and of the reputation of claimant 2 | 68 |
| 3.6.3 | Impending further violations | 69 |
| 3.6.4 | Interdiction of the imminent violation | 70 |
| 3.7 | VIOLATION OF THE NAME AND STYLE OF CLAIMANT 2 | 70 |
| 3.8 | VIOLATION OF THE PERSONALITY OF CLAIMANT 2 | 70 |
| 3.9 | DECLARATORY INTEREST OF THE CLAIMANTS | 71 |
| 3.10 | ACTION FOR RESTITUTION OF PROFITS | 73 |
| **IV.** | **PRECAUTIONARY MEASURES** | 74 |

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

Zollikon-Zürich, November 05, 2007

Dear colleagues:

In re:

1. **Mr. Armin Mattli**
   Rosenhof 4
   8808 Pfäffikon SZ (hereinafter "A. Mattli")

2. **Clinique La Prairie S.A.**
   rue du Lac 101
   1815 Clarens (hereinafter "Clp SA")

3. **CT-Holding SA**
   Route Principale 25
   1796 Courgevaux (hereinafter "CT-Holding")                    **Claimants**

   all represented by:
   Me Pierre Schifferli
   8 avenue Jules-Crosnier, 1206 Geneva
   and Dr. iur. Alexander Faber, Attorney at Law
   Dufourstrasse 58, 8702 Zollikon

versus

1. **Laboratoires La Prairie S.A.**
   c/o Fiduciaire Winkler
   rue du Lac 101
   1815 Clarens (hereinafter "Lp SA")

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

2.  **La Prairie Inc.**
    680Fifth Avenue
    New York, N.Y. 1001905429 (hereinafter "Lp Inc.")          **Respondents**

    all represeneted by:
    Dr. iur. Martin Ammann, Attorney at Law, and
    Dr. iur. Marcel Lustenberger, Attorney at Law
    Forchstrasse 452
    8032 Zürich

concerning

**ASCERTAINMENT, INJUNCTION, CLAIM**

in the name and on behalf of the claimants (power of attorney, <u>enclosure 1</u>)
I present the following

**<u>REQUEST FOR LEGAL REMEDY</u>**

"1.  That it be ascertained that the respondents have violated the provisions
     of the Agreement of 2 June 1995 concluded between the parties and
     are acting unlawfully by doing the following, either themselves or via
     third parties

     1.1  by using the designation (name, brand, style, trade name or
          device [enseigne]) "La Prairie" or a designation derived from it or a
          similar name

          (i)  providing services or assisting in having such services
               provided in spas, hotel spas, fitness and wellness centers,
               beauty parlors or in any other establishment or operation in
               the area of restitution, maintaining, and fostering health and
               the physical and mental well-being, including medical and
               paramedical services, of health consultation, detoxification,
               purification and weight-reducing cures, of physiotherapy, of
               any kind of body massage, Shiatsu, Qi gong, acupuncture, of
               mental training, transcendental meditation, fitness, yoga, anti-

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

stress, anti-aging treatments, dermatology, beauty, anti-cellulite, and UV treatments, lymphatic drainage, skin analysis, water and steam treatments (thalassic therapy, hamams, saunas), image consulting and similar services, and/or

(ii)  (providing) establishments in the area of restitution, maintaining and fostering health and physical and mental well-being such as spas, wellness centers, fitness and gymnastic rooms as well as equipment, baths (saunas, hamams, swimming-pools) and rooms for relaxing to consumers, or assisting in having such establishments and equipment provided to them;

1.2  by using the device mark of the old Clinique La Prairie in the following or a derivative or similar representation

(logo)

or assisting in having it used for

(i)  services in the area of restitution, maintaining and fostering health and the physical and mental well-being, inclusive of medical and paramedical services, of health consultations, detoxification, purification and weight-reducing cures, of physiotherapy, of any kind of body massage, Shiatsu, Qi gong, acupuncture, of mental training, transcendental meditation, fitness, yoga, anti-stress, anti-aging treatments, dermatology, beauty, anti-cellulite, and UV treatments, lymphatic drainage, skin analysis, water and steam treatments (thalassic therapy, hamams, saunas), image consulting and similar services, and/or

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

(ii) installations made available by the respondents or third parties in the field of restitution, maintaining and fostering health and the physical and mental well-being such as spas, wellness centers, fitness and gymnastic rooms as well as equipment, baths (saunas, hamams, swimming pools), beauty parlors and rooms for relaxing;

1.3 by establishing a direct or indirect tie (or by assisting in establishing this tie) between Clinique La Prairie and the following services offered by the respondent or third parties

(i) services in the area of restitution, maintaining and fostering health and the physical and mental well-being, inclusive of medical and paramedical services, of health consultations, detoxification, purification and weight-reducing cures, of physiotherapy, of any kind of body massage, Shiatsu, Qi gong, acupuncture, of mental training, transcendental meditation, fitness, yoga, anti-stress, anti-aging treatments, dermatology, beauty, anti-cellulite, and UV treatments, lymphatic drainage, skin analysis, water and steam treatments (thalassic therapy, hamams, saunas), image consulting and similar services, and/or

(ii) installations made available by the respondents or third parties in the field of restitution, maintaining and fostering health and the physical and mental well-being such as spas, wellness centers, fitness and gymnastic rooms as well as equipment, baths (saunas, hamams, swimming pools), beauty parlors and rooms for relaxing;

2. That the respondents be enjoined from offering, either by themselves or through third parties

2.1 by using the designation (name, brand, style, trade name or device [enseigne]) "La Prairie" or a designation derived from it or a similar name

(i) (to provide) services or assist in having such services provided in spas, hotel spas, fitness and wellness centers, beauty parlors or in other installations and operations in the area of restitution, maintaining and fostering health and the physical and mental well-being, inclusive of medical and paramedical

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

services, of health consultations, detoxification, purification and weight-reducing cures, of physiotherapy, of any kind of body massage, Shiatsu, Qi gong, acupuncture, of mental training, transcendental meditation, fitness, yoga, anti-stress, anti-aging treatments, dermatology, beauty, anti-cellulite, and UV treatments, lymphatic drainage, skin analysis, water and steam treatments (thalassic therapy, hamams, saunas), image consulting and similar services, and/or

(ii)  installations made available by the respondents or third parties in the field of restitution, maintaining and fostering health and the physical and mental well-being such as spas, wellness centers, fitness and gymnastic rooms as well as equipment, baths (saunas, hamams, swimming pools), beauty parlors and rooms for relaxing; or to assist in having them made available;

2.2  from using the device mark of the old Clinique La Prairie in the following or a derivative or similar representation

(device mark)

or to assist in having it used for

(i)  Services in the area of restitution, maintaining and fostering health and the physical and mental well-being, inclusive of medical and paramedical services, of health consultations, detoxification, purification and weight-reducing cures, of physiotherapy, of any kind of body massage, Shiatsu, Qi gong, acupuncture, of mental training, transcendental meditation, fitness, yoga, anti-stress, anti-aging treatments, dermatology, beauty, anti-cellulite, and UV treatments, lymphatic drainage, skin analysis, water and steam treatments (thalassic therapy, hamams, saunas), image consulting and similar services, and/or

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

(ii) installations made available by the respondents or third parties in the field of restitution, maintaining and fostering health and the physical and mental well-being such as spas, wellness centers, fitness and gymnastic rooms as well as equipment, baths (saunas, hamams, swimming pools), beauty parlors and rooms for relaxing;

2.3 of establishing a direct or indirect tie (or being involved in establishing such a tie) between Clinique La Prairie and the following offered by the respondents or third parties:

(i) Services offered in the area of restitution, maintaining and fostering health and the physical and mental well-being, inclusive of medical and paramedical services, of health consultations, detoxification, purification and weight-reducing cures, of physiotherapy, of any kind of body massage, Shiatsu, Qi gong, acupuncture, of mental training, transcendental meditation, fitness, yoga, anti-stress, anti-aging treatments, dermatology, beauty, anti-cellulite, and UV treatments, lymphatic drainage, skin analysis, water and steam treatments (thalassic therapy, hamams, saunas), image consulting and similar services, and/or

(ii) installations made available in the field of restitution, maintaining and fostering health and the physical and mental well-being such as spas, wellness centers, fitness and gymnastic rooms as well as equipment, baths (saunas, hamams, swimming pools), beauty parlors and rooms for relaxing;

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

3. That the respondents be held jointly and severally liable to restitute to claimant 2 the profits in an amount to be set by a court of arbitration, but minimum CHF 10,000,000.00, plus interest at 5% p.a. as of the 06 November 2007 which the respondents as well as the companies being controlled by the same entity as the respondent have achieved overall since 01 July 2002 by their unlawful actions violating the Agreement of 02. June 1995, which are to be ascertained and enjoined in accordance with items 1 and 2 of the request for legal remedy.

## REQUEST FOR ORDERING PRECAUTIONARY MEASURES

4. That the respondents, for the purposes of precautionary measures, be enjoined for the duration of the present arbitration procedure until its definite, final settlement, and at once from themselves or via third parties

   4.1 newly using, or assisting that it be used, the designation (name, brand, style, trade mark or enseigne) "La Prairie" or any designation derived thereof or similar to it for

   (i) Services provided in spas, hotel spas, fitness and wellness centers, beauty parlors, or in any other establishments and operation by the respondents or by third parties in the area of restitution, maintaining and fostering health and the physical and mental well-being, inclusive of medical and paramedical services, of health consultations, detoxification, purification and weight-reducing cures, of physiotherapy, of any kind of body massage, Shiatsu, Qi gong, acupuncture, of mental training, transcendental meditation, fitness, yoga, anti-stress, anti-aging treatments, dermatology, beauty, anti-cellulite, and UV treatments, lymphatic drainage, skin analysis, water and steam treatments (thalassic therapy, hamams, saunas), image consulting and similar services, and/or

   (ii) installations made available by the respondents or third parties in the field of restitution, maintaining and fostering health and the physical and mental well-being such as spas, wellness centers, fitness and gymnastic rooms as well as equipment, baths (saunas, hamams, swimming pools), beauty parlors and rooms for relaxing;

Translation from the German original

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

4.2   to newly use the device mark of the old Clinique La Prairie in the following representation or one derived from it or a similar representation

(logo)

or to assist in having it used for

(i)   services in the area of restitution, maintaining and fostering health and the physical and mental well-being, inclusive of medical and paramedical services, of health consultations, detoxification, purification and weight-reducing cures, of physiotherapy, of any kind of body massage, Shiatsu, Qi gong, acupuncture, of mental training, transcendental meditation, fitness, yoga, anti-stress, anti-aging treatments, dermatology, beauty, anti-cellulite, and UV treatments, lymphatic drainage, skin analysis, water and steam treatments (thalassic therapy, hamams, saunas), image consulting and similar services, and/or

(ii)   installations made available by the respondents or third parties in the field of restitution, maintaining and fostering health and the physical and mental well-being such as spas, wellness centers, fitness and gymnastic rooms as well as equipment, baths (saunas, hamams, swimming pools), beauty parlors and rooms for relaxing;

4.3   newly establish a direct or indirect link (or to assist in the establishment of such a link) between Clinique La Prairie and the following offered by the respondents or third parties

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

(i) services in the area of restitution, maintaining and fostering health and the physical and mental well-being, inclusive of medical and paramedical services, of health consultations, detoxification, purification and weight-reducing cures, of physiotherapy, of any kind of body massage, Shiatsu, Qi gong, acupuncture, of mental training, transcendental meditation, fitness, yoga, anti-aging treatments, dermatology, beauty, anti-stress, anti-cellulite, and UV treatments, lymphatic drainage, skin analysis, water and steam treatments (thalassic therapy, hamams, saunas), image consulting and similar services, and/or

(ii) installations made available (by the respondents or third parties) in the field of restitution, maintaining and fostering health and the physical and mental well-being such as spas, wellness centers, fitness and gymnastic rooms as well as equipment, baths (saunas, hamams, swimming pools), beauty parlors and rooms for relaxing;

Everything with consequential costs and compensation to be imputed to and with joint and several liability of the respondents."

# SUBSTANTIATION

## I.     PROCEDURAL ASPECTS

### 1.1     AUTHORIZATION OF THE ATTORNEYS

1.     The attorneys of the claimants are duly authorized

**BO** (proof offered): Powers of attorney of … and of 06 July 2007
**K 1 and K 2**

### 1.2     COMPETENCE OF THE COURT OF ARBITRATION

2.     The subject of the present arbitration proceedings are the mutual rights and obligations of the party in the context of the Agreement they entered into on 02 June 1995 ("the Agreement").

Translation from the German original

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

<u>**BO**</u>: Agreement dated 02 June 1995                                    <u>**K 3**</u>

3.      Item 10, "Litigation" of the Agreement foresees that in case of a disagreement, the parties must first try to come to an agreement by mutual consent. For this purpose, the parties are obliged to admonish each other in writing before instituting proceedings, and are to set a deadline for taking part in a meeting or to regulate complaints (Art. 10.1 of the Agreement, <u>enclosure K 3</u>).

4.      Art. 10.2 of the Agreement then says:

        "Any litigation arising from this Agreement on which the parties are unable to reach agreement, shall be submitted to a court of arbitration of three, with headquarters in Zurich, for an award, with the exclusion of an ordinary court of justice. The Zurich Code of Civil Procedure shall govern the proceedings."

5.      The efforts undertaken to find an amicable solution between the parties prior to calling in the Court of Arbitration failed.

        <u>**BO**</u>: Letter from Attorney Schifferli, dated
        26 April 2007 to the respondents (p. 1
        par. 2 and p. 2 par. 3, 4, and 5)                          K 4

        Reply letter by Attorneys Lustenberger
        and Amman, dated 14 May 2007 (p. 1 par. 2 item 2)          K 5

6.      From the above considerations it is evident that the Court of Arbitration is competent to assess the present case at issue.

II      **<u>FACTS OF THE CASE</u>**

2.1     **<u>INTRODUCTION</u>**

The **claimant** in this procedure is Armin Mattli, a Swiss national, currently 83 years old, as well as two companies owned by him. Armin Mattli's entrepreneurial life's work is the development and consolidation of **Clinique La Prairie** at Clarens near Montreux, which he acquired some 30 years ago. Clinique La Prairie was originally known primarily

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

for the living cell therapy (Niehans therapy) practiced there; currently it is a medical center for therapy and research of world renown, awarded the highest distinctions, with a complete, international offer, also in the area of health, well=being, and fitness.

At the end of the seventies, Armin Mattli developed at Clinique La Prairie a cosmetics line, originally also based on living cells, which he marketed under the name of **La Prairie.** In 1982, Armin Mattli sold this cosmetics business to an independent third party. Today, it is owned by the German Beiersdorf group (among other things, also owning Juvena), who are operating it via the **respondents**. The La Prairie cosmetics line has currently become one of the best-known brands in the area of luxury cosmetics. This is also, and not least, due to the renown of the Clinique La Prairie as a therapeutic and research establishment, with which these cosmetics are usually perceived as being related.

The parallel existence of two independent enterprises, arisen after the spin-off of the cosmetics business, both on the market under "Clinique La Prairie" and/or "La Prairie" respectively, required a contractual delimitation between the two corporations for the use of the main brand of each and the designation "La Prairie." This was necessary, although the core business of the two corporations was and is basically different - here we have services in the area of medicine and contiguous areas, in particular health care, there the sale of luxury cosmetics. The parties regulated this delimitation by an **Agreement dated 2 June 1995**. This Agreement replaced all earlier agreements; it is still in force.

**The present arbitration procedure is about the enforcement of this Agreement**. The claimants will show that the respondents did not comply with the agreed delimitation in some essential points and that they threaten to continue to do so. The main reproach addressed to the respondents centers on the fact that they do not only distribute their cosmetic products under the brand and designation "La Prairie" but also provide **services**. They do it precisely in the area of **health care**, which is allocated to Clinique La Prairie, manifested in particular - but not exclusively - by the operation of so-called spas and other installations for well-being in numerous top locations in large cities and luxury resorts all over the world. With the present action, the claimants request that the respondents' behavior in breach of the Agreement, and of third parties authorized by them, be stopped and that the breach of contract be sanctioned.

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

## 2.2    CASE HISTORY

### 2.2.1    Period prior to 31 Dec. 1982

7.     The clinic Clinique La Prairie, the place where Professor Dr. med. Paul Niehans, the pioneer of living cell therapy was active, was created in 1931.

       **BO**:  E. Wolf, Vor 50 Jahren: Paul Niehans bringt den Begriff "Zellulartherapie" in die Öffentlichkeit.
       Swiss Medical Journal, 2002, 83 No. 32/33,
       p. 1726                                                            **K 6**

8.     Cellular therapy essentially consists of the injection of live cells obtained from sheep fetuses (<u>enclosure K6</u>).

9.     Prof. Niehans became world-famous when he succeeded in the year 1954 to heal the terminally ill Pope Pius XII by means of the cell therapy. From then on, the prominent people of the world went to Clinique La Prairie to enjoy the healing and revitalizing effect of this therapy. Charlie Chaplin, Konrad Adenauer, Winston Churchill, Marlene Dietrich - to mention just a few examples - were treated there (enclosure K6).

10.    In the year 1952, Clinique La Prairie SA (Clp SA) with registered office in Montreux and address in Clarens was incorporated. Its purpose is the operation of Clinique La Prairie.

       **BO**:  Certificate of incorporation from the Internet
       concerning Clinique La Prairie S.A.                                **K 7**

11.    After Professor Niehans died in an accident in 1971, Clinique La Prairie S.A. was acquired in 1976 by Mr. Armin Mattli (hereinafter "A. Mattli")

       **BO**:  Mr. Gregor Mattli
       Clinique La Prairie
       rue du Lac 101
       1815 Clarens                                          **as a witness**

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

12.    A. Mattli invested a lot in research and in improving cell therapy. Thanks to these efforts, it was possible to improve this therapeutic method.

      **BO**: Ms. Monica Jürgens-de Gamio
            Trockenloostr. 70
            8105 Watt

            Mr. Dominique Carrupt
            chemin de Béranges 176
            1810 Morges VD          **as witnesses**

13.    At the suggestion of a patient staying at the Clinique, A. Mattli began to develop cosmetic products contained living cells, which he marketed under the name of "La Prairie."

      **BO**: Ms. Monica Jürgens

            Mr. Dominique Carrupt, both named above     **as witnesses**

14.    In the course of this reorientation, A. Mattli incorporated the Laboratoires La Prairie S.A. (Lp SA) with registered office in Montreux and address in Clarens in 1977. The purpose of this corporation is the production and distribution of cosmetic and pharmaceutical products.

      **BO**:  Certificate of incorporation from the Internet
            concerning Laboratoires La Prairie S.A.      **K 8**

15.    Prior to the sale of the company in the year 1982, A. Mattli was the sole shareholder of Lp SA.

      **BO**: Mr. Gregor Mattli, named above      **as a witness**

**2.2.2    Sale of the cosmetics business on 03 Dec. 1982**

16.    As mentioned in the Recitals to the Agreement (<u>enclosure K 3</u>), A. Mattli sold the operation for producing and distributing cosmetic products under the "La Prairie" brand, together with all the appurtenant brands to Lp Inc., New Jersey (formerly Aviatrix Corp.), respondent 2, on 03 Dec. 1982.

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

17.     Legally, this transfer was effected by A. Mattli selling all his Lp SA shares to respondent 2, the Aviatrix (Corp.).

18.     This Agreement was accompanied by a number of other contracts, concluded at the same time, which were intended to safeguard the successful continuation of the cosmetics business (transfer of various assets, of know-how, and of brands, cooperation agreement, warranties, etc.).

       **BO**: Umbrella Agreement dated 03 Dec. 1982        **K 9**

19.     It is true that these agreements concern an exchange of services. But from the context of the mutual services agreed in the cooperation agreement, it is evident that this is also a matter of cooperation.

20.     The continuing agreements signed on 03 Dec. 1982 have in the interim been replaced by the Agreement (enclosure K 3, item 7).

**2.2.3**    **Period from 04 Dec. 1982 - 01 June 1995**

21.     On 30 Dec. 1982, Aviatrix Corp. changed its style to "La Prairie Inc."

       **BO**: "Assignment of Registration" between
       La Prairie Inc. *"(name changed from Aviatrix*
       *Corporation as of December 30, 1982)"*
       and Nichols NV of 04 Jan. 1983        **K 10**

22.     In the year 1995, A. Mattli then incorporated CT-Holding SA, the purpose of which was the acquisition and holding of share holdings. This company is currently the sole shareholder of Clp SA.

       **BO**: Certificate of incorporation from the Cantons
       of Neuchatel and Fribourg from the Internet
       concerning CT-Holding SA        **K 11 and K 12**

23.     In the year 1988, Clinique La Prairie starts offering the services characteristic of spas, namely massages, a Beautymed program, electric therapy and a Corpo appliance. Furthermore, from then on, hydrotherapy is offered and a solarium is put into operation.

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

**BO**: Mr. Dominique Carrupt, mentioned above          **as a witness**

24.    In the year 1991, the new medical center is opened at Clinique La
       Prairie. The above-named spa activities are transferred there. In the
       new building, a swimming-pool, various saunas and hamams and a
       gymnastic and fitness room are put into operation.

       BO:  Ms. Monica Jürgens

            Mr. Dominique Carrupt, both named above          as witnesses

            further evidence reserved

25.    The term "spa" (derived from "salus per aquam" or, according to
       another opinion from the Belgian balneary town Spa) is understood as
       an operation or establishment where services are offered in the area of
       well-being. Among other things, a Spa includes, for instance

       -    wet rooms (saunas, hamam, etc.
       -    baths (interior swimming pool, whirlpool etc.
       -    a fitness area (cardio and strength training, gymnastics room etc.)
       -    an area for massages, tub baths, beauty care, facials and foot
            care treatments
       -    relaxation areas with lounge chairs or cots, places for meditation
            etc.

       BO:  Extract from Wikipedia                          K 13

            Extract from the Merriam Webster online dictionary    K 14

26.    All these installations, as already explained, were put in operation at the
       clinic by 1991 at the latest. Massages, beauty care, hydrotherapy,
       electric therapy and a solarium have already been a part of the services
       offered at the clinic since 1988. But at that time, there was no part of the
       building specifically equipped for it.

       **BO**:  5 bulletins of Clinique La Prairie of the years
               1989-1995                                    **K 15-19**

27.    It is true that the bulletins of the Clinique did not expressly use the term
       of spa. But the areas of services outlined therein are characteristic of
       such an establishment, namely wet areas (sauan, hamam etc.), baths
       (interior pool, whirlpool etc.), a fitness area (cardio and strength training,

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

gymnastics room etc.) an area for massages, tub baths, beauty care, facial and foot care treatments, relaxation zones with areas for lying down, places for meditation etc.

**BO**: Ms. Monica Jürgens
Mr. Dominique Carrupt, both mentioned above    **as witnesses**

28.    It has to be remembered that the term of "spa" hails from English usage and has only become generally used in this country for the past few years.

29.    The concept of Clp SA - qualified medical care paired with a modern spa - was a complete success. It was correspondingly mentioned and commended in the press.

**BO**: "Golf" No. 10, 1994, "La revitalisation grâce
aus traitements cellulaires"    **K 20**

"Telva" edition of May 1995, "Clinique
La Prairie, tratamientos vanguardistas"    **K 21**

"Annabelle," insert to edition 4/1995,
"Beauty-farms"    **K 22**

30.    In addition to the numerous prominent personages who came to the Clinique for treatment and cannot be named for reasons of confidentiality, Maradona - besides Pelé the most famous soccer player of all times - went to the Clinique in 1996 for a withdrawal and fitness treatment.

**BO**: "L'illustré" of Aug. 28, 1996, "Maradona remis à neuf"    K 23

31.    The share holdings in Lp SA sold to Aviatrix ("La Prairie Inc." since Dec. 30, 1982) at the end of 1982 changed ownership a number of times, together with the rights sold with them, until in 1992, as far as we know, they were sold to Juvena (International) AG, a company of the Beiersdorf group, Hamburg, Germany.

32.    In the course of time, increasing friction arose between the parties because the respondents did not comply with the Agreement. After 1992, these disagreements degenerated into an actual dispute. Each party called in a lawyer and various, mutual lawsuits were filed by both parties.

BO:  Mr. Dominique Carrupt
Ms. Monica Jürgens

Translation from the German original

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

Mr. Gregor Mattli, all named above                    **as witnesses**
further evidence reserved

**2.2.4    The Agreement of 02 June 1995**

33.    Tired of the dispute, the parties signed the Agreement on 02 June 1995
after lengthy negotiations (enclosure K 3).

34.    The mutual rights and obligations of the parties concerning the
designation "La Prairie" are the object of the Agreement. Furthermore, it
also regulates the future cooperation between the parties.

35.    The objective of the Agreement was to settle the disputes existing at
that time and the prevention of future litigation.

36.    With the signature of the Agreement, the continuing agreements concluded on
03 Dec. 1982 were canceled (Agreement, enclosure 3, item 7).

**2.2.5    The development of the relationship between the parties after 02
June 1995**

37.    During the period after the signature of the Agreement until approx. the
year 2001, nothing worth mentioned happened in the relationship
between the parties

38.    However, there were repeated delimitation problems in brand
applications.

2.2.5.1  The Thalassomed case

39.    For instance, Lp SA defended itself against the registration of the Swiss
brand "CLP Thalassomed" by Clp SA. In so doing, it referred to item 3.2
of the Agreement according to which AM committed not to use the
"CLP" brand for cosmetic products.

**BO**: Letters from attorney Heinrich to attorney König
of 17 Oct. and 22 Nov. 2000                    **K 24 and K 25**

40.    Clp SA objected by stating that the "CLP Thalassomed" was being used
for services, exclusively.

**BO**: Letter from att. König to att. Heinrich dated 30 Nov. 2000    **K 26**

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

2.2.5.2 <u>The battle for the "La Prairie" trademark for beverages</u>

41.     In a letter dated 25 July 2003 to att. Amman, att. König objected to Lp
        SA having deposited the "La Prairie" brand for mineral waters and
        waters containing carbonic acid as well as non-alcoholic beverages.
        According to the Agreement, however, the brand for food, dietary foods,
        and food additives belongs to AM (Armin Mattli, Clinique La Prairie S.A.,
        and CT-Holding SA). The registration therefore violated the Agreement.
        Attorney König therefore aks LP (Laboratoires La Prairie S.A. and La
        Prairie Inc.) to withdraw the trademark registration in question as well
        as possible other registrations for "La Prairie" in class 52, or to assign it
        to AM.

        **BO**: Letter att. König to att. Amman dated 25 July 2003          **K 27**

42.     In his reply of 25 Aug. 2003, att. Amman contradicts the opinion of att.
        König. Essentially, he substantiated it to the effect that, according to
        item 3.1 of the Agreement, Lp SA acknowledged AM's ownership of the
        "La Prairie" product trademark for foods, dietary foods and food
        additives, but only to the extent of the items listed in Annex B.

        **BO**: Letter att. Amman to att. König of 25 Aug. 2003          **K 28**

43.     That this opinion is untenable from the factual point of view and will
        undeniably lead to renewed disputes between the parties is to be
        further elucidated below (cf. item 3.1.1.3).

44.     After that, there is a further exchange of correspondence between att.
        König as representative of the claimants and att. Amman as attorney of
        the respondents.

        **BO**: Letter att. König to att. Amman of 09 Sept. 2003          **K 29**

                Letter att. Amman to att. König of 19 Sept. 2003          **K 30**

                Letter att. König to att. Amman of 30 Sept. 2003          **K 31**

45.     This exchange of correspondence apparently did not produce any
        result.

46.     At any rate, Juvena (International) AG writes to Mr. Mattli on 06 Oct.
        2005 and confirms, referring to a conversation that had taken place
        between the parties, that they were interested in an amicable
        arrangement with A. Mattli. To this effect, they offer to him to be willing

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

to purchase all rights in the trademark "La Prairie" as well as in the device-trademark "La Prairie" for foodstuffs, dietary foods, and food additives and/or food supplements at a fair price.

**BO**: Letter Juvena (International) AG, signed Trappman
to Mr. A. Mattli of 06 Oct. 2006                          **K 32**

47.    This letter is an indication that the respondents themselves are not quite so convinced of the standpoint they take with regard to beverages.

2.2.5.3  The beauty salon in Mexico City

48.    A first foretaste of today's argument about the spas was offered by one of the respondents by offering beauty treatments under the enseigne (sign) "Beauty Center 'la prairie' Switzerland" und using the device mark of the old Clinique La Prairie in a beauty parlor in Mexico City.

**BO**: Fax from Ms. Maike Kiessling of Lp SA to A. Mattli
of 07 March 2000                                          **K 33**

49.    Unlike what Ms. Kiessling had hoped for according to her facsimile transmission, Mr. Mattli did not feel that this was all right, at all.

**BO**: Letter or fax from Mr. A. Mattli to Ms. Maike Kiessling
of 07 March 2000                                          **K 34**

50.    In this letter, Mr. A, Mattli states with good reason that the respondents are not authorized to offer "treatments" under the name of Clinique La Prairie.

51.    In more precise terms, this means that the respondents, in accordance with the Agreement, are not allowed to offer any services under the name of "La Prairie" which is an integral part of the name of "Clinique La Prairie."

52.    In his letter of 28 March 2000 to attorney Amman, attorney König repeats and emphasizes his former statement. He points to the fact that, according to the Agreement, Lp SA was allowed to use the device mark of the old Clinique La Prairie only for cosmetic products. That Lp SA was forbidden to use this device mark as a services mark. By using the device mark as a store sign for a beauty center in which treatments were being offered, Lp SA was violating the Agreement. Furthermore, in

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

accordance with the Agreement (item 4.3 third hyphen), products of decorative cosmetics such as lipsticks were not to be linked to the clinic. But that this was being done in the beauty center in question.

53.     The interesting part of attorney Amman's reply is the fact that he does not call into question the principles established in attorney König's letter. He limits himself to contesting the facts of the case presented by attorney König - albeit wrongly. Essentially, he alleges that the shop sign was merely indicating the possibilities of sale. That the term "beauty center" did not forcibly mean that services were being provided. That this designation was being used regularly for a shop making sales.

        **BO**:  Letter from att. Amman to att. König of 17 April 2000        **K 36**

54.     In his reply of 25 April 2000, attorney König repudiates attorney Amman's statements and insists on the removal of the image of the Clinique on the Mexican beauty center.

        **BO**:  Letter from att. König to att. Amman of 25 April 2000        **K 37**

2.2.5.4 <u>The spa on the "World Resident Sea"</u>

55.     The "World Resident Sea" is a luxury liner on which condominium apartments can be bought.

56.     On 04 Dec. 2000, Ms. Nina Dimoglou of Clinique La Prairie Franchising Ltd. (ClpF SA) wrote to Ms. Kiessling of Lp SA.

        **BO**:  Fax from Ms. Dimoglou of Clinique La Prairie
                Franchising Ltd. to Ms. Kiessling of Lp SA, dated 04 Dec. 2000
                                                        **K 38**

57.     In this letter, Ms. Dimoglou mentions that ClpF SA, a subsidiary of CT-Holding SA, had concluded an agreement ot operate a health and beauty center on the "Resident Sea."

58.     Ms. Dimoglou complains about Lp SA trying to compete with her by trying to establish an "Art of Beauty" operation on the "Resident Sea" for the health and beauty center. She points out that such happenings

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

would cause further unrest in the already complex situation. She asks Lp SA to prevent such happenings from occurring in future.

59.    On 02 March 2001 attorney König then writes to attorney Amman.

**BO**:  Letter from att. König to att. Amman, dated 02 March 2001 **K 39**

60.    He finds fault with Lp SA for refusing to supply "La Prairie" products for the Clinique La Prairie station on the "Resident Sea" and thus is violating item 5.1 of the Agreement (enclosure K 39, item 1).

61.    In his reply of 20 March 2001, att. Amman refers to Ms. Dimoglou's fax letter to Ms. Kiessling wherein she requests Lp SA to keep out of the "World Resident Sea" project, since in this project the ClpF Ltd. had already entered into a contractual relationship. His client, Lp SA, had allegedly complied with this wish.

**BO**: Letter from att. Amman to att. König of 20 March 2001        **K 40**

62.    In this case, Lp SA evidently realized that the area of health services was reserved for the claimant pursuant to the Agreement and that (Lp SA) had no business in it.

2.2.5.5  The "Art of Beauty" "la prairie Switzerland Daily Spa" in Athens

63.    In his letter dated 02 March 2001, to att. Amman (enclosure K 39, item 2) in which talk is primarily about the "World Resident Sea," att. König dwells primarily on the "La Prairie" center in Athens.

64.    Copies of the leaflets used by Lp SA for advertising this establishment are enclosed with the letter (enclosure 2 to the letter). From these leaflets it is evident that the device mark of the old Clinique La Prairie is linked to terms such as "Daily spa," "the art of beauty" as well as facials, body massage, Shiatsu, hamam, solarium, fitness, yoga ("exercise you body and mind"), with weight-loss cures supervised by a nutrition scientist and even with medical services ("the doctor at your side" dermatology) for advertising purposes.

**BO**:  Leaflet of the "Daily spa" from Lp SA in Athens        **K 41**

        Photograph of the entrance of the "Daily spa" in Athens    **K 42**

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

65.     In his letter, att. König states correctly that according to the Agrement, Lp SA had no right to use the device mark of the old Clinique La Prairie for services such as those of a beauty parlor, a spa, or a fitness center. Furthermore, item 4.2 of the Agreement limits the allowed reference to Clinique La Prairie to advertising for cosmetic products, and that under restricting conditions, correctly represented in the letter (item 4.3 of the Agreement).

66.     It has to be added that on the last page (back cover) of the leaflet, the brand name "La Prairie Switzerland" is showing in large letters.

67.     It is particularly grave that even medical services are offered in the brochure under the brand "La Prairie" and the logo of the old clinic. According to items 5.5 and 5.6 of the Agreement, the claimants have the exclusive right to use the brand "La Prairie" for medical services.

68.     In this regard, att. König requests in item 2 Bst. c of his letter that Lp SA clarify this matter.

69.     In his letter dated 20 March 2001, att. Amman gives evasive answers and refers to the meeting with the representative of A. Mattli planned for 22 March 2001. In his opinion, this conversation was to offer an opportunity to clarify possible "misunderstandings" concerning items 2 Bst. a and c of att. König's letter.

70.     The somewhat awkward response by att. Amman is evidence that there was not much to be opposed to the overwhelming weight of the proof. The legal assessment of the irrefutable facts by att. König hit the bull's eye.


2.2.5.6   Spas operated under the designation "La Prairie" in New York (Ritz Carlton), in Grand Cayman, as well as in the Beverly Hills Hotel, California

71.     In a letter dated 05 Oct. 2005 to att. Amman, att. König refers to the fact that the respondents were operating spas under the name of "La Prairie" in the Ritz Carlton Hotel New York, in Grand Cayman, and in the Beverly Hills Hotel in California.

        BO: Letter from att. König to att. Amman of 05 Oct. 2005          **K 43**

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

72.     According to the pertinent comments by att. König, the respondents are thus expanding their area of activities under the name of "La Prairie" beyond the area to which they are entitled pursuant to the Agreement (production and distribution of cosmetic products).

73.     (According to att. König) the services offered by these spas were related to those of a health clinic. That this is an area which, according to the Agreement, is assigned to the owner of the services mark "La Prairie," i.e. Armin Mattli and/or his companies, respectively.

74.     (According to att. König) the respondents are entitled to selling their products to a third party in the spa, but not so treatments not related to proper cosmetics. In such a case, but especially when the spa was acting under the name of "La Prairie," the rights of his clients were being violated.

75.     With a letter dated 21 Nov. 2005, addressed to the persons in charge of managing the respondents' operations, A. Mattli took the floor.

        **BO**: Letter from A. Mattli to Messrs. Quaas, Trappmann, and Ms. Kiessling, dated 21 Nov. 2005                  **K 44**

76.     He blames Lp SA for having violated the Agreement by having registered spas in New York, Los Angeles, on the Cayman Islands, and in other parts of the world.

77.     That Lp SA had the right to use the name of Clini    que La Prairie for selling cosmetic products, but never to advertise spa services.

78.     Among other issues, Mr. Mattli essentially blames Lp SA for disregarding the Agreement by establishing a link between the spas and Clinique La Prairie by, for instance

79.     a)      exhibiting the photograph of Clinique La Prairie at the reception of the spas in New York and in the Cayman Islands as well as the spas in Greece and in Bangkok; furthermore printing it in the advertising leaflets for the various spas;

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

80.     b)     using the picture of Clinique La Prairie in the Ritz Carlton in New York without permission by A. Mattli (this refers to the device mark of the old clinic);

81.     c)     using the name of Clinique La Prairie for advertising purposes in the publicity for the spa in New York and in the advertising leaflets for the spas in general;

82.     d)     using the designation "Spa by La Prairie" in the Beverly Hills Hotel and advertising the "Spa & Resort/Medical Spa" in the Ritz in New York under the designation "La Prairie Spa;"

        e)     maintaining in the spa in New York that they are associated with Clinique La Prairie;

83.     A. Mattli in the end requested that Lp SA refrain from opening any further "La Prairie" spas in any part of the world, that they not use any photographs of Clinique La Prairie in the spas and the leaflets distributed in the spas, to no longer use the name Clinique La Prairie in the latter and to no longer distribute any more leaflets advertising products of decorative cosmetics under the name of "La Prairie".

84.     He finally informs that he will take legal steps in case the respondents were not to heed this request.

85.     Lp SA replied with a letter signed by Mr. Trappmann and Ms. Kiessling dated 07. Dec. 2005.

        **BO**:  Letter Lp SA to A. Mattli dated 07. Dec. 2005          **K 45**

86.     As a first item, Lp SA contests A/ Mattli's flat statement (by its strict wording[1]) that according to the Agreement he is the only one authorized to operate medical and health clinics.

87.     Here, the respondent 1 on purpose misconstrues the meaning of A. Mattli's affirmation. As any reasonable and well-meaning addressee of Mr. Mattli's letter can easily ascertain, he refers, as a matter of course, only to the operation of such clinics under the brand and designation "La Prairie" and not to their operation in general.

---

[1] remark by the author

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

88.  Furthermore, the letter states that the Agreement mentions the operation of medical and health clinics solely in the context of the list of the service brand "Clinique La Prairie" registered by AM (item 1 Bst. c) as well as item 3.1. That there it is stated that Lp acknowledges AM's right to operate medical and health clinics under the brand of "La Prairie." That the operation of medical and health clinics is (allegedly) not mentioned anywhere else in the Agreement.

89.  Here it is omitted - probably on purpose - that the above-named operation of clinics is also provided for in item 5.5 of the Agreement.

90.  That in item 5.6 it is (allegedly) stated that the provisions of the Agreement do not restrict the rights of the parties to sell other products or services, or to assist in such sale, as long as no direct or indirect reference to "La Prairie," or designations that might be confused with it, in contradiction with the Agreement, were excluded. That from this provision, it could even be concluded that the Agreement would allow Lp itself to operate such establishments (spas), of course, always on condition that no other provision of the Agreement were thereby violated.

91.  These arguments by Lp SA are missing the point. It is precisely decisive whether Lp SA, by the behavior of which it is reproached in Mr. Mattli's letter of 21 Nov. 2005 (enclosure 44), does indeed violate its obligations according to the Agreement.

92.  The same observation applies to Lp SA's statement in item 3 of its letter. There, it maintains that the Agreement does not restrict its right to be present and active in spas in any way. The decisive question, however, is in what appearance this involvement in spas takes place - for instance by using the designation "La Prairie."

93.  In item 4 of the above-named letter, Lp SA maintains that the term "health clinic" according to the Agreement cannot be equaled to the term "spa."

Translation from the German original

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

94.     Furthermore, in item 5, it is claimed that Lp's spa concept is clearly
        limited to the use of high-class, luxury cosmetics and does not include
        any medical use or treatment.

95.     That the complaint in A. Mattli's letter primarily referred to the use of the
        stylized picture of Clinique La Prairie. But that according to item 1 Bst. f
        of the Agreement, this device mark undoubtedly belonged to Lp. That in
        item 2 of the Agreement, AM expressly acknowledges Lp's right to use
        this device mark for cosmetic and related products (enclosure 45, item
        6).

96.     That item 4.2 foresees the worldwide, exclusive right of Lp to refer to
        Clinique La Prairie in its advertising of cosmetic products. That the
        references to the clinic mentioned in A. Mattli's letter were references of
        that sort because basically they referred to the sale and the application
        of cosmetic products in the spas in question (enclosure 45, item 7).

97.     That it was true that this right foreseen in item 4.2 was dependent on
        the compliance with conditions. But that these conditions were met in
        full (enclosure 45, item 8).

98.     Summing up, Lp SA contests the contents of A. Mattli's letter and the
        accusation that it was damaging Clinique La Prairie's reputation, or that
        it was deceiving its clientele. Under those circumstances, there was
        (allegedly) no need for  an amicable settlement.

99.     The core statement of Lp SA's letter says that Lp SA is not providing
        any services and, in particular, is not operating any spas but is only
        selling and applying cosmetic products in the context of spas. That
        therefore the use of the device mark with the old Clinique La Prarie and
        the reference to this clinic was lawful.

100.    This allegations are - as shall still be shown - are contrary to the facts.
        In reality, the respondents are themselves or via third parties
        advertising spas  by using the designation "La prairie," the device mark
        with the old Clinique La Prairie, and the photographs of the clinic and
        linking the spas with the Clinique La Prairie. it is to be suspected that
        the respondents themselves are operating the spas.

NEUPERT & PARTNER
ATTORNEYS AT LAW

2.2.5.7  Further escalation of the differences of opinion between the parties

101.    On 22 Nov. 2006, Mr. A. Mattli writes another letter to the persons in
        charge of the management of Lp SA.

        **BO**: Letter from A. Mattli to Mr. Trappmann
               and Ms. Kiessling, dated 22 Nov. 2006                    **K 46**

102.    In this letter, Mr. Mattli expresses his displeasure about the business
        behavior of the respondents in unmistakable words.

103.    In particular, he reproaches Lp with having violated the Agreement by
        opening spas in the whole world because the operation of medical and
        health clinics is his exclusive right.

104.    He adds that the reputation of Clinique La Prairie had been damaged by
        Lp's behavior. As an example, Lp was using the pictures and the name
        of Clinique La Prairie in an illegal manner. That his patience was at an
        end.

105.    Furthermore, Mr. Mattli essentially blames Lp for having deceived the
        consumers by its claim that its products were being produced in
        Switzerland and contained cell additives, whereas this was not the case
        according to experts' reports.

106.    A. Mattli's justified indignation explains the emotional tone of his letter
        as well as the warning contained therein, namely from letting third
        parties know of the irregularities mentioned in the letter.

107.    With a letter dated 06. Dec. 2006, Mr. Trappmann and Ms. Kiessling
        reply, this time apparently on the letterhead of Juvena (International)
        AG, in the name of Lp Mr. Mattli's letter of 22 Nov. 2006.

        **BO**: Letter from Mr. Trappmann and Ms.
               Kiessling to Mr. A. Mattli, dated 06 Dec. 2006           **K 47**

108.    At the beginning, the writers reject the charge of Lp having violated the
        Agreement and in this regard they refer to their letter of 07 Dec. 2005.

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

109. They add that they were observing closely how AM was planning to open new "Clinique La Prairie Health & Wellness Centers" in various cities of the world. Furthermore they point to the fact that Lp SA had registered the "La Prairie" brand in various states also for services, in particular for beauty treatments. That they would therefore consider it a clear violation of their brand rights if AM were to offer such services in the planned wellness centers.

110. Evidently it is forgotten that beauty treatments have been offered at the Clinique La Prairie since a long time ago and that Lp even covenanted to provide cosmetic products for them, both in the cooperation agreement of 03. Dec. 1982 (enclosure K 56) as well as in the Agreement.

111. Furthermore, this letter is proof of the fact that the respondents plan to open new establishments worldwide in which services are to be offered in the spa and wellness areas, but in particular for beauty treatments.

112. The remaining charges raised by A. Mattli in this letter are rebuked, in particular the remonstrance that Lp SA's products did not contain any cell ingredients and were not being produced in Switzerland.

## 2.3    THE PRESENT SITUATION

113. After construction and opening of the new spa in the year 2005, Clinique La Prairie has further gained in attractiveness.

   **BO**: Clinique La Prairie "Inside 44 / Été 2006"          **K 48**

114. Equipped with the latest medical installations, it offers, on the one hand, purely medical treatments such as general and plastic surgery, neurology, etc.

   **BO**:  List of services offered by Clinique La Prairie          **K 49**

115. On the other hand, the clinic offers paramedical treatments and programs such as physiotherapy, all types of massages, acupuncture, beauty treatments, thalassic therapy, and fitness programs (cf. list of services, enclosure K 49).

   **BO**:  Leaflet «CLP Beautymed»          **K 50**

Translation from the German original

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

116.    These are all services characteristic of spas.

117.    The paramedical area (spa) located in the Medical Center since the year 1991, was transferred to the new spa building after its completion in the year 2005.

   **BO**:  Mr. Gregor Mattli                                    **as a witness**

118.    What differentiates the spa of Clinique La Prairie from traditional spas is the medical attention to the visitors of the spa. It expresses itself in the fact that, based on a medical entry examination, a well-being and health program attuned to the individual physical and mental condition as well as the objective of the individual guest is set up. This is then accompanied by physicians ("medically accompanied" in German).

   **BO**:  DVD on Clinique La Prairie                              **K 51**

           **Judicial inspection** at Clinique La Prairie

119.    The considerable investments made by A. Mattli into new buildings such as the Centre Medical (opened in 1991) and in the new spas, as well as in the most up-to-date medical installations and in research, to be able to keep pace with the latest medical developments, have proven their worth.

120.    Clinique La Prairie has been awarded multiple distinctions for the best spa.

   **BO**:  List of spa awards of Clinique La Prairie
           with supporting documents                            **K 52/1 - 5**

121.    The reason why Clinique La Prairie is so successful with its spa is only fully fathomed by a visit of the clinic on site.

   **BO**:  **Judicial inspection** at Clinique La Prairie

122.    The people profiting especially from these successful efforts, without any major risk, are the respondents. They themselves, or via third parties, they operate in different locations, spread all over the globe, in particular in large cities and luxury hotels, under the designation "La Prairie," actual "La Prairie" spas and beauty parlors. In addition, they

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

also offer services under the name "La Prairie" and with reference to the Clinique La Prairie which are characteristic of spas and wellness installations, and finally even medical, paramedical, and anti-aging services

**BO:** Extracts from the Internet of spas
operated under the designation "La Prairie"          K 53/1 - 59

123.    Here, the following distinction can be made:

124.    a)    Operations actually designated as "La Prairie" spas or "La Prairie" wellness installations:

       1.   The Ritz-Carlton New York, Central Park, New York, NY/USA
       2.   The Beverly Hills Hotel, Beverly Hills (California) USA
       7.   The Ritz-Carlton, Grand Cayman, grand Cayman
      13.  The ritz-Carlton, Berlin, Berlin/Germany (where mention is even made of medical services: "how can therapists know my needs?")
      23.  La Prairie The Art of Beauty Day Spa, Kifisia / Greece
      24.  La Prairie The Art of Beauty Day Spa, Athens / Greece (cf. item 2.1.5.5 above and enclosures),
      34.  The Residence Mauritius, Bella Mare / Mauritius
      37.  Lapa Palace, Lisbon / Portugal

    b)    Installations which are not expressly designated as "La Prairie" spas or "La Prairie Wellness" but make prominent reference to "La Prairie" in connection with a wellness area:

      12.  Mas de la Fouque, Saintes Maries de la Mer / France
      30.  Hotel Cipriani, Venice / Italy
      33.  Salon La Prairie / Shangri-la Hotel, Kuala Lumpur / Malaysia
      34.  The Residence Mauritius, Bella Mare / Mauritius
      38.  Maia Luxury Resort & Spa, Mahe, Seychelles

    c)    Installations which are not expressly designated as "La Prairie" spas or "La Prairie Wellness" but where the designation "La Prairie" is being used

    aa)   in the context of a list of services that is characteristic for spas and wellness (centers) and largely corresponds to those of the spas of Clinique La Prairie;

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

14    InterContinental Resort Berchtesgaden, Berchtesgaden / Germany

16.    Residenz Heinz Winkler, Aschau / Germany

18.    Park Hotel Adler, Hinterzarten / Germany (express reference to wellness treatments)

30.    Hotel Cipriani, Venice / Italy

31.    Royal Park Hotel, Tokyo, Japan

33.    Salon La Prairie / Shangri-la Hotel Kuala Lumpur, Malaysia

37.    Lapa Palace, Lisbon, Portugal

38.    Reid's Palaace, Madeira, Portugal

39.    Maia Luxury Resport & Spa, Mahe, Seychelles

44.    Hotel Ra, Vendrell-Tarragona / Spain

bb)    with reference to Clinique La Prairie

19.    Schlosshotel Bühlerhöhe, Baden-Baden / Germany ("since its inception over 20 years ago, La Prairie has been one of the leading authorities in skin care. Its high repute is based on the successes of the renowned Swiss clinic La Prairie, which concentrates on the medical and scientific aspects of the aging process as well as the premature aging of the skin."),

33.    Salon La Prairie / Shangri-la Hotel etc., Kuala Lumpur / Malaysia ("Laboratoires La Prairie traces its proud heritage to the highly renowned Clinic La Prairie in Monreux ...")

34.    The Residence Mauritius, Bella Mare / Mauritius ("The Art of Beauty is ... experience in the art of de-aging based on scientific concepts pioneered at the famous Swiss Clinique La Prairie").

57.    The Lanesborough, London / UK (inadmissible reference to the clinic in contradiction to item 4.2 of the Agreement)

cc)    in the context of anti and/or de-aging treatments, respectively:

28.    Hotel Hermitage, Cervinia / Italy

29.    Hotel Cavalieri Hilton, Rome / Italy

30.    Hotel Cipriani, Venice / Italy

34.    The Residence Mauritius, Bella Mare / Mauritius ("de-aging techniques")

42.    Hotel Byblos Andaluz, Malaga / Spain

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

dd)  in the context with medical and paramedical services:

13.  The Ritz-Carlton, Berlin, Berlin / Germany ("How can therapists know my needs")
14.  InterContinental Resort Berchtesgaden, Berchtesgaden / Germany ("care experience," "thermo-therapy," "detoxifying lymphatic draining")
17.  Schlosshotel Lerbach, Bergisch Gladbach / Germany ("La Stone" therapy, manual lymphatic draining)
35.  Les thermes marins de Monte Carlo, Monte Carlo / Monaco ("therapists use products for … treatments")
59.  Claridge's, London / UK ("easing of sinus pressure, ease effects of headaches").


ee)  for beauty parlors and beauty treatments operated in spas

3.   The Observatory Hotel, Sydney / Australia
4.   Park Hyatt Melbourne, Melbourne / Australia
5.   Hyatt Regency Coolum, Queensland / Austrlia
6.   Hotel Sacher, Vienna / Austria
8.   Evian Royal Palace, Evian-les-Bains / France
9.   Villa Belrose, Saint-Tropez / France
10.  Le Kilimanjaro, Courchève / France
20.  Kempinski Grand Hotel Heiligendamm, Heiligendamm / Germany
22.  Benen-Diken-Hof, Sylt / Germany
27.  Four Seasons Dublin, Dulin / Ireland
28.  Hotel Hermitage, Cervinia / Italy
29.  Albergo Cavalieri Hilton, Rome / Italy
36.  Hotel van Oranje, Noordwijk / Netherlands
42.  Hotel Byblos Andaluz, Malaga, Spain
45.  Mandravall Hotel & Spa, Palma de Mallorca / Spain
46.  Hotel Castello del Sole, Ascona / Switzerland
47.  La Réserve Genève Hotel and Spa, Geneva / Switzerland
48.  Grand Hotel Quellenhof, Bad Ragaz / Switzerland
56.  Burj al Arab, Dubai / UAE
58.  Whatley Manor,

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

    d)    Reference to Art of Beauty on the homepage of Lp SA
        (shoplaprairie.com.locations.asp) but unclear under what
        apperance since there is no Internet web site of the installations in
        question:

        25.   The Art of Beauty Centre (several), Hong Kong
        26.   La Prairie Salon de Beauté, Jakarta / Indonesia
        49.   La Prairie Counter, Taipei / RUC
        50.   Salon La Prairie, Bangkok / Thailand
        51.   Salon La Prairie, Pathumwan / Thailand
        52.   Radisson SAS Resort & Thalasso, Djerba / Tunesia
        53.   The Art of Beauty, Nisantasi / Turkey
        54.   Hillside Sun Hotel, Antalya / Turkey
        55.   The Art of Beauty at Altug, Etiler / Turkey

    If the respondents are not operating these spas themselves, at least
    they condone or assist in having third parties operate spa or wellness
    installations with the designation "La Prairie," that they use the device
    mark with the old Clinique La Prairie and photographs of the clinic for
    their spas or wellness establishments and establish a reference
    between them and Clinique La Prairie.

125.    To the above classification has to be added that several of the
        establishments operated under the business style "La Prairie" or by
        referring to the latter may correspond to several categories.

126.    Thus, in most of the beauty parlors listed under Bst. c/ff massages are
        offered as well as, to a certain extent, also paramedical services (cf.
        <u>enclosures 68/3, 4, 5, 6, 8, 9, 10, 20, 27, 28, 29, 36, 42, 46, 47, 56</u>).

127.    The exact appearance of the establishments listed above is not
        perfectly visible from the Internet.

128.    The apperance of these establishments is surely about the same as
        with the beauty salon in Mexico City, with the "Art of Beauty," "La Prairie
        Switzerland, Daily Spa" in Athens, and with the Ritz-Carlton Hotel "La
        Prairie" Spa in New York, NY.

        **BO**:  **Producing** of the documents concerning the appearance and the
            establishments listed in the enclosures 53/1-59, operated by the
            respondents under the designation "La Prairie" or with reference to
            "La Prairie."

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

129.    On these establishment, the designation "La Prairie" is posted large and
        clearly visible. In addition, there is usually also made a fine show of the
        device mark with the old Clinique La Prairie, or at least of a large-sized
        photograph of the latter (leaflet of the "Daily Spa" of Lp SA in Athens,
        <u>enclosure K 41</u>).

130.    This is easily understandable from the respondents' view. For what
        good would all the awards for the spa of Clinique La Prairie, the long
        years of development work, the investments made by Mr. Mattli do, if
        not precisely for advertising the services offered by the respondents
        competing with those of the clinic?

131.    Regarding the request for producing the documents it has to be added
        that the claimants cannot be expected to roam the world in all directions
        to reconnoitre in what shape and trim the various "La Prairie"
        establishments appear.

132.    The respondents, however, ought to be perfectly well documented on
        the appearance of the establishments using the designation "La
        Prairie." For the purposes of a "corporate identity" they will certainly
        have to make sure that all these operations have a more or less uniform
        appearance. In case of a possible franchising, this is a matter of course.
        This is why it is perfectly reasonable to ask the respondents, for their
        greater closeness to the evidence, to present their documentary
        evidence on the exact appearance of the establishments listed in
        enclosure 53/1-59.

133.    In the "La Prairie" establishments listed in enclosure K 53, the services
        offered are primarily in the area of wellness (well-being). This is evident
        from the puffing of the treatments offered and to be found on the
        corresponding Internet home pages.

134.    Unlike what  Mr. Trappmann wants to make believe in his letter of 07
        Dec. 2005 (enclosure K 45) with regard to the "La Prairie" Spa in the
        Ritz Carlton Hotel in New York City, it is not the sale and the application
        of cosmetic products that are in the foreground.

135.    Whether these establishments are operated by the respondents
        themselves or by through them contractually authorized third parties is
        irrelevant.

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

136.    That a further spreading of "La Prairie" spas and wellness establishments is imminent is evident from the letter Juvena (International) AG to Mr. Mattli of the 06 Oct. 2006 (<u>enclosure K 32</u>).

137.    In that letter, Juvena offers to Mr. A Mattli that they were willing to buy all rights to the name mark "La Prairie" as well as to the name-device mark "La Prairie" for foodstuffs, dietary foods, and food additives and/or food supplements, respectively at a fair price.

138.    The condition tied to this offer is interesting. The purchase of the above-named brand ("such a solution") was to contain a settlement clause by which was to be assured that A. Mattli and the corporations controlled by him would acknowledge the right of the respondents to the name mark and the name/device mark "La Prairie" for the operation of beauty centers, wellness centers, spas, as well as for the application and the distribution of its products in such establishments, so as to prevent any further arguments.

139.    This is proof that the respondents are about to cover the world with additional "La Prairie" spas and wellness establishments.

## III.    <u>LEGAL CONSIDERATIONS</u>

### 3.1    <u>THE AGREEMENT OF THE 02 JUNE 1995</u>

#### 3.1.1    <u>Division into areas within which each party may use the designation "La Prairie"</u>

##### 3.1.1.1    <u>The distribution according to items 1, 2, and 3 of the Agreement</u>

140.    In item 1, subject of the Agreement, it is stated that this Agreement is in particular to regulate the mutual rights of the parties to the brands listed therein.

141.    According to item 1 Bst. a, e, f, and g of the Agreement, Laboratoires La Prairie SA and La Prairie Inc. (in the Agreement called jointly "LP") have registered brands and a device mark of the old Clinique La Prairie for cosmetic and related products, exclusively.

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

142.    According to item 1 Bst. c and d, on the other hand, Armin Mattli, Clinique La Prairie S.A. and CT-Holding (in the Agreement called jointly "AM") own registered service marks.

143.    Furthermore, according to item 1 Bst. b, AM has registered the product trademark "La Prairie" for foodstuffs, dietary foods, and food additives, and the product trademark "CLP" for cosmetic and related products.

144.    For all the brands mentioned under the letters a to g, reference is made to the corresponding enclosures A - G, which is the "current list" of the registrations made by a party for the corresponding trademark.

145.    According to items 2 and 3 of the Agreement, the parties mutually acknowledge ownership of the individual trademarks listed under item 1 as follows:

146.    a)    The product trademarks ("La Prairie," "LP Cosmétique") as well as the device mark of the old Clinique La Prairie, all for cosmetic and related products (item 1 Bst. a, f, and g) according to the Annexes A, F, and G, are acknowledged by AM as the property of LP.

147.    b)    All services trademarks (item 1 Bst. c and d) according to the Annexes C and D for operating medical and health clinics are acknowledged as being the property of AM.

148.    There is, therefore, a distribution of trademark rights on principle between the parties. LP owns the product trademarks of certain goods and AM is the owner of services to certain services (sic.) (translator's suggestion: probably means .. the owner of service trademarks to certain services).

149.    This principle is breached - in favor of AM - only by the exceptions that LP:

        a)    acknowledges AM's ownership of the product trademark "La Prairie" for foodstuffs, dietary foods, and food additives, according to Annex B (item 3.1, acknowledgement).

        b)    assigns the product trademark "CLP" for cosmetic and related products according to Annex E (item 3.2, assignment) to AM.

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

150.   These exceptions, however, cannot change the principle that the product trademarks LP and services trademarks are allocated to AM.

151.   The reason for the above-mentioned exceptions are AM's rights according to the agreements of 1982 and the hostile measures triggered by the respondents' violations of the agreement, which were taken by the parties in the context of the previous disputes and which subsequently led to lawsuits.

       **BO**: Reserved in case of contestation

152.   These combative measures were revoked to end the quarrel in the context of the Agreement.

       **BO**: Reserved in case of contestation

153.   As it happens, according to item 3.2, LP commits to assign the "CLP" brand for cosmetic and related products according to Annex E to AM. AM, on the other hand, covenants not to use this brand for cosmetic products.

154.   According to item 2, LP commits to not using the "LP Cosmétique" trademark according to Annex G without AM's consent.

155.   The principle that LP owns product trademarks and AM owns services trademarks is in agreement with the contracts of the 03 Dec. 1982 which have since been rescinded.

156.   The exclusive subject (of those contracts) was the sale of the business operation owned by AM for the production and the distribution of cosmetic products under the "La Prairie" brand. This fact is specifically stated in the Recitals to the Agreement.

157.   In combination with the provisions of items 2 and 3, the distribution of the brands into services trademarks of AM and product trademakrs of LP for cosmetics goes way beyond a mere mutual acknowledgment of the ownership of these brands (trademarks).

158.   Due to the sale of the operation for the production and the distribution of cosmetic products on 03 Dec. 1982, the business areas and the corresponding trademarks, which originally were part of a single operation, were distributed among the parties.

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

159.    Under the designation "La Prairie" - except for the production and the distribution of food etc. - services, exclusively are reserved for AM, whereas for LP, the production and the distribution of cosmetics is reserved exclusively.

3.1.1.2    Confirmation of the above-mentioned distribution

160.    This is corroborated by the facsimile of 14 Dec. 1994, which Mr. H. Stolzenberg, at that time the CEO of Lp SA, addressed to Mr. Udo Horstmann, the former consultant to AM.

    **BO**:  Fax from Mr. Stolzenberg of Lp SA to
            Mr. U. Horstmann, representative of AM,
            dated 14 Oct. 1994                          **K 54**

161.    In said fax, Mr. Stolzenberg stated the key items of a possible agreement to settle the existing disputes.

162.    As the most important item 1, Mr. Stolzenberg expressly writes at the beginning of his fax to Mr. Horstmann of 14 Oct. 1994 (enclsoure K 54, p. 1, item 1):

            "There would have to be agreement that the **product trademark**[2] 'La Prairie' belongs to us, exclusively … "

163.    Significatively, there is no mention at all of services in this facsimile.

164.    This understanding of the Agreement is confirmed by AM's commitment contained in item 5.5 of the Agreement, (namely) to use the "La Prairie" brand merely in ways that do not debase the worth of "La Prairie" for Lp or for "the quality of **La Prairie products**"[3]

165.    Under "La Prairie products," the only LP products mentioned in the Agreement are to be understood, that is, cosmetic and related products.

---

[2] Emphasis by the author
[3] Emphasis by the author

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

166.    At this point, there is no mention whatsoever of the worth of the brand for services.

167.    If Lp had had the authority to provide services under the "La Prairie" brand, with all certainty a commitment by AM would have been foreseen so as not to diminish the worth of the "La Prairie" brands for services, either.

168.    That there is no such commitment is proof that only the production and the distribution of cosmetic and related products under the designation "La Prairie" is reserved for LP. Services, however, are in the exclusive sphere of authority of AM.

3.1.1.3    The importance of Annexes A, E, F, and G

169.    Annexes A, E, F, and G to the Agreement (enclosure K 3), consisting of a 39 page listing, not subdivided by Annexes, of the trademarks of Lp SA and Lp Inc., do, indeed, if you inspect them more closely, also contain services trademarks (cf. enclosure K 3, Annexes A, E, F, G, column "Gebkl").

170.    But they are not necessarily easily evident in this list. As it happens, the classes indicated therein do not correspond to the currently valid, international classification (9th edition 2007) into 45 categories. Some of them are even national classifications, the class numbers of which deviate sometimes considerably from those of the international classification.[4] At any rate, several services trademarks can be spotted in said list.[5] Insofar as they are traceable, they refer to services of a beauty parlor.

171.    These services trademarks, however, were not clearly acknowledged by AM.

---

[4]    E.g. p. 1 of the list, Anguilla, national class 42 = international class 3; p.8 Dominican Republic, national class 50 = international class 3; Fidji, national class 48 = international class 3; p. 23, Montserrat, national class 48 = international class 3; p. 50 Thailand, national class 50 = international class ?

[5]    p. 2 Australia, int. class 45 for "beauty salon services;" p. 13 Hong Kong, reg. No. 1993/03157, class 42 "beauty salon services;" p. 19 Canada, registration No. TMA471871 for "services of a beauty salon, …;" p. 23 New Zealand, class 42, "beauty salon services …"

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

172. According to item 2 of the Agreement, AM actually only acknowledges LP's ownership of the **product trademarks**[6] "La Prairie" and "LP Cosmétique" mentioned therein as well as of the device trademark of the old Clinique La Prairie. Furthermore, it is expressly and restrictively stated that these were brands (trademarks) "for cosmetic and related products" in accordance with Annexes A, F, and G. This acknowledgment therefore does not in any way affect the services trademarks listed in the Annexes, but only the product trademarks for cosmetic and related products listed therein.

173. Consequently, the few services trademarks mentioned in the list of Annexes A, F, G, and E do not change the principle in any way, namely that LP may only use the "La Prairie" brand or any trademark derived from it as a product trademark for cosmetic products and AM (may only use it) as a services trademark - except for foods, dietary foods, and food additives.

174. With regard to AM's ownership of the "La Prairie" brand for foodstuffs, dietary foods, and food additives, recognized by LP According to item 3.1, Lp SA furthermore held a very restrictive opinion.

175. In his letter of 25 August 2003 to attorney König (enclosure K 28), attorney Amman happens to claim that the recognition in question was referring only to foods, dietary foods, and food supplements according to Annex B. That the acknowledgment therefore affected only the expressly named foods for which the trademarks listed in Annex B had been registered. Mineral waters, carbonic-acid containing water and non-alcoholic beverages, according to him, are nowhere to be found in this Annex. That for this reason his client was allowed to use the "La Prairie" brand for these beverages.

176. This interpretation isa too narrow.

177. According to item 1, the different Annexes are a "**current**"[7] list of entries.

178. The word "current" means that it is not a matter of a definite listing of the registered trademarks. Rather, it is about the registrations both parties have undertaken so far of the trademarks designated under the letters a - g.

---

[6]    Emphasis by the author
[7]    Emphasis by the author

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

179.    It is logical that the ownership by a person can only be acknowledged for a registered trademark. Registration only conveys to the holder of the trademark an owner-like position. This is why the parties logically can only acknowledge the ownership of the other (party) of trademark rights that have been registered. In turn, however, these are registered in the various Annexes.

180.    Now that does not in any way mean that the holder of the trademark cannot register the trademark mentioned under the corresponding letter of item 1 for other goods and services, than the ones for which the trademarks listed in the Annexes were registered.

181.    As long as the goods and services for which the corresponding trademark is registered correspond to the pertinent category described in one of the letters of item 1, this is wholly admissible.

182.    The opposite view leads to restricting the parties inappropriately and in an inadmissible manner in their freedom of action. This would hinder them in adapting their offers continuously to the sweeping technical and scientific developments, and it might entail ruinous consequences for them,

183.    It is to be emphasized that the barriers which attorney Amman tries to impose on the claimants on behalf of his client, in turn would also be valid for the respondents as a matter of course.

184.    Based on the view advocated by the respondents (i.e. attorney Amman) in the letter in question, according to item 2 of the Agreement, AM also only acknowledges LP's ownership of the various trademarks described in item 1 Bst. a, f, and g according to Annexes A, F, and G. Following the same logic, this would, however, mean that this acknowledgment strictly and in a limiting way only covers the products for which the trademarks expressly listed in the Annexes have been registered. Consequently, LP could thus not sell a single other product under the "La Prairie" brand.

185.    As just shown above, AM has not acknowledged any brands (trademarks) that have possibly occasionally been registered for services and for other products than the cosmetic products pursuant to Annexes A, F, and G.

186.    The opinion of the respondents referred to at any rate clarifies that, without any doubt, LP has no right to provide any services, above all none in the areas of health and well-being.

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

187. Furthermore, this attitude by the respondents undeniably leads to renewed disputes between the parties, because it causes a genuine race between the parties, targeted on having trademarks registered by way of precaution, with the objective of forestalling the other party in obtaining trademark-legal protection of individual goods and services.

188. That the latter is not a mere hypothesis results from the letter by attorney König to attorney Amman of 09 September 2003 (enclosure K 29).

189. Referring to a meeting with att. Amman on 08 Sept. 2003, in the course of which this had evidently been discussed, att. König happens to mention, Lp SA had registered the "La Prairie" trademark for mineral waters etc. merely as a precautionary measure, without there being any respective marketing plans.

190. With regard to the "CPL" trademark, it is also to be borne in mind that the investigating magistrate at the Cantonal Court of Vaud had prohibited Lp SA to use the trademark "CLP" (and "LP Cosmétique") registered by Lp SA in any way.

191. Essentially, the reason given for this decision was that Clp SA had a better right to the designation and the logo "CLP" and that it was unfairly competed with by Lp SA using the "CLP" trademark registered by the latter.

192. In view of this decision, however, the claimants had no interest whatsoever to tie themselves to the use of the CLP trademark.

3.1.1.4    The scope (implications) of the provisions of items 5.5 and 5.6 of the Agreement

193. According to item 5.5 of the Agreement, AM covenants to use the "La Prairie" trademark, or any trademark derived from it or similar to it only to the extent that he has the right to do so pursuant to this Agreement (in particular item 3). But in a restrictive manner it is further added that AM may only use this trademark in a way that its worth will not be diminished.

Translation from the German original

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

194.    It has to be emphasized that according to its - at least in this point - unequivocal wording this provision only concerns the use of the actual brand "La Prairie." It does not at all refer to the general designation "La Prairie."

195.    This follows from the juxtaposition of the provision of item 5.5, according to which talk is expressly of the "brand," with that of item 5.6 which unambiguously is on the general subject of the designation "La Prairie."

196.    The formulation according to which pursuant to the Agreement "(**in particular** item 3)"[8] AM is entitled to the rights in the brand "La Prairie" reveals that item 3 of the Agreement does not circumscribe all rights of AM in this brand, but that still other provisions anchor these rights.

197.    One provision which states such rights is item 5.5 of the Agreement.

198.    There, it is agreed that "AM and consequently the brand 'La Prairie' shall not be used for any goods other than foods, dietary foods, and food additives, nor for any other services than the operation of health clinics."

199.    Expressed in positive terms, this provision means that AM may use the "La Prairie" brand as a product trademark for foods, dietary foods, and food additives and as a service trademark for operating health clinics.

200.    It is easy to explain why, according to item 3, AM's ownership of the service trademark "La Prairie" for medical and health clinics is not recognized, even though AM does have the right to use this brand (trademark) for such services.

201.    Such a trademark was not registered at the time the Agreement was signed. Consequently, no ownership right by AM to this brand could be acknowledged.

202.    Subsequent to AM's obligation to use the "La Prairie" trademark for no other goods than foods etc. nor for other services than the operation of health clinics, a further obligation by AM is established in item 5.5. AM promises that "insofar, he will not object to the registration and the use of the 'La Prairie' trademark by LP."

---

[8]    Emphasis by the author

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

203.    This means that AM must accept that LP uses the "La Prairie" trademark for cosmetics.

204.    This passage, however, does not mean in any way that LP may use this trademark for other products than cosmetics and related products, and for services altogether, and that AM must tolerate that.

205.    As just explained, according to the provisions of items 1, 2, and 3 of the Agreement, a distribution of the business areas between the parties is effected with regard to the designation "La Prairie." To AM pertain services, to LP, on the other hand, the production and the distribution of cosmetics. This principle is merely breached by the special regulation concerning foods, dietary foods, and food additives. For these goods, AM may use the "La Prairie" brand.

206.    The separation of the spheres of activity described above, for which the parties may use the designation "La Prairie," is confirmed in item 5.6.

207.    There, it is stated that the provisions of the Agreement do not in any way restrict the rights of the parties to sell or assist in selling **other**[9] products or services, as long as any direct or indirect reference to "La Prairie" or designations that might be confused with it, (which would be) in contradiction to the Agreement, are impossible.

208.    **Other** products or services can only refer to (products or services) that are not the subject of the Agreement. But the subject of the Agreement are only products and services concerning which an arrangement exists concerning the use of the designation or the trademark "La Prairie."

209.    In this context, these are only cosmetic or related products, foods, dietary foods, and food additives, as well as the operation of medical and health clinics.

---

[9]    Emphasis by the author

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

210.  According to item 5.6 of the Agreement, the designation "La Prairie"
      may be used for such goods and services. Goods and services other
      than the above-mentioned ones, may be sold or provided by the parties,
      but not with reference to the designation "La Prairie" or designations
      that might be confused with it.

211.  The provision of item 5.5. does not contradict this principle. Although in
      it, obligations are imposed on AM only, but not on LP.

212.  AM undertakes to use the "La Prairie" brand only for foods etc., and
      only for health clinics, but not for other goods and services. Any
      obligation to be levied on LP with regard to the use of this brand is,
      however, missing in item 5.5.

213.  The fact that item 5.5 only foresees an obligation encumbered on AM,
      while LP is not subject to any restriction in accordance with this
      provision, must not entice to the conclusion that LP is completely free to
      use the "La Prairie" brand at its discretion for any other goods and
      services, other than foods and the operation of clinics.

214.  If something is forbidden to someone, this does not at all mean that it is
      permitted to the other party, even when this is not explicitly stated.

215.  The judge of the hearing at the Cantonal Court of Vaud has quite
      correctly recognized this with regard to the trademarks derived from the
      "La Prairie" brand (ordinance of the judge at the hearing at the Cantonal
      Court of Vaud, dated 29 June 1993, p. 14, section 1 last sentence,
      <u>enclosure 55</u>).

216.  Based on the same logic - restriction of AM in the use of the "La Prairie"
      brand equals complete freedom for LP to use this trademark otherwise -
      it would in such a case also be completely all right for AM to use all
      other, non-"La Prairie" brands that belong to him according to items 1
      Bst. c - e and 2 of the Agreement, in any way he sees fit.



**NEUPERT & PARTNER**
ATTORNEYS AT LAW

217.    It has to be borne in mind that, according to item 5.5, AM is only subject to a restriction of use concerning the brand "La Prairie," while nothing of that sort is established concerning the other brands that belong to him. Since a restriction has only been stipulated concerning the "La Prairie" brand, based on the same logic in reverse this would mean that he is not subject to any restriction concerning the other brands.

218.    Thus, as an example, AM might use the service trademarks "Clinique La Prairie" and "CLP" for other services than the operation of medical and health clinics, the "Clinique La Prairie" even for merchandise.

219.    The above conclusions can, of course, only be drawn if a restriction in the use of a trademark foreseen in item 5.5 is truly all-decisive. Only then can the above reverse conclusions be drawn from the fact that such a restriction concerning a trademark or a party is missing in this provision.

220.    But the decisive fact is not the provision of item 5.5, but the one of item 5.6. This one does not refer to trademarks only, but in general to the designation "La Prairie."

221.    The provision of item 5.6 says that the designation "La Prairie" may only be used for the products and services foreseen in the Agreement, but not for any other goods and services.


**3.1.2    Buffer zone**

222.    Thus, a sort of buffer zone is established between the parties:

LP is forbidden to use the designation "La Prairie" for

a)    services in general

b)    other goods than cosmetic and related products


AM, in turn, is forbidden to use the designation "La Prairie" for

a)    Services, except for the operation of medical and health clinics

b)    Other goods than foods, dietary foods, and food additives

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

223.    The purpose of this arrangement is to avoid that the parties again disturb each other's preserves and thus quarrel arises again.

224.    Only a distinct division of the areas within which the parties are allowed to use the designation "La Prairie" or similar designations, can reduce this risk to a minimum.

225.    But, logically, the areas which are reserved for the parties for using the designation "La Prairie" must not overlap.

226.    It is the purpose of the above-mentioned buffer zone to prevent any such overlapping.

227.    It is quite obvious that terms such as "cosmetic and related products," "foods, dietary foods, and food additives" as well as "operation of medical and health clinics" are not sufficiently well defined. This is why in individual cases it may be open to question what exactly this entails.

228.    Concluding it is to be said that according to the Agreement, the respondents are not allowed to provide any services with reference to the designation "La Prairie."

**3.1.3    Right of LP to link cosmetic products with Clinique La Prairie in its publicity for cosmetic products**

229.    According to item 4.2, AM grants to LP the exclusive right to refer to the name of Clinique La Prairie and the know-how acquired in the context of cellular therapy in the publicity for cosmetic products which are sold under the name of "La Prairie," and to associate these products to the clinic with certain, predetermined claims.

230.    In the context of the sale of Lp SA on 03 Dec. 1982, a cooperation agreement was concluded between Clinique La Prairie S.A., Armin Mattli, and Aviatrix.

**BO**:    "Cooperation Agreement" between Clinique
La Prairie S.A., Armin Mattli, and Aviatrix
dated 03 Dec. 1982.                                     **K 56**

Translation from the German original

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

231.    In item 1 of this cooperation agreement, A. Mattli and Clp SA granted the right to Aviatrix to establish a link between the clinic and these products in the publicity for "La Prairie" cosmetics.

232.    In fact, this was extremely important for the respondents. This right was, indeed, one of the points of controversy, which led to legal disputes between the parties and were settled by the Agreement of 1995.

        **BO**:  Evidence reserved in case of contestation

233.    Correspondingly, in the fax of 14 Oct. 1994 that Mr. Stolzenberg of Lp SA addressed to Mr. Udo Horstmann, the former consultant of AM (enclosure K 54), he called this right indispensable.

234.    This clearly shows that the respondents were aware of the world-wide fame of the clinic (Clinique La Prairie) and its outstanding reputation. This is why the sale of their cosmetics was to profit therefrom as much as possible, in particular, as is generally well known - special publicity value is to be expected from a reference to the medical use of a product and its scientific origin.

235.    As already mentioned, the name of Clinique La Prairie in the interim has acquired even more brilliance thanks to A. Mattli's intense work and substantial investments.

236.    The right to refer to the clinic has thus become even more valuable for the respondents and thus the temptation to misuse it has too.

237.    In order to protect the reputation of the clinic, exercising the right granted in item 4.2 is conditional on observing certain strict conditions. These conditions have the purpose of protecting the name and reputation of the clinic.

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

238.    According to the provisions of item 4.2, the respondents are prohibited
to relate services in general and goods with clinic La Prairie, except for
cosmetic products.

239.    Any reference to the clinic which violates the rules established in item
4.2 is forbidden, no matter how it comes about, whether in images,
sound, by electronic means or otherwise.

240.    Lastly, the references to the clinic must be truthful, not jeopardize the
reputation of the clinic, and no link must be established between
Clinique La Prairie and products of decorative cosmetics (item 4.3).

241.    As a matter of course, any reference contrary to this basic principle to
Clinique La Prairie is also forbidden, since it gives rise to a risk of
confusion with services of the clinic.

242.    Also, in the distribution of "La Prairie" and other products, no impression
must be given that these were products of the clinic or products
developed by it.

243.    Based on the above statements it follows that the respondents are
contractually prohibited from decorating their wellness installations and
beauty parlors with photographs of Clinique La Prairie, or to refer to the
clinic in their advertising for them in any way (e.g. in leaflets and by
using the device mark with the old Clinique La Prairie).

244.    Such reference not only violates the provisions of item 4.1, and possibly
of item 4.2, but also creates a danger of confusion with the services of
Clinique La Prairie. And lastly, it seriously breaches the mutual trust (cf.
item 3.1.4.1 below).

**3.1.4    Right to use the device mark with the picture of the old Clinique La
Prairie**

245.    In keeping with item 4.2 of the Agreement, according to which goods
other than cosmetic and related products shall not be linked with
Clinique La Prairie, this device mark is to be used exclusively for desig-
nating cosmetic products (cf. item 1 Bst. f in combination with item 2).

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

246.    It would be illogical to admit in item 4.2 the reference to Clinique La Prairie only for cosmetic products, but on the other hand to allow that by using the picture of the old Clinique La Prairie such a reference be established for services and other goods.

247.    Typically, the device mark of the old Clinique La Prairie according to item 1 Bst. f of the Agreement characterizes (indeed) cosmetic and related products.

248.    As proven by the example of the beauty salon in Mexico City, (cf. above item 2.2.5.3) and the "La Prairie" spa in Athens (cf. above item 2.2.5.5), the respondents, however, furnish all their installations where services are provided with the logo of the old Clinique La Prairie.

   **BO**: **Production** of the documentation concerning the appearance and the installations of the establishments operated by the respondents listed in enclosure 53/1-59.

**3.1.4    The interpretation of the Agreement**

3.1.5.1 Cooperation of the parties as one of the objectives of the Agreement

249.    As impressively stated in the Recitals to the Agreement, (the Agreement) deals with the parties' cooperation.

250.    This cooperation refers, of course, to the designation "La Prairie," which had already been foreseen in the set of agreements of 03 Dec. 1982 ("Cooperation Agreement" of the 03rd Dec. 1982, enclosure K 56).

251.    This cooperation is provided for in item 4.1 (Protection and fostering of the name and the prestige of the "La Prairie" brand), 5.1 and 5.2 (Supply of "La Prairie" products to, and use of them by, clinic La Prairie), 5.3 (Notice of the assignment of the "La Prairie" brand to third parties), 5.4 (assignment of the name and the goodwill of Clinique La Prairie free of cost in case of the shutdown of this operation), 5.7 (Right of first refusal to the shares of Clp).

252.    The provision of item 4.1 of the Agreement is particularly important and will be dealt with in greater detail below (item 3.2).

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

253.    In it, the mutual obligation of the parties to defend and increase the prestige and the worth of the "La Prairie" brand is agreed, as well as the abstention from any damage to the latter.

254.    Insofar, the parties take on the obligation of cooperating towards a common objective.

255.    By this, the Agreement also shows the features of a simple company.

256.    A simple company gives rise to the obligation of the partners to be loyal. This obligation manifests itself primarily in a restraint of trade (no competition) (Art. 536 Swiss Contract Law).[10]

257.    It is obvious that the parties must not compete with each other.

258.    For, how should the parties be able to jointly defend and increase the prestige and the worth of the "La Prairie" brand (item 4.1 of the Agreement) with all their efforts, in every regard, if they mutually competed with each other precisely with this brand or, to state it more correctly, with this designation?

259.    It is to be noted here that A. Mattli and the various companies on the selling party quite obviously would not have sold the production operation in the year 1982 if they had have to expect that the buyer, Aviatrix Corp. and/or La Prairie Inc., respectively and the sold corporation were going to compete with them under the sold designation "La Prairie" of all names.

260.    The seller party was entitled to trust that the buyer would refrain from any competing activity under this designation. After all, it had sold a plant for manufacturing and distributing goods, not a service operation.

261.    The Agreement of 02 June 1995 did not change anything in this understanding. Quite contrary, the parties thereby wanted to do away with the dispute existing between them, once and for all. As it was, the dispute had arisen because the parties, gradually more aggressively, competed with each other economically by using the designation "La Prairie" or some designation derived therefrom.

---

[10]    Meier-Hayoz/Forstmoser, Schweizerisches Gesellschaftsrecht, 1. ed. Bern 2007, § 12 N 61 p. 323

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

262.    Therefrom it follows that that the Agreement has to be interpreted in the sense that no restraint of trade ensues from the interpretation.

### 3.1.5.2    Further Objective of the Agreement: Prevention of disputes

263.    The leading idea of the Agreement is to prevent under all circumstances that the parties compete with each other, either by the direct or indirect use of the designation "La Prairie" or any designation that might be confused with it, and thus another dispute arises.

264.    From this objective follows that in case of doubt the party becoming active or having become active in an area that possibly overlaps with the traditional area of activity of the other party will have to desist from such activity. It so happens that this might lead to a competitive situation.

### 3.1.5.3    Interpretation based on name and company law

265.    As shall be further elaborated below (item 3.2), there follows a further rule of interpretation from name and company law.

266.    It says that, in case of doubt, where the wording or the interpretation of the Agreement does not clearly show the right of the respondents to the use of the designation and the brand "La Prairie," the respondents must not use the designation and the brand "La Prairie."

### 3.2    PROTECTION OF THE NAME "CLINIQUE LA PRAIRIE"

267.    The name "Clinique La Prairie" has been in use since the foundation of the clinic in the year 1931.

268.    The name "Clinique La Prairie" became world-famous when Prof. Niehans healed the then terminally ill Pope Pius XII in 1954 by applying the cellular therapy (Schweizerische Ärztezeitung 2002, enclosure K 6).

269.    Thanks to the cell therapy applied at the clinic, but also because of the top-quality, medical services and care, the health-medical spas, and the beauty treatments offered there, the name of Clinique La Prairie in the interim has gained further in fame and reputation (sundry press cuts, enclosures K 20 - 23).

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

270.   With regard to the spa of Clinique La Prairie, this is recognized afar as
       one of the world's most progressive and highest quality spas (List of spa
       distinctions with enclosures, <u>enclosures K 52/1-5</u>).

271.   As just explained, the respondents are fully aware of this. This is why it
       is so important for them to link their products and - inadmissibly - their
       services to Clinique La Prairie.

272.   To assure that the name of Clinique La Prairie does not suffer thereby,
       clear bounds were set, as mentioned above, for reference to the clinic
       by the respondents in the Agreement (items 4.2 and 4.3).

273.   That this is not entirely useless is illustrated by the Ordinance of the
       investigating magistrate of the Cantonal Court of Vaud of 07 Sept. 1992
       in re Clinique La Prairie S.A. vs. Laboratoires La Prairie S.A.

       <u>**BO**</u>:  Ordinance by the investigating magistrate at the Cantonal
             Court of Vaud of 07 Sept. 1992 in re Clinique La Prairie
             S.A. vs. Laboratoires La Prairie S.A.                     **K 57**

274.   By virtue of this Ordinance, Lp SA was forbidden to refer in its
       advertising and leaflets for several of its products to research at
       "Clinique La Prairie S.A.," to its know-how, to its reputation or that of its
       physicians in any way that might cause the impression that these
       products or their composition had been developed by the claimant
       (Ordinance dated 07 Sept. 1992, <u>enclosure K 57</u>, Dispositiv, in
       particular items I and II).

275.   In the same sense did the judge sitting alone at the District Court of
       Uster and the High Court of the Canton of Zurich decide in re Clinique
       La Praries (sic) S.A. against Juvena International AG and Juvena
       Produits de Beauté AG with ordinance dated 11 Sept. 1992 and
       decision dated 26 Nov. 1992,

       <u>**BO**</u>:  Ordinance of the judge sitting alone at the District
             Court of Uster dated 11 Sept. 1992 in re Clinique
             La Prairie S.A. vs. Juvena International AG and Juvena
             Produits de Beauté AG                                     **K 58**

             Decision by the High Court of the Canton of Zurich
             of 26 Nov. 1992 in re Clinique La Prairie S.A.
             vs. Juvena International AG and Juvena
             Produits de Beauté AG                                     **K 59**

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

276. Respondent I and the Juvena companies gave cause for these
ordinances by distributing products, among other things against
cellulite, and falsely claimed in their advertising that these products or
their components had been developed at the clinic (court injunctions,
enclosures K 57 p. 15, K 58, K 59).

277. Another provision of the Agreement also indirectly foresees a protection
of the name Clinique La Prairie.

278. In item 4.1, the mutual obligation of the parties to protect and increase
the prestige and the worth of the brand "La Prairie" is agreed, as well as
the abstention from any detraction thereof.

279. Unlike the impression caused by the wording of this provision, the
obligation of item 4.1 does not have the sole purpose of protecting the
"La Prairie" brand, not at all.

280. The provision of item 4.1 is a consequence of the mutual inter-
dependence of the parties with regard to the designation "La Prairie."

281. This designation is an integral part of the name and the trademark
"Clinique La Prairie" of AM. It is also being used by AM as a trademark
for foods, dietary foods and food additives and, in accordance with item
5.5, may also be used by AM for the operation of medical and health
clinics.

282. On the other hand, the "La Prairie" designation is used by LP as
trademark for the cosmetics manufactured and distributed by LP.

283. If the trademark "La Prairie" suffers, the name and the trademark
"Clinique La Prairie" will suffer and vice-versa. On the other hand, the
increase of the prestige and the worth of the "La Prairie" trademark
increase that of "Clinique La Prairie" and vice-versa. With regard to the
joint designation "La Prairie," there is therefore a mutual dependence of
the parties.

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

284.  The provision of item 4.1, which based on its wording has the protection of the "La Prairie" trademark as a subject, therefore primarily also has the objective of protecting the name and the brand "Clinique La Prairie."

285.  This is all the more necessary as the public barely differentiates, or can differentiate, the (corresponding) legal entities because of the similarity of the designations "Clinique La Prairie" and "La Prairie."

286.  That there is, indeed, a risk of confounding them, is confirmed by Lp SA itself, respondent I, within a trademark contradiction action, which Lp filed against the registration of the trademark CH 555 940 "CLINIQUE LA PRAIRIE" by Clinique La Prairie Franchising SA.

> **BO**: Petition filed by Lp SA on 12 June 2007 in the contradictory lawsuit No. 8977-8978 against the registration of the trademark CH 555 940 "CLINIQUE LA PRAIRIE" by Clinique La Prairie Franchising SA (items 2 and 3 and p. 5 ff.) and order by the IGE of 28 June 2007                          **K 60**

287.  The risk of confusion exists all the more because both companies have their registered offices in Montreux and their business addresses in Clarens (certificates of incorporation, <u>enclosures K 7 and K 8</u>). In the past, Lp SA had its offices in the premises of Clinique La Prairie, but does currently not have any offices, installations or employees in Clarens but trades c/o a trust company.

288.  Clp SA frequently receives correspondence intended for Lp SA.

> **BO**: Mr. Dominique Carrupt
> Mr. Gregor Mattli                          **as witnesses**

289.  Furthermore, the cooperation agreement of the 03 Dec. 1982 already contained a provision (item 1), which essentially matches the one of item 4.1 of the Agreement ("Cooperation Agreement," <u>enclosure K 56</u>).

290.  Although the name "Clinique La Prairie" has been in existence since 1931, it has furthermore been used as the firm name of claimant 2 since the foundation of Clinique La Prairie SA in the year 1951 (cf. certificate of registration concerning Clinique La Prairie S.A., <u>enclosure K 7</u>).

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

**BO**: Ms Monica Jürgens
Mr. Dominique Carrupt                              **as witnesses**

other evidence reserved

291.    Compared to that, the respondent Laboratoires La Prairie S.A. was only incorporated 16 years later, that is, in the year 1977 (cf. certificate of incorporation concerning Laboratoires La Prairie S.A., <u>enclosure K 8</u>).

292.    The name and the style "Clinique La Prairie" therefore enjoy seniority and priority on principle compared to the trademark "La Prairie" and the company Laboratoires La Prairie S.A.

293.    If there were no Agreement, the claimants, or more specifically claimant 2, would therefore have the right, based on their right to the name and to the style "Clinique La Prairie," to have the respondents prohibited from using the trademark "La Prairie" in any way.

294.    But to the extent that according to the Agreement the respondents are allowed to use the trademark and the designation "La Prairie," the claimants are incapable of having such a ban imposed.

295.    The other way around, to the extent that the respondents were not granted any right to use the designation and the trademark "La Prairie" based on the clear wording of the Agreement or its interpretation, they must abstain from using this designation.

296.    From this follows that, in case of doubt, where no right of the respondents to the use of the designation and the trademark "La Prairie" is clearly established, the respondents may not use the designation and the trademark "La Prairie."

297.    It further follows therefrom that the use of the designation "La Prairie" and of the device mark of the old Clinique La Prairie (item 1 Bst. f) for services and goods other than cosmetics, which is not permitted to the respondents by the Agreement, infringes the personal rights of claimant 2.

298.    The same holds true for the unauthorized use of the photograph of the old Clinique La Prairie (actually "Résidence") and the unauthorized reference to the clinic in the advertising for services in general.

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

**3.3**    **THE TERMS "MEDICAL CLINIC" AND "HEALTH CLINIC"**

**3.3.1**    **Services offered at Clinique La Prairie at the time the Agreement was signed**

299.    It is irrelevant what is to be understood by the term "medical and health clinic" or "health clinic."

300.    Rather, it is important what services the clinic did, indeed, provide at the time the Agreement was concluded in the year 1995.

301.    Because at the time the Agreement was concluded, it was doubtlessly discernible for both parties that claimant 2, Clp SA, did under no circumstances wish to limit the area of activity of the clinic at that time by the Agreement.

302.    In this context, it is to be emphasized that the clinic operated a spa at that time, which is to be gleaned from various press reports (enclosures K 20-K 23) and the bulletins of the clinic of the years 1989 - 1995 (enclosures K 15-K 19) (cf. above item 2.2.3).

303.    As mentioned above, already prior to the year 1995, in the year 1988 to be exact, services characteristic of a spa were initiated at Clinique La Prairie (e.g. massages and Beautymed program).

> **BO**: Mr. Dominique Carrupt
> Ms Monica Jürgens
> Mr. Gregor Mattli
> all named above                             **as witnesses**

304.    Beauty care had, in turn, been offered at the clinic since primeval times and this in full cognizance of the respondents.

> **BO**: Mr. Dominique Carrupt
> Ms Monica Jürgens
> all named above                             **as witnesses**

305.    Actually, the Cooperation Agreement between Clinique La Prairie S.A., Armin Mattli, and Aviatrix of 03 Dec. 1982 (enclosure K 56, item 3) already foresaw that AM would use the "La Prairie" cosmetic products within the living cell therapy offered at Clinique La Prairie, and that Lp would supply the products required for that in the previous amounts.

NEUPERT & PARTNER
ATTORNEYS AT LAW

306.    This provision was then taken over into the Agreement (item 5.2).

307.    Furthermore, according to item 4.2 of the Agreement, Lp is allowed to point to the fact that "La Prairie" products for cosmetic purposes are being used at the Clinique La Prairie.

### 3.3.2   Objectified interpretation of the terms medical and health clinic

308.    However, what services were offered at the clinic in the year 1995 is not the only decisive aspect.

309.    It depends on what the parties understood, or could understand, as a medical clinic and health clinic, based on trust and in good faith, from the standpoint of an unbiased and unprejudiced observer under the given circumstances.

310.    Surely these terms included, from the beginning, the entire range of treatments, services, and installations already existing at that time at Clinique La Prairie. Under no circumstance could the respondents reasonably expect the claimants to accept a restriction of the clinic's range of offers upon signing the Agreement.

311.    Furthermore, the sweeping development of medical science and its findings have to be taken into account in this context. In the interest of the patients, an institution such as Clinique La Prairie cannot possibly turn a deaf ear to such developments.

312.    In this context, for instance, the rediscovery of holistic medicine has to be mentioned, which postulates the comprehensive inclusion of all aspects of an illness. In this context, beauty medicine and (plastic) surgery are to be mentioned, which may influence the well-being and the health of the patient in a positive way. Furthermore, the longer life expectancy and the increased need for remaining performing, also in old age, play a role. Further the stronger awareness that a healthy lifestyle and physical exercise may help to prevent disease.

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

313.   This is why any clinic, and especially Clinique La Prairie, which champions primarily "anti-aging," is forced to expand and change its offer of services continuously.

314.   No reasonable person may or will expect it to refrain from doing so, and letting itself be restricted by a petty understanding of the terms "medical clinic" and "health clinic."

315.   And even less so can the respondents expect this. Maintaining and increasing the reputation of the clinic, after all, is in their own interest. The better known the clinic, the more radiant its reputation, the more effective will the admissible reference to the clinic be in their publicity for their products (cf. item 4.2 of the Agreement).

316.   At this point, we may recall that the parties have the obligation of doing everything to defend and increase the prestige and the worth of the "La Prairie" trademark, and in no way to jeopardize it (item 4.1 of the Agreement, enclosure K 3).

317.   This obligation entails that the respondents must not hinder the adaptation of the clinic's services program to the findings and achievements of medicine and health care. The designation "La Prairie" happens to be an integral part of the name and the trademark "Clinique La Prairie." Fostering the reputation of the clinic is therefore simultaneously an increase of the reputation of the trademark "La Prairie."

318.   The obstacles, which LP raised for Clp SA with the registration No. 56176 of the combined name/device mark "Clinique La Prairie and Diagnostic, Health and Beautymed Center" in class 42 in Cyprus, are therefore difficult to understand and narrow-minded.

319.   It happens that it objected to the inclusion of the terms "beauty clinic," "beauty care," "cosmetic treatment," "beauty," and "beauty cures" next to "medical clinics" and "health clinics" in the services listing of the trademark.

| | | |
|---|---|---|
| **BO**: | Letter from att. König to att. Amman of 10 July 2002 | **K 61** |
| | Reply by att. Amman to att. König dated 19 July 2002 | **K 62** |
| | Fax from att. König to att. Amman of 23 July 2002 | **K 63** |

Translation from the German original                                    59/75

NEUPERT & PARTNER
ATTORNEYS AT LAW

| | |
|---|---|
| Letter from att. Amman to att. König of 31 July 2002 | **K 64** |
| Fax from att. König to att. Amman of 07 Aug. 2002 | **K 65** |
| Letter from Lp SA to att. König of 13 Aug. 2002 with enclosure | **K 66** |

320.   This happened even though, as mentioned above, the respondents were very well aware that beauty treatments had been carried out at the clinic forever.

321.   Lastly, it is to be borne in mind that the operation of medical and health clinics under the designation and the trademark "La Prairie" in accordance with the Agreement is reserved for the claimants (items 1, 3, 5.5, and 5.6 of the Agreement).

### 3.3.3   The generally used terms "medical and health clinic"

322.   From the confrontation of medical clinics on the one hand and health clinics on the other, it is evident that a health clinic offers a more extensive range of services than a medical clinic. The term of health clinic includes the one of medical clinic. As is generally well known, medicine ought to serve health. This is why a health clinic offers services and treatments going beyond the range of services offered by traditional medicine.

323.   Although the general meaning of the terms "medical clinic" and "health clinic" is not relevant, let us mention at this place that the term health clinic includes the services of a spa. This is evident from the publicity of various health clinics.

| | |
|---|---|
| **BO**:  Printouts of Internet portals of various health clinics | **K 67 - 72** |

324.   This includes, for instance, walking, Qi gong, massages, relaxation procedures, all types of baths, gymnastics, fitness, massages (sic), solariums, well-being (wellness), acupuncture (cf. enclosures K 67 - 72).

325.   Except for walking and Qi gong, all these services are also provided by Clinique La Prairie.

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

### 3.3.4    The corporate purpose of the parties and their compatibility with medical and health clinics

326.    A spa or a wellness center serves to improve the health and the well-being of human beings. A medical or a health clinic has the same purpose. This is why, merely by common sense, a spa and a wellness center belong to the service scope of a health clinic, and thus to the one of the claimants.

327.    However, what a spa has to do with the corporate sphere of business of the respondents, (namely) the production and distribution of cosmetic and pharmaceutical products of all types (certificate of incorporation, enclosure K 8), is hard to understand.

328.    A wellness center is, of course, well suited to accommodate a stand or - in more contemporary jargon - a "Beauty Counter" or a beauty parlor, where beauty products are being offered for sale.

329.    Via this detour, a - although somewhat artificial - connex to the distribution of cosmetics is created. But this cannot deceive us about the fact that in the "La Prairie" establishments (enclosures K 53/1-59) that are the subject of this indictment, it is evidently no longer the sale of products that has priority. First and foremost, it is a matter of operating spas and about services in the area of health and well-being (wellness).

330.    Consequently, the main source of income in the spas and other wellness establishments or installations operated by the respondents or with their assistance, is certainly not the sale of products but services.

331.    From these facts it follows that the operation of a spa or a wellness center and the services listed in the various requests for legal remedy fall into the sphere reserved for the claimants.

### 3.3.5    Meaning of the term "medical and health clinics" (plural)

332.    It is to be emphasized that, according to the Agreement, the claimants not only are allowed to operate a clinic, but medical and health clinics (plural) under the trademark and designation "La Prairie" as well as under the trademarks mentioned in items 1 Bst. c and d (also items 3.1 and 5.5).

Translation from the German original                                    61/75

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

333.    This means that the claimants may open and operate additional establishments for fostering, maintaining, and restituting health, everywhere on earth, in addition to Clinique La Prairie in Clarens.

334.    The claimants have already made use of this possibility by claimant 2 having opened a spa in Seoul.

**BO**:  Mr. Dominique Carrupt
        Mr. Gregor Mattli                                    **as witnesses**

        further evidence reserved

335.    Thus, the claimants have an interest in having the respondents enjoined from operating spas and similar installations everywhere.

336.    A further reason is the fact that claimant 2 approaches clients all over the world and thus, insofar, a competitive situation exists between them and other health and wellness establishments abroad.

**3.4    CONTRACTUAL COMMITMENT OF THE RESPONDENTS NOT TO PROVIDE ANY SERVICES UNDER THE DESIGNATION "LA PRAIRIE"**

**3.4.1    Contractual obligation of the respondents not to provide services of any kind.**

337.    As explained above, the respondents are not allowed, according to the Agreement, to provide any services under the designation "La Prairie."

338.    This includes that, from the very beginning, they are not allowed to operate any spas, wellness centers and fitness centers and similar installations, and may not provide any massages, beauty treatments and other services.

**3.4.2    Contractual obligation of the respondents, in particular not to provide any services in the area of health and physical and mental well-being**

339.    Even if the Agreement did not hinder them in general terms from providing services, according to this Agreement the respondents would still be prohibited to provide services in the area of therapy, health, and

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

the fostering, maintenance, or restitution of the physical or mental well-being. Such services are contractually reserved for the claimants.

340. This covers all services offered by claimant 2 at Clinique La Prairie, in particular also paramedical services (cf. list of services of Clinique La prairie, <u>enclosure K 49</u>).

341. This is why it is forbidden to the respondents, for instance to provide or offer themselves, or be instrumental in having them offered, under the designation "La Prairie" any type of massages, relaxation procedures, beauty treatments, fitness training, physiotherapy, mental training, acupuncture, thalassic therapy, yoga, steam and other baths (hamams and saunas), water treatments (baths), be it in spas, wellness centers, beauty parlors, or other establishments created for that purpose, or in any other way.

342. If there is any uncertainty as to which party is entitled to provide or operate services and establishments of the same or a similar type as the ones that are the subject of this indictment (<u>cf. enclosure K 53/1 - 59</u>) pursuant to the Agreement, the decision will have to be in favor of the claimants based on the right to the name, the personal right, and the company right (cf. above, item 3.2).

343. As already explained, the main objective of the Agreement consists in hindering the parties from competing with each other under the designation "La Prairie" or any similar designation.

**3.4.3    <u>Contractual obligation to loyalty</u>**

344. As indicated, the parties form a simple company with regard to the increase and the defense of the reputation of the desigantion "La Prairie" (item 4.1 of the Agreement).

345. Consequently, they are bound to mutual loyalty and obliged to refrain from any competition (Art. 536 OR = Swiss Contract Law) by the use of the designation "La Prairie" (cf. above item 3.1.5.1).

346. This also corresponds to a natural, basic obligation also contained in the Agreement.

NEUPERT & PARTNER
ATTORNEYS AT LAW

**3.4.4** (wrongly designated as 3.4.3 in the German text) **Contractual prohibition to use the device mark of the old clinic La Prairie for services**

As has been shown (above, item 3.2), the respondents have no right to use this device mark, neither for services, nor for goods other than cosmetic and related products.

**3.4.5** **Contractual prohibition to establish a reference between services and Clinique La Prairie**

According to item 4.2, the respondents may only refer to Clinique La Prairie in the exactly specified manner and for cosmetic and related products, exclusively, which are not serving for the so-called decorative cosmetics (foundation, powder, lipsticks etc.).

347.    For other products and, in particular, for services in general, this is forbidden for the respondents.

**3.5    VIOLATIONS OF THE AGREEMENT BY THE RESPONDENTS**

348.    The respondents are violating the Agreement by providing services under the designation "La Prairie," either themselves or via third parties, or assist in having them provided, for instance based on licensing or franchise agreements, in the area of therapy, health, and the fostering, maintenance, and restitution of the physical and mental well-being in the form of massages, relaxation procedures, beauty treatments, fitness training, physiotherapy, mental training, acupuncture, thalassic therapy, yoga, steam and other baths (hamams and saunas), water treatments (baths) in various establishments such as spas, wellness centers, or beauty parlors.

349.    Contrary to the allegations of the respondents, this is not merely a matter of selling cosmetics. Rather, the main sources of income are the services provided by the respondents or third parties, but not the sale of cosmetic preparations, which are, so-to-say, a by-product.

**BO**: **Edition**: (production)

a)    the account books (business records) of all establishments listed in enclosure 53/1-59, and possible other establishments operated with the assistance of the respondents under the name "La Prairie"

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

      b)    agreements possibly concluded with the operation (operators?) of such establishments (e.g. licensing or franchising agreements) and the corresponding business records,

350.    Further violations of the Agreement exist, because the respondents not only use the following for cosmetic and related products, exclusively, but for the services just described above

      a)    by using the device mark with the picture of the old Clinique La Prairie;

      b)    by establishing a reference to Clinique La Prairie in their advertising (e.g. also by photographs of the old Clinique La Prairie).

351.    As has been shown, the respondents do not seem to personally operate any genuine spa under the designation "La Prairie" at certain places, at least if looked at from the outside. But on the other hand they do offer massages, beauty, and health treatments in the context of those spas and other installations, something that is equally contrary to the Agreement.

352.    Even in case these spas were possibly not operated by the respondents themselves, they still foster external spas and wellness installations by their presence, their beauty treatments, and partially paramedical and even medical services. The latter, of course, profit from the designation "La Prairie" and the logo, and in some cases from the photograph of the old clinic La Prairie, which is usually displayed at a prominent place near the entrance of the spa or on advertisements.

    By this they promote the competition of a third party by means of the designation "La Prairie" and thereby violate the contractual agreements mentioned above. In addition, they breach item 4.1 of the Agreement, which obliges them to protect the trademark.

353.    The claimants have a contractual claim to the discontinuation of the respondents' behavior, which is contrary to the Agreement. Consequently the requests for legal remedy 2 are to be approved.

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

## 3.6     UNFAIR COMPETITION

### 3.6.1     Unfair actions

354.     The reason why the respondents violate the Agreement by providing themselves services in the area of health and beauty care and wellness under the designation "La Prairie," or have the provided by third parties, or allow that they are provided under this designation, has already been indicated (cf. above "the beauty salon in Mexico City" item 2.2.5.3, "the 'La Prairie' 'Daily Spa' in Athens" item 2.2.5.5, "the current situation" item 2.3).

355.     It has further been shown why the respondents equip the establishments in which these services are provided with the device mark of the old Clinique La Prairie, and why they establish a link between these services and the clinic by means of photographs and texts in leaflets (cf. at the place mentioned above).

356.     What the respondents want is to profit from the worldwide, excellent reputation of Clinique La Prairie as a healing and research center. By this, the establishments operated by them, or with their assistance, under the designation "La Prairie" are given a coat of a good, even medical-scientific reputation.

357.     In this, these operations also and above all profit from the renown of the spa of the clinic, which has repeatedly been distinguished internatio-nally as one of the world's best spas, if not as the world's very best spa.

358.     Thus, they convey the impression to the public that those establishments are operated by, or with the assistance of, Clinique La Prairie.

359.     This is achieved all the more easily since health, wellness, and well-being are associated with Clinique La Prairie, which has been active in these areas with success and over a prolonged period of time.

360.     The risk of confounding Clp SA and Lp SA, existing as such, is thus substantially exacerbated.

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

361.    At any rate, the respondents create an additional risk of confusion with regard to the areas in which each of the parties is active.

362.    Up to now, the consumers' conception related "La Prairie" to luxury cosmetics, whereas Clinique La Prairie appeared as an oasis of convalescence and physical as well as mental relaxation and balance.

363.    With the new spa, "Art of the Beauty" - Center, (or) whatever the establishments operated by "La Prairie" may be called, which is opened by or with the assistance of the respondents, the dividing lines between the traditional areas of activity of the parties are gradually blurred for the public.

364.    The consumer no longer knows who does what.

365.    Admittedly, the Agreement does hold a certain risk of confusion, because it gives the right to both parties to use the trademark and the designation "La Prairie" within certain limits.

366.    As long as a party sticks to these contractually established boundaries, however, it need not worry about this risk of confusion.

367.    But if it transgresses these boundaries, it finds itself in the area of application of the Unfair Trade Act, according to which somebody is acting unfairly whosoever takes measures that are suitable to cause confusion with the goods, acts, services, or business operation of someone else (Art. 3 Bst. d UTA, 367. Cf. also Art. 110 section 3 IPRG).

368.    All these characteristic features - as explained above - are met by the respondents in the present case.

369.    Furthermore, they profit unfairly from the renown of Clinique La Prairie by violating their contractual obligation to loyalty (cf. above, items 3.1.4.1 and 3.4.3).

370.    By their unfair (disloyal) competition with the claimants, the respondents practically make any cooperation between the parties to maintain and increase the reputation of the "La Prairie" trademark (Agreement item 4.1.) impossible and thus jeopardize their reputation and, consequently, that of the clinic.

Translation from the German original

### NEUPERT & PARTNER
ATTORNEYS AT LAW

**3.6.2** __Violation of the economic interests of the claimants and of the__
__reputation of claimant 2__

371.    It is to be emphasized that the respondents' behavior causes a
weakening of the reputation and the position of claimant 2 in
competition.

372.    Clinique La Prairie attracts clients from all over the world, and its visitors
are almost exclusively foreigners.

  **BO**:  Mr. Dominique Carrupt
    Mr. Gregor Mattli                    __as witnesses__
    further evidence reserved

373.    Therefore, there surely exists a competitive situation between the
establishments of the respondents, spread all over the globe, and
Clinique La Prairie.

374.    In addition, the claimants, who are already operating a spa in Seoul,
themselves intend to open additional spas.

  **BO**:  Mr. Dominique Carrupt
    Mr. Gregor Mattli                    __as witnesses__
    further evidence reserved

375.    This is confirmed by Mr. Trappman himself in his letter dated 06 Dec.
2006 to Mr. A. Mattli (enclosure K 47).

376.    It so happens that in this letter it can be read that the respondents are
closely observing A. Mattli's plans to open spas in various cities of the
world.

377.    Furthermore, the spa of Clp SA is a medical spa, of top quality. While
the respondents are profiting from the renown of this spa, this is not true
in reverse. Clp SA does not in any way profit from the almost
innumerable "La Prairie" establishments with which the respondents
cover the earth, or assist in doing so, and in which services in the
wellness area are offered.

378.    Quite contrary, the reputation of "Clinique La Prairie," as one of the
leading and most exclusive spas of the world, with an almost mystical
aura, suffers - something that is obvious - from the sheer, immense

NEUPERT & PARTNER
ATTORNEYS AT LAW

number of "La Prairie" operations of the most diverse kinds, spread everywhere, with which it is being associated.

379.    It has to be underlined that the economic interests and the reputation of claimant 2 are primarily jeopardized by the unfair actions of the respondents. Since A. Mattli controls CT-Holding and this in turn (controls) Clp SA, any immediate damage to Clp SA indirectly also causes damage to claimant 1 and claimant 3.

**3.6.3    Impending further violation**

380.    The spreading of "La Prairie" establishments by the respondents, however, has only just begun. A further wave of expansion is imminent.

381.    This ensues from Mr. Trappmann's reaction to Mr. Mattli's letter of 22 Oct. 2006 (enclosure K 46).

382.    In his reply of 06 Dec. 2006 (enclosure K 47), Mr. Trappmann does not promise in any way to stop wellness activities under the designation "La Prairie."

383.    Quite contrary. After the comment that they were closely observing Mr. Mattli's expansion efforts in the area of spas and wellness, the letter states, black on white, that the respondents themselves have registered the "La Prairie" trademark in various countries, also for services.

384.    This clearly means that the respondents plan to open new wellness or beauty centers.

385.    This is further confirmed by the letter from Juvena (International) AG of 06 Oct. 2006 to Mr. A. Mattli (enclosure K 32).

386.    The offer presented by Juvena in this letter, to purchase the "La Prairie" trademark for foods is tied to the condition that A. Mattli and his companies acknowledge the respondents' right to the name mark and the name-device mark "La Prairie" for operating beauty centers, wellness centers, spas, as well as for the application and distribution of their products in such establishments.

Translation from the German original

NEUPERT & PARTNER
ATTORNEYS AT LAW

**3.6.4** **Interdiction of the imminent violation**

Based on the above-mentioned facts and on Art. 9 secion 1 Bst. a of the UCA, the request for legal remedy 2 is to be approved.

**3.7** **VIOLATION OF THE NAME AND THE STYLE OF CLAIMANT 2**

387. What applies to unfair competition also applies, as explained above (item 3.2), equally to the violation of the name and the style of claimant 2.

388. When the respondents transgress the area within which they have the right, in accordance with the Agreement, to use the designation "La Prarie," they violate the right to the name and style of Clinique La Prairie S.A. (Art. 29, section 2 ZGB [code of civil law], Art. 956 section 2, OR [Swiss Contract Law], if they use this designation (name, style, trademark, business designation or enseigne [device]).

389. As set forth extensively, this is the case here.

390. According to item 9 of the request for legal remedy, the Agreement is subject to Swiss law. The violation of the right of claimant 2 to its name and its style is a direct consequence of the breach of contract. This is why Swiss law is to be applied also in this regard. Additionally, this ensues from Art. 157 section 1 IPRG.

391. Consequently, the requests for legal remedy 1 and 2 are to be approved, also based on the provisions of Art. 29, section 2 of the Swiss Civil Code and Art. 956 section 2 of the OR (Contract Law).

**3.8** **VIOLATION OF THE PERSONALITY OF CLAIMANT 2**

392. As indicated above, the respondents link their services in the health and wellness areas with the operation of claimant 2, Clinique La Prairie.

393. By the parasitical exploitation of the name and the reputation of the clinic, the confusion caused by the respondents concerning the provider of services and their indistinguishability and by violating the economic interests of claimant 2, the respondents violate the personality of claimant 2.

394. It is well known that the legal remedies for protection of the personality may be called up in addition to the lawful measures against unfair

Translation from the German original

## NEUPERT & PARTNER
### ATTORNEYS AT LAW

competition. The economic, commercial reputation of a person is also the subject of protection.

395. Since the violation of the personality of claimant 2 goes hand in hand with a breach of contract, the Swiss law applicable to the Agreement is also to be referred to to sanction the violation of the personality.

396. Consequently, the requests for legal remedy 1 and 2 are also to be approved based on the provisions of Art. 28 section 1, items 1 and 3 ZGB (Swiss Civil Code).

## 3.9    DECLARATORY INTEREST OF THE CLAIMANTS

397. There is a need for the claimants to have the challenged (competitive) behavior of the respondents expressly declared in the "Dispositiv," and not only hidden away in the reasoning of the arbitration award.[11]

398. In order not to hurt the reputation of the trademark and the designation "La Prairie," and not to confuse the public any further, the claimants dispense with the publication of the award for the time being. They do, however, reserve the right to request, in this or any subsequent procedure, that the award be published if this should prove to be necessary.

399. Already with regard to a later publication of the award, the claimants have an interest deserving of protection to have the violation of the contractual rights by the respondents and the unlawfulness of their behavior that has been challenged declared in the arbitration award.

400. Furthermore, at the present time, a lawsuit against the Ritz Carlton Hotel in New York is pending because of the unauthorized use of the designation "La Prairie," the logo of Clinique La Prairie, and its photograph.

   **BO**: In case of contestation, evidence reserved

401. The outcome of the present arbitration procedure will evidently have a prejudicial effect on the lawsuit in New York. After the initiation of the arbitration procedure, said lawsuit has therefore been suspended for the time being - probably at the request of the respondents.

---

[11]    Carl Baudenbacher, Lauterkeitsrecht, Kommentar zum Gesetz gegen den unlauteren Wettbewerb. Basel, Geneva, Munich 2001, N 210 to Art. 9 UCA

Translation from the German original

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

**BO**:  In case of contestation, evidence reserved

402.    The full prejudicial effect, however, is only guaranteed in full if in the "Dispositiv" of the arbitration award it is clearly declared that the behavior of the respondents, which is objected to, violates the Agreement and is unlawful.

403.    In addition, it cannot be excluded that any prohibition awarded by the court of arbitration will have to be enforced abroad without taking recourse to the New York agreement. This will be made easier by a declaration award, which clarifies the disputed matter in generally valid terms, or possibly only made feasible.

404.    This also applies if the claimants, in case of a renewed violation of their rights by the respondents' illicit behavior, were forced to file another claim for the restitution of profits or damages against the respondents.

405.    In this context, it is to be borne in mind that the court of arbitration cannot combine the prohibition requested in the request for legal remedy 2 with the penalty clause of Art. 292 StGB (Swiss Criminal Code) in case of malfeasance.

406.    When entering into business relationships, the potential business partners of the claimants frequently ask whether the business at issue might not disturb the respondents' preserve. To clarify the situation as far as possible, in the past attorneys were mandated to give their legal opinion in each case.

BO:  Mr. Gregor Mattli
Mr. Dominique Carrupt              **as witnesses**
further evidence reserved

407.    In one case, a project actually failed due to the unclear wording of the Agreement. A potential investor withdrew from the project because he feared that it might lead to legal disputes with the respondents.

**BO**:  Mr. Gregor Mattli
Mr. Dominique Carrupt              **as witnesses**
Further evidence reserved

Translation from the German original                                        72/75

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

408.  The claimants, but probably also the respondents, therefore have a genuine interest in clarifying the question at issue be unequivocally clarified for the future in an immediately evident form.

409.  Only a declaration award immediately creates the certainty for an outsider that the question at issue has been judged in a certain sense, independent of the particularities of the concretely judged case.

410.  This is proof of the claimants' interest in a declaration[12]

**3.10    ACTION FOR RESTITUTION OF PROFITS**

411.  Based on Art. 9 par. 3 UWG (UCA) and Art. 28a par. 3 ZGB (Civil Code), claimant 2 has the right to demand that the respondents hand over the profits which they have achieved by their unlawful behavior.

412.  It is, of course, impossible for the claimants to know how large this profit is.

413.  This is why the court of arbitration is to order the respondents to hand over to be put on record

   a)  the business records of all establishments operated by the respondents, or with their assistance, under the name "La Prairie," listed in enclosure 53/1-59 as well as, should the case arise, any other such establishments.

   b)  possible agreements concluded in the context of operating these establishments (e.g. licensing or franchising agreements) and the corresponding business records.[13]

414.  Based on the documents to be presented by the respondents and further evidence, which the claimants reserve to produce later, the *lucrum cessans* (lost profit) is then to be determined at the discretion of the court of arbitration and its restitution to claimant 2 to be ordered.

---

[12]    Baudenbacher, at the place mentioned, N 120 - 122 to Art. 9 UWG (UCA)
[13]    Lucas David / Reto Jacobs, Schweizerisches Wettbewerbsrecht, Bern 2005, Rz 755.

Translation from the German original

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

415.    The remittance of this bill of indictment to the attorneys of the respondents is to be considered a dunning letter for the purposes of Art. 102 par. 1 OR, as of the date of which interest is due on arrears at 5% p.a.

## IV.    PRECAUTIONARY MEASURES

416.    Based on Art. 14 UWG (UCA) and/or in combination with Art. 28c-28f ZGB (Civil Code) as well as on § 110 ZPO (code of civil procedure), the claimants finally request that provisional measures be ordered.

417.    Urgency is always present when a claim could otherwise not be enforced in due time or completely because of the duration of ordinary proceedings, in particular when further injuries are to be feared.[14]

418.    These prerequisites - as shown above - are met. Based on the correspondence from the respondents (letter from Juvena [International] AG to Mr. A. Mattli, enclosure 32, letter from Mr. Trappmann and Ms. Kiessling to Mr. A. Mattli dated 06 Dec. 2006. Enclosure 47) the opening of numerous additional establishments is to be expected; in them, services in the areas of health, fitness, and well-being will be offered under the designation "La Prairie."

419.    It has to be emphasized that the requested, precautionary measures merely have the purpose of maintaining the current state of affairs and the prevention of a future damage.

420.    That there is a risk of a disadvantage due to a change of the current situation, which will not be easily remedied, is also apparent from the above facts.

421.    Part of such a disadvantage would, above all, include a possible market confusion, or the watering-down of the claimants' characteristic mark, since the damage in case of a risk of confusion can never be established with certainty.[15]

422.    The confusion described above (item 3.6.3), caused by the respondents, concerning which business operation provides the services at issue, and concerning the business areas in which each of

---

[14]    David, at the place mentioned, Rz 741
[15]    David, at the place mentioned, Rz 743; Baudenbacher at the place mentioned, N 22 to Art. 14 UWG

**NEUPERT & PARTNER**
ATTORNEYS AT LAW

the parties is active, will be aggravated if the respondents continue with their behavior, which is objected to.

423.    Furthermore, the illicit use, in violation of the Agreement, of the device mark with the old Clinique La Prairie, the picture of the clinic and the reference to the latter in the advertising for services will proceed unhindered.

424.    By that, and due to the use of the designation and the trademarkt "La Prairie," the wrong impression will continue to be maintained, or even be strengthened, for an indefinite period of time, (the impression) that the establishments in question are operated by, or at least with the assistance of, Clinique La Prairie.

425.    If no precautionary measures are taken, this allows the respondents to continue pushing ahead with their expansion plans, profiting in a parasitic way from the reputation of the clinic. In such a case, however, with the – for the respondents – reassuring thought that they are perfectly well allowed to do so - because no opposing, precautionary measures were taken.

426.    The damage thereby caused to the claimants and the profit, which the respondents thereby obtain, will only be assessed approximately and with great expense.

427.    This would doubtlessly cause a disadvantage that cannot easily be put right again.

428.    This is why the request for measures is to be approved.

In summary it is to be retained that all claims of the claimants are justified, and that the requests for legal remedy presented at the beginning are to be approved.

With kind, collegial regards,

(signed)

Alexander Faber