**M&L**

# MEYER LUSTENBERGER
### RECHTSANWÄLTE — ATTORNEYS AT LAW

Dr. Ferdinand Meyer °
Dr. Thomas Lustenberger, LL.M.
Corinne Sieger-Ronner, lic.iur., LL.M.
Dr. Marcel Lustenberger
Dr. Martin Ammann, lic.oec., LL.M.
Dr. Christoph Heiz, LL.M.
Dr. Armin Zucker
Dr. Michael Ritscher, LL.M.
Patricia Guerra, lic.iur., LL.M., NY Bar
Prof. Dr. Urs Behnisch
Dr. Alexander Vogel, LL.M., NY Bar^
Dr. Thomas Ladner
Dr. Wolfgang Müller MBA
Dr. Walter Häberling, LL.M.
Dr. Reinhard Oertli, LL.M., NY Bar
Dr. Adriano Marantelli, LL.M.°
Rolf Hänni, lic.iur.
Dr. Daniel Schär°
Dr. Harald Maag, lic. rer. publ.
Dr. Daniela Koenig, LL.M.
Andrea Sieber, lic.iur., LL.M.
Daniel Schoch, lic.iur., LL.M.
Dr. Barbara K. Müller, LL.M.
Erich Herzog, lic.iur.
Laurence Ruckli, lic iur.
Dr. Simon Holzer
Daniel Bill, lic.iur.³
Christophe Steiger, lic.iur.
Silvia Margraf, lic.iur.^
Annette Widmer Schietinger, lic.iur. *
Dr. André Ruchin
Tobias Kunz, lic.iur.
Guillaume Fournier, lic.iur.
Dr. Peter Schramm°
Thomas Kälin, lic.iur.
Marco Meili, lic.rer.pol. et lic.iur.
Beat Dubs, lic.iur.
Dr. Urban Hulliger

Prof. Dr. Karl Spühler °
G. Hans Moede ° *
Dr. oec. Manuel Vogel ° ° *

**Registered letter**

Herr RA Dr. Bernhard F. Meyer
MME – Meyer Müller Eckert Partner

Herr Prof. Dr. Peter Nobel
Nobel & Hug Rechtsanwälte

Frau Dr. Magda Streuli-Youssef
Walder Wyss & Partner

Zürich, December 19, 2007

**Dr. iur. Martin Ammann, lic.oec., LL.M.**
martin.ammann@ml-law.ch

**Dr. Marcel Lustenberger**
marcel.lustenberger@ml-law.ch

**Statement of Defense**

Mr. President
Ladies and Gentlemen Arbitrators

In re

**Armin Mattli**
Rosenhof 4, 8808 Pfäffikon

**Claimant 1 and cross defendant 1**

**Clinique La Prairie S.A.**
Rue du Lac 101, 1815 Clarens

**Claimant 2 and cross defendant 2**

**CT-Holding SA**
Route Principale 25, 1796 Courgevaux

**Claimant 3 and cross defendant 3**
together hereinafter the Claimants

all represented by Me. Pierre Schifferli, 8, avenue Jules-Crosnier, 1206
Geneva and RA Dr. iur. Alexander Faber, Dufourstrasse 58, 8702 Zollikon

versus

**Laboratoires La Prairie S.A.**
c/o Fiduciaire Winkler, rue du Lac 101, 1815 Clarens

Eingetragen im Anwaltsregister
des Kantons Zürich
^ Eingetragen im Anwaltsregister
des Kantons Zug und Notar in Zug
° Konsulent
° Dipl. Steuerexperte
^ Zugelassen in Deutschland
* Nicht als Rechtsanwalt zugelassen

Zürich

Forchstrasse 452
Postfach 1432
CH-8032 Zürich
Tel. +41 44 396 91 91
Fax +41 44 396 91 92
zurich@ml-law.ch

Zug

Grabenstrasse 25
CH-6340 Baar/Zug
Tel. +41 41 768 11 11
Fax +41 41 768 11 12
zug@ml-law.ch

Genf

In Assoziation mit
Croisier Gillioz & Associés
61, rue du Rhône
Case Postale
CH-1211 Genève 3
mail@cglaw.ch

www.meyerlustenberger.ch

**Respondent 1 and cross claimant 1**

**La Prairie Inc.**
680 Fifth Avenue, New York, N.Y. 10019-5429, USA

**Respondent 2 and cross claimant 2**
together hereinafter the Respondents

both represented by RA Dr. Martin Ammann and RA Dr. Marcel Lustenberger, Meyer
Lustenberger Attorneys-at-Law, Forchstrasse 452, P.O.Box 1432, 8032 Zürich

concerning

**Ascertainment, Injunction, Claim**

in the name and on behalf of the Respondent, we herewith file the

## STATEMENT OF DEFENSE

with the following

### Request for legal remedy:

1.    *That the Claimants' request for arbitration be dismissed in full;*

2.    *That the Claimants' request for ordering precautionary measures be dismissed in full;*

3.    *All with consequential costs and compensation to be imputed to and with joint and several liability of the Claimants;*

and at the same time, in the name and on behalf of the Respondents, we file the following

## COUNTERCLAIM

with the following

### Request for legal remedy:

1. *That the Claimants be forbidden to market and advertise, either themselves or through third parties, any cosmetic products with reference to the trademark LA PRAIRIE, or to any trademark containing the brand name LA PRAIRIE, in particular the trademark CLINIQUE LA PRAIRIE;*

2. *All with consequential costs and compensation to be imputed to and with joint and several liability of the Claimants.*

**Index**

| | | |
|---|---|---|
| I. | Formal aspects | 6 |
| II. | Provisional Measures | 7 |
| 1. | Basis | 7 |
| 2. | Foundedness of the main claim | 8 |
| 3. | Impending prejudice, not easily to be remedied | 9 |
| III. | Facts of the case | 11 |
| 1. | The time prior to 1995 | 11 |
| 2. | The Agreement between the Claimants and the Respondents of June 2, 1995 | 20 |
| 2.1 | Preliminary remarks | 20 |
| 2.2 | Grammatical interpretation of the Agreement | 20 |
| 2.2.1 | Re item 1 | 20 |
| 2.2.2 | Re item 2 | 22 |
| 2.2.3 | Re item 3 | 24 |
| 2.3 | Re item 4 | 25 |
| 2.4 | Re item 5 | 27 |
| 3. | The period after June 2, 1995 to date | 30 |
| 4. | Facts of the case re the Respondents' contingent position | 39 |
| 5. | Facts of the case concerning the cross-action | 40 |
| IV. | Comments on individual points of the Claimants' statement of facts | 42 |
| V. | Legal aspects | 44 |
| 1. | Protection of the name "Clinique La Prairie" | 44 |
| 2. | Contractual obligations of the Respondents | 45 |
| 3. | Unfair competition | 45 |
| 4. | Claimants' interest in a declaratory award | 45 |
| 5. | Claim to surrender of profits | 47 |

## II.    Provisional Measures

### 1.    Basis

10    The Claimants request provisional measures "based on Art. 14 UWG and/or in combination with Art. 28c. - 28f. ZGB as well as on § 110 ZPO" that provisional measures be ordered by the Court of Arbitration (SK item 416). With regard to provisional measures, Art. 14 UWG refers to Art. 28c - 28f. ZGB. In accordance with Art. 28c ZGB the party that establishes proof beyond reasonable doubt that his/her/its personality has been unlawfully violated, or has to fear that such violation might be forthcoming, and if such violation would threaten to cause such party a disadvantage not easily to be reversed, may request provisional measures.

11    Pursuant to §110 ZPO, the court will take the appropriate provisional measures, if prima facie evidence is provided that one of the parties might suffer a disadvantage not easily to be reversed, in particular by a change of the current situation.

12    The extent and the individual effects of the right of relief are determined – for rights founded in federal civil law – in accordance with federal law. Thus, also the question whether and in what manner temporary protection has to be granted by provisional measures, therefore also has to be answered in accordance with federal law (Vogel/Spühler, Grundriss des Zivilprozessrechts, 8. Aufl. Bern 2006, p. 353 N 205).

13    The federal legislator has uniformly regulated the admissibility and prerequisites for various fields of law (cf. ZGB 28c, UWG 14, MSchG 59 etc.).

14    Essentially, the Claimants raise the claims of violation of rights to trademarks, unfair competition, and violation of personal rights.

15    In all these cases, to pass provisional measures, the Claimants will have to satisfy the court of the following prerequisites:

    a)    Foundedness of the primary grounds of the action, as well as

    b)    an imminent, not easily remedied disadvantage (prejudice).

16    Within a forecast of prejudice (Vogel/Spühler, a.a.O., S. 355 N 210), the court of arbitration will have to consider:

•    whether the prejudice of the Claimants, which threatens if the Claimants win the main procedure, but cannot enforce it because the provisional measures were rejected, is overwhelming, or (whether)

**REASONS**

## I.    Formal aspects

### 1.    General

1    The undersigned are duly empowered.

    **BO:**    Power of attorney of December 17, 2007    **Enclosure 1**

2    The arguments of the Claimants in the Statement of Claim dated November 5, 2007 ("SK") are contested unless expressly acknowledged hereinafter.

3    The Respondents offer legally sufficient proof of the statement of facts, insofar as the burden of proof lies with them. Further evidence is reserved.

4    The Respondents acknowledge the competence of the court of arbitration called in.

5    Also, the cross-action lodged herewith by the Respondents is a dispute resulting from the Agreement of June 2, 1995 (SK-enclosure 3, item 10.2). According to §117 ZPO (Code of Civil Procedure) it is to be filed together with the Statement of Defense.

6    The Respondents and Cross Claimants shall hereinafter be referred to as the Respondents; the Claimants and Cross Respondents shall be called the Claimants.

7    The value in dispute in the current proceedings can be circumscribed as follows at the present time:

| Claimants' claim | Declaratory action and injunction: | in excess of CHF 10 million |
| | Claim for damages: | CHF 10 million |
| Cross-action | Injunction: | more than CHF  1 million |

8    The Respondents' enclosures shall be numbered as Enclosure 1 etc.

9    Due to the insecurity caused in the market by the Claimants' course of action, it is of the utmost importance for the Respondents that the present arbitration be concluded as quickly as possible. To prevent the current proceedings from running to excess, the Respondents therefore have restricted their counterclaim to a certain behavior by the Claimants. However, the Respondents expressly reserve their right to assert further violations of the Agreement by the Claimants and claims against the Claimants in a separate arbitration procedure. The Respondents therefore reserve their comprehensive right to file subsequent claims.

- the prejudice of the Respondents (predominates) which the latter suffer if they win the main procedure, but are restricted in the exercise of their rights for the duration of the proceedings due to the provisional measures.

## 2.   Foundedness of the main claim

17    The following statements show in summary that the claims set forth by the Claimants in the current arbitration procedure are nonexistent.

18    Decisive for the appreciation of the request for legal remedy of the Claimants are not their absolute rights (trademark rights, personal rights) and not the rightness of their intentions, but the Agreement undisputedly concluded between the parties in 1995 by which the parties regulated the use of the trademark LA PRAIRIE.

19    Correspondingly, the Claimants essentially reproach the Respondents for allegedly violating the Agreement of June 2, 1995 (cf. Claimants' enclosure 3) for distributing not only cosmetic products under the tradename LA PRAIRIE, but by operating spas also offering services in the area of health care allegedly reserved exclusively for *Clinique La Prairie* (SK p. 11, bottom).

20    But this reproach has no grounds in the Agreement of 1995. That Agreement had been preceded by the sale of all rights to the brand LA PRAIRIE by Claimant 1 to Respondent 2 in the year 1982 within which Claimant 1 merely reserved the right, firstly, to continue to operate clinics under the designation *"Clinique La Prairie"*, and, secondly, to manufacture and distribute foodstuffs, diet and food additives under the LA PRAIRIE trademark (cf. RZ 42, in particular RZ 57).

21    There was never any mention of a general prohibition, enjoining the Respondent from using the LA PRAIRIE trademark for services outside of clinics, neither in 1982, nor in the Agreement of 1995, even though at that time service marks could be protected and a limitation of the use of the LA PRAIRIE trademark for services was expressly foreseen in the Agreement. Thus, the Claimants covenanted in Art. 5.5 par. 1:

> (...) *"not to use the "La Prairie" trademark for any other goods than foods, diet foods and food additives, nor for other services than the operation of health clinics" (cf. RZ108).*

22    Thus, there is no basis for the claims raised by the Claimants in the present procedure.

23    That the comprehensive distribution between the use of the trademark LA PRAIRIE for products on the one hand and services on the other hand as contended by the Claimants herein is not correct, is thus not only (disproved) proven by the text of the Agreement and its interpretation in the light of the previous history and the general principles, but also by the following three circumstances:

    i.   As expressly confirmed in Art. 3 of the Agreement of 1995, ownership of the service mark LA PRAIRIE resides in the Respondents (cf. RZ 95 ff. hereinafter).

    ii.   Even before the Agreement of 1995 was concluded, the Respondents already provided services under the trademark LA PRAIRIE (cf. RZ 65 f hereinafter), which has been protected also for services since 1989.

    iii.   Also, after concluding the Agreement of 1995 to this date, the Claimants never objected to the Respondents' continuing to offer, and to an increasing extent, not only products but also services under the trademark LA PRAIRIE (cf. RZ 123 hereinafter).

24    Even if it were assumed that the Agreement of 1995 contained an injunction against the Respondents, prohibiting them from using the trademark LA PRAIRIE for the *"operation of medical and health clinics,"* the Respondents would never have violated this injunction because they have always used the trademark LA PRAIRIE only in the context of operating spas or wellness centers (cf. RZ 129 ff.).

### 3.    Impending prejudice, not easily to be remedied

25    It is, of course, hypocritical if the Claimants maintain that the subject of the requested provisional measures is *"merely maintaining the existing situation and the prevention of a future damage."* (SK item 419).

26    As a matter of fact, the Claimants want to achieve the claim raised in the main procedure, (prohibition of the designation "La Prairie") by means of the requested provisional measures at once, i.e. already for the duration of the arbitration proceedings. This is why the claim for legal remedy item 2 (SK S. 4 ff.) of the main action happens to be identical with the request for ordering provisional measures (SK p. 7 ff. item 4), (except for the requests being introduced with *"Newly"*).

27    In case of such a performance measure, the requirements for meeting the above-mentioned prerequisites for issuing a provisional measure are to be set particularly high.

28    In this context, it is to be stated initially, that the Claimants have not substantiated the alleged, imminent, not easily remedied prejudice in a legally sufficient manner. An overall reference in SK item 420 to the *"above-mentioned facts"* is insufficient in this regard.

29    Also the sweeping reference to *"a possible market confusion or the watering-down of the Claimants' distinctive marks"* (SK item 421) is not sufficient (HGer ZH of the 12 Nov. 2002 in sic! 2004, 947 ff; BGer of the 14 May 2007, 4C.52/2007). In SK item 422 the Claimants refer to SK item 3.6.3. But there, it is not a matter of an alleged market confusion but of allegedly imminent further violations by the Respondents by (opening) further "La Prairie" establishments.

reputation vis-à-vis the Ritz Carlton, but also in the entire market. All the more so because the Claimants have already placed information on said lawsuit against the hotel Ritz Carlton in the Internet and it is correspondingly to be assumed that they would also widely spread any decision for measures by the court of arbitration (cf. to this RZ 149).

37    Lastly, it is to be borne in mind in this context that the Claimants have taken their good old time with filing the present action. The Claimants have tolerated the behavior of the Respondents which is allegedly in violation of the Agreement for more than 10 years without taking action against it (cf. RZ 123 ff below). Correspondingly, there is no urgency, and even less a necessity, to enforce the alleged claims by the Claimants already within the framework of the action for measures.

## III.    Facts of the case

## 1.    The time prior to 1995

38    *Clinique La Prairie* in Clarens on Lake Geneva has been in existence since the 1930s. In this medical clinic, a cell therapy has been applied for decades in which cells obtained from living sheep fetuses are injected into the patient.

39    Clinique La Prairie SA (hereinafter "CLP SA"), with registered office in Montreux and domicile in Clarens, was incorporated in the year 1952. The corporation's purpose is the operation of *Clinique La Prairie.*

40    In the mid-70s, Mr. Armin Mattli (hereinafter "A. Mattli") acquired CLP SA and thus *Clinique La Prairie.*

41    Shortly thereafter, in 1977, A. Mattli incorporated the "*Laboratoires La Prairie S.A*". (hereinafter "LP SA"), also with registered office in Montreux and domicile in Clarens (this is Respondent 1 in the present case). The purpose of this corporation is the manufacture and distribution of cosmetic and pharmaceutical products. Evidently, A. Mattli wanted to make better commercial use of the business success and the reputation of *Clinique La Prairie* by producing and distributing cosmetic products in the sale of which the relationship to *Clinique La Prairie* is used as an advertising argument. Initially, the products of this corporation contained extracts of living cells such as they are also being used in *Clinique La Prairie.*

42    Only 5 years later, that is on December 13, 1982, A. Mattli sold all 4000 bearer shares of Laboratoires La Prairie S.A. to the US company Aviatrix Corporation. Shortly after concluding the sales agreement, at the end of December 1982, Aviatrix Corporation changed the company name to La Prairie Inc.; thus, the buyer of that time is the current Respondent 2.

43    Decisive for the present legal dispute is the fact that Respondent 2, with the purchase of all shares of LP SA, acquired this company as a whole, with all its assets and liabilities.

30    The Claimants' reproaches peak in the allegation that, without the ordering of the requested provisional measures, the Respondents could *"continue to push their expansion plans unhindered, profiting in a parasitical manner from the reputation of the clinic"* (SK item 425). Here, the Claimants evidently misjudge their position on the world market and distort the facts.

31    In 1991, the La Prairie Group achieved with its products and fewer than 200 employees in only a few countries sales of less than CHF 50 million. In 2007, it achieved in 82 countries, i.e. practically worldwide, with more than 1',000 employees sales of more than CHF 300 million. In addition, LA PRAIRIE products are being sold by more than 30 airlines and numerous duty-free shops and travel-retail markets. To achieve this commendable sales growth, the Group has invested more than CHF 1 billion since 1991 in the development of the trademark LA PRAIRIE now well known the world over.

32    Contrary to the beginnings (cf. RZ 60 ff.), at present it is the Claimants who are, without doubt, profiting from the renown of the LA PRAIRIE brand and do not shrink back from trying to increase their share in the pie by instituting legal proceedings, also against clients of the Respondents (cf. RZ 144).

33    Should the court of arbitration, contrary to expectation, sanction the Claimants' main request, it would certainly be possible to ascertain the damage caused to the claimants prior to the instigation and for the duration of the present proceedings and the profits earned by the Respondents in an allegedly unlawful manner. Nobody will seriously doubt the corresponding soundness of the Respondents. For this reason, there is no imminent damage that could not easily be repaired.

34    On the other hand, if the requested, provisional measures were issued, and thus an injunction against the Respondents to provide services in new spas and/or wellness centers using the trademark LA PRAIRE, or having them provided by its contractual partners, respectively, it would not be possible to subsequently assess the damage caused to the Respondents by the prohibiting measures.

35    In particular, it would not be possible to ascertain the volume of sales with LA PRAIRIE products that could not be achieved in the spas and/or wellness centers running under the LA PRAIRIE trademark because of the precautionary injunction. The same applies to the corresponding services.

36    The very circumstance of the Claimants having filed an action in the USA against the hotel *Ritz Carlton* in New York (cf. to this RZ 147) (which they typically do not mention in any way in their statement of claims!) and pretending that the Respondents are violating the rights of the Claimants resulted in the Ritz Carlton hotel chain freezing all further cooperation projects in the area of spas/wellness centers until the award in the present procedure is available. Thus, not only a material damage is at stake, but in particular also the reputation of the Respondents as trustworthy business partners, whom you can rely on. Ordering the requested precautionary measures would not only jeopardize this

Thus, not individual trademarkt rights were assigned in 1982, but all brands (trademarks) of the company were acquired qua purchase agreement.

44      At the time of purchase in the year 1982, LP held the following trademarks:

| Trademark / No. | Country | Goods and services claimed |
|---|---|---|
| P La Prairie<br>2P-289 967 | Switzerland | Cosmétiques, huiles essentielles, parfumerie, savons. |
| LA PRAIRIE<br>1 150 741 | USA | Topical Cellular Based Cosmetics-Namely, Day Cream, Night Cream, Anti-Wrinkle Cream, Mask, Beauty Milk, Cellular Body Treatment Cream and Cellular Neck Treatment Cream. |
| LA PRAIRIE<br>1 564 650 | Japan | buckles of metal<br>pedicure sets, manicure sets<br>personal ornaments (other than cuff links), cuff links, purses and wallets of precious metal, semi-wrought precious stones and their imitations, powder compacts of precious metal bags and the like, pouches and the like, vanity cases (sold empty)<br>cosmetic and toilet utensils (other than electric toothbrushes)<br>belts for clothing<br>armbands, buckles for clothing (clothing buckles), brooches for clothing, ornamental stickers for front jackets, hair ornaments, buttons and the like, artificial flowers (other than artificial garlands and wreathes) |
| LA PRAIRIE<br>80/2383 | South Africa | soaps, perfumery, essential oils, cosmetics, hair preparations and other toiletries. |
| LA PRAIRIE<br>(in Katakana)<br>1 739 659 | Japan | personal ornaments (other than cuff links), cuff links, purses and wallets of precious metal, semiwrought precious stones and their imitations, powder compacts of precious metal bags and the like, pouches and the like, vanity cases (not fitted)<br>belts for clothing |
| LA PRAIRIE<br>(in Katakana)<br>1 735 144 | Japan | soaps, dentifrices, cosmetics and toiletries, perfumery |
| LA PRAIRIE SWITZERLAND & Clinic device<br>Number unknown | Fiji | cosmetics, essential oils, perfumery, soaps |
| LA PRAIRIE SWITZERLAND & Clinic device<br>Number unknown | Lebanon | cosmetics, essential oils, perfumery and soaps |
| LA PRAIRIE<br>TMA 303 685 | Canada | cosmetics, namely, skin care preparations.<br>Extension application No. 478267-1 of the |

| Trademark / No. | Country | Goods and services claimed |
|---|---|---|
| | | 18.03.2005: hair care preparations |
| LA PRAIRIE SWITZERLAND & Clinic device<br><br>Number unknown | Gambia | cosmetics, essential oils, perfumery, soaps |
| LA PRAIRIE SWITZERLAND & Clinic device<br><br>Number unknown | Taiwan | perfumery, cosmetics, preparations in the form of creams, lotions, emulsions and concentrates for protection, care and treatment of the skin, sun care products, deodorants and anti-perspirants for personal use. |
| LA PRAIRIE<br><br>257 735 | Paraguay | All goods of the international class 3 |
| <br>1 267 918 | USA | Prints and Publications - Namely, Catalogs and Brochures Concerning the Applicant's Products and Services. |
| la prairie<br>1 268 605 | USA | Prints and Publications - Namely, Catalogs and Brochures Concerning the Applicant's Products and Services. |
| la prairie<br>1 334 997 | USA | Topical Cellular Based Cosmetics-Namely, Day Cream, Night Cream, Anti-Wrinkle Cream, Mask, Beauty Milk, Cellular Body Treatment Cream and Cellular Neck Treatment Cream. |
| <br>TMA 306 294 | Canada | Cosmetics namely skin care preparations. |
| la prairie<br>TMA 306 295 | Canada | Cosmetics namely skin care preparations. |
| la prairie<br>TMA 317 637 | Canada | Printed publications, namely, brochures, catalogues, booklets and pamphlets. |
| LA PRAIRIE<br><br>Number unknown | Japan | soaps and detergents, dentifrices, cosmetics and toiletries, natural perfumery made from plants, natural perfumery prepared from animal extracts, synthetic perfumery, compound perfumery, food flavorings prepared from essential oils, incenses and fragrances |
| LA PRAIRIE<br><br>Number unknown | Japan | soaps and detergents, dentifrices, cosmetics and toiletries, perfumery and incenses |

45    These trademarks were part of the assets of LP SA, that is, the present Respondent 1, and - as mentioned before - got into the domain of the buyer, the present Respondent 2 via the ownership of the shares. They therefore definitely exited from the sphere of ownership of A. Mattli.

46    The above-mentioned trademarks laid claim to protection for goods. The terms of the lists of goods conform with the Treaty of Nice on the international classification of goods and services for entering trademarks, revised in Geneva on May 13, 1977 (SR 0.232.112.9).

47    This international classification of goods and services for entering trademarks (trademark classification) has been contractually determined in an agreement concluded at the diplomatic convention of Nice on June 15, 1977, revised in Stockholm in 1967 (Stockholm version) and in Geneva in 1977 (Geneva version), modified in 1979. The international trademark classification is based on the classification elaborated by the "Bureaux Internationaux Réunis pour la Protection de la Propriété Intellectuelle" (BIRPI) - the predecessor of the WIPO – in the year 1935. This classification, which consisted of a distribution into 34 classes and an alphabetical list of the goods, was taken over by the Treaty of Nice and later extended by a classification of eleven services classes (1957) and an alphabetical list of these services. Class 42 was revised and classes 43 to 45 were newly created (2000). For Switzerland, the Nice classification only entered into force on April 22, 1986 (for the USA on February 29, 1984, and for Japan on February 20, 1990; the other countries mentioned in the table at RZ 44 have not ratified the Nice Treaty).

48    In Switzerland, the possibility of claiming protection with trademarks also for services was only introduced with the revised Federal Act of August 28, 1992 on the protection of trademarks and marks of origin (Trademark Act, MSchG) (SR 232.11), which entered into force on April 1, 1993. Thus, there had not been any actual services marks at the time of the acquisition of the above-named company, in the year 1982.

49    Thus it is clear that in **1982 all rights of the LA PRAIRIE** brand **passed over**, via the stock ownership, from Respondent 1 **to Respondent 2** and that, besides the Respondents, nobody owned trademarks with the integral part "La Prairie" and that nobody else (incl. Claimants) held any more rights to the trademark LA PRAIRIE.

50    The above-mentioned sale of stocks of 1982 was combined with a "**Cooperation Agreement**" in which A. Mattli personally as well as Clinique La Prairie SA by agreement granted to the buyer (that is Respondent 2) among other things also express permission to use **the name of Clinique La Prairie as a reference** in their advertising and distribution of the products.

> **BO:**    Cooperation Agreement between Clinique La Prairie S.A. and Armin
> Mattli on the one hand and Aviatrix Corp. on the other of Dec. 3, 1982     **enclosure 2**

51    According to item 1 of this Cooperation Agreement, Respondent 2 was expressly dispensed from having to get any previous approval for advertising material using this reference.

52    In item 9 of this Cooperation Agreement it was then expressly stated that the "*benefits*" of this Agreement also applied to "*affiliated companies*" of the buyer. In the present case, Laboratoires la Prarie SA (that is, the "subject of purchase" of that sale, i.e. the present

Respondent 1) is, without doubt, such an "*affiliated company*" for whom these benefits also apply.

53    Furthermore, the above-mentioned sale transaction was combined with a **written declaration of guarantee by A. Mattli** personally to the buyer. Letter G of this declaration of guarantee – which the Claimants typically did not present to the court of arbitration – has the following wording:

> "G. So long as you or any of your affiliated companies are actively utilizing the LA PRAIRIE trademark, or any derivation thereof, or any trademark, service mark or trade name similar thereto, neither I, nor any entity of whose capital or capital stock I have a share of 5% or more, directly or indirectly, will use the LA PRAIRIE trademark or any derivation thereof, or any trademark, service mark or trade name confusingly similar thereto, except (i) in a manner which does not dilute the value of such trademark to you or your affiliated companies or the quality connoted thereby of the products to which such trademark is affixed, as the trademark for foods, diet foods and food supplements, and (ii) as the name of the Clinique La Prairie."

54    For the current dispute it is of importance that the subject of this declaration is, in general and comprehensively, the "*LA PRAIRIE trademark, or any derivation thereof, or any trademark, service or trademark or trademark similar thereto…*"

55    It was further expressly stated that this guarantee also covers service marks.

56    In this guarantee, A. Mattli further expressly assures that neither he himself, nor any companies in which he has an interest, shall use the LA PRAIRIE brand in the above-named, comprehensive sense.

57    Excepted therefrom was (already at that time) A. Mattli's right to use the trademark LA PRAIRIE for foods, diet foods, and food supplements and for a clinic:

> "except (i) in a manner which does not dilute the value of such trademark to you or your affiliated companies or the quality connoted thereby of the products to which such trademark is affixed, as the trademark for foods, diet foods and food supplements, and (ii) as the name of the Clinique La Prairie."

**BO:**   "Guarantee" by Armin Mattli to Aviatrix Corp. of December 3, 1982       **enclosure 3**

58    The Agreements of the year 1982 do not contain any restrictions concerning the LA PRAIRIE brand to be encumbered to the Respondents, i.e. the Respondents in turn did **not** commit to **not** using the LA PRAIRIE trademark in certain areas.

59    For the above-mentioned stock purchase of LP SA shares, the buyer paid - taking into account the rate of exchange at that time - the substantial price of 13.7 million dollars, even though the assets of LP SA at that time amounted to merely 1.5 million USD. This

price is only understandable if it is based on the assumption that a development potential of the LA PRAIRIE trademark in question was sold to the buyer, secured long-term in an overall deal as best as possible by the above-mentioned Cooperation Agreement and the above-mentioned declaration of guarantee, and thus also the right to register and use new trademarks in addition to the then existing ones, in particular – as explicitly mentioned in the above-mentioned declaration of guarantee – **also service marks**.

| | | |
|---|---|---|
| **BO:** | Stock Purchase Agreement between Armin Mattli and Aviatrix Corp. of December 3, 1982 | **enclosure 4** |
| | Umbrella Agreement between Armin Mattli and Aviatrix Corp. of December 3, 1982 | **Claimants' enclosure 9** |

60    The relationship between the Claimants 1 and 2 and the Respondents was harmonious during the years 1982 to 1991. This relationship was relatively close because at that time LP SA concentrated on the production and distribution, but also the application of cosmetic products of the LA PRAIRIE brand which contained the above-mentioned extract of living cells. This extract was supplied by CLP SA or later on by a third party controlled by A. Mattli, respectively, (Cellorgan SA or CE Cellular Extracts Ltd. respectively) based on a Supply Agreement also concluded in the frame of reference of the above-mentioned sales transactions. By these supplies, A. Mattli secured, via the CLP SA Company controlled by him and the above-mentioned third company, still a regular, long-term, considerable income from the Respondents, over and above the above-mentioned sales price when he sold LP SA. Conversely, the LA PRAIRIE cosmetic products were, among others, also used in the *Clinique La Prairie* by its patients and sold to the *Clinique*'s patients, whereby LP SA (Respondent 1) offered particularly favorable terms to CLP SA.

| | | |
|---|---|---|
| **BO:** | Supply Agreement between Armin Mattli and Laboratoires La Prairie of December 3, 1982 | **enclosure 5** |
| | Cooperation Agreement between Clinique La Prairie SA and Armin Mattli on the one hand and Aviatrix Corp.on the other hand, dated December 3, 1982 | (cf. enclosure 2) |

61    On June 12, 1991, the German Beiersdorf Group acquired Respondent 2 and thus also its then 100%-owned subsidiary, Respondent 1.

| | | |
|---|---|---|
| **BO:** | Stock Purchase Agreement of June 12, 1991 | **enclosure 6** |

62    The purchase price paid at that time for the shares of Respondent 2 alone was more than USD 20 million, that is, about 50% higher than the price paid for them in the year 1982 (cf. item 2.1. of the Stock Purchase Agreement of June 12, 1991). But the transaction as a whole cost the buyers a lot more because numerous other commitments, such as the takeover of management members of Respondent 2 with special security guarantees were entered into.

Stock Purchase Agreement of June 12, 1991                    (cf. enclosure 6)

63    The indirect subject of the purchase were also a multitude of trademarks (cf. item 4.8 of
      the Stock Purchase Agreement), among them, and this is of importance in the current
      case, also service marks that had been registered for years. Precisely this brand portfolio
      and the potential seen therein was an essential reason for the acquisition by the
      Beiersdorf Group at that time.

Stock Purchase Agreement of June 12, 1991                    (cf. enclosure 6)

**BO:**   Service marks of Laboratoires La Prairie SA up to June 17, 1991         **enclosure 7**

64    Subsequent to the above-mentioned change of ownership, the corporate image of the LA
      PRAIRIE trademark was updated and expanded. As a novelty, more and more cosmetic
      products were developed, distributed, and applied in the context of the Respondents'
      service offers, which no longer contained the above-mentioned living cell extracts of
      animal origin. This was done based on the consideration that the Respondents, in view of
      the BSE problems arising as well as, in part, incorrect press reports on the obtention of
      the above-mentioned living cells and, in anticipation of the expected, legal
      restrictions on the use of animal ingredients in cosmetics, would have to lead away from
      the association with ingredients of animal origin - not rashly, but in the medium-term. For
      this purpose, a new Cellular Complex on a biotechnological, non-animal basis was
      developed and used in LA PRAIRIE products instead of the living cell extract. The
      corresponding contractual Agreements with the Claimants 1 and 2 from the year 1982 did
      not foresee any restriction for such a reorientation.

65    Of particular importance for the present dispute, furthermore, is the fact that the La Prairie
      Group, after the above-mentioned change in ownership, also launched a new concept of
      **services** to be provided under the LA PRAIRIE trademark, concretely: "*The Art of
      Beauty.*" To develop and implement said concept, in 1992 LP SA hired an already
      renowned specialist, Ms. Maike Kiessling, who at present is still working in the
      Management of the La Prairie Group. Within this concept, LA PRAIRIE products were
      applied, subject to payment, by professionally trained staff to particularly demanding
      female clients (currently also to male clients) in especially stylishly furnished premises.
      Part of this service was, and still is, a careful analysis of the skin type and the specific
      needs of the clients. In this context, the LA PRAIRIE products that are also available in
      general sales, are applied, although some of them in special, large packs designated as
      "salon products." This concept is supported by professional training manuals and training
      provided by competent specialists of the La Prairie Group. These services are regularly
      provided against payment; they therefore are significant in themselves, in addition to the
      sale of LA PRAIRIE products.

**BO:**   Maike Kiessling, c/o Laboratoires La Prairie S.A., Volketswil         **as a witness**

Art of Beauty Manual                                          **enclosure 8**

66    This concept refined and professionalized services concepts that had already been applied years before: As it happens, LA PRAIRIE products have been applied by specially trained staff in "salon booths," for instance in perfume shops or luxury department stores, or in the USA in "Facial Cliniques" since the 80s, whereby in addition to the products, the corresponding services were also invoiced.

| | | |
|---|---|---|
| BO: | Letter from La Prairie to the "Facial Clinique" in the Saks' department store, New York, dated February 10, 1986 | enclosure 9 |
| | Letter from La Prairie to a "Facial Clinique" in Chicago dated August 9, 1986, with enclosure | enclosure 10 |
| | Notes of proof and settlement of account of a La Prairie Facial Clinique dated May 17, 1986 | enclosure 11 |
| | "Clinique Feedback Report" of a La Prairie Facial Clinique of the year 1985 | enclosure 12 |
| | Documentation of the equipment of a La Prairie "Facial Clinique" of the year 1986 | enclosure 13 |
| | "La Prairie Promotional Manual" of 1991 | enclosure 14 |
| | Parfume shops that offer salon treatments with La Prairie products in Germany | enclosure 15 |
| | Lynne Florio, c/o Laboratoires La Prairie Inc., New York | as a witness |
| | Maike Kiessling, named above | as a witness |

67    Almost all leading luxury cosmetic companies have known comparable concepts for many years. Such service concepts are important for them and a natural supplement to their offer.

| | | |
|---|---|---|
| BO: | Maike Kiessling, named above | as a witness |

68    A "*The Art of Beauty*" establishment was also set up as early as 1992/94 – that is, before the Agreement of 1995 was signed – in a luxury hotel, specifically in the "*Sofitel Thalasso Miramar*" hotel in Biarritz, France.

| | | |
|---|---|---|
| BO: | Nadja Miller, c/o Laboratoires la Prairie S.A., Volketswil | as a witness |
| | Lynne Florio, named above | as a witness |



69      The statements in the RZ 66 are proof that the Respondents also actively provided services under the trademark LA PRAIRIE long before 1995. This with knowledge of A. Mattli.

70      It was probably the reorientation indicated in RZ 64 - which, by the way, soon led to economic success - but which in the medium term was to result in an "emancipation" of the LA PRAIRIE brand from its "origin", that is, *Clinique La Prairie*, that may have caused A. Mattli to give up his previous cooperative attitude towards the Respondents. Starting in late summer of 1992, shortly after a friendly meeting of the Respondents' CEO and A. Mattli, the latter started a genuine juridical "war" against the Respondents, without any prior warning and with reference to insignificant reasons and complaints concerning details of advertising, which might easily have been settled between business partners by dialogue.

71      To begin with, superprovisional requests for precautionary measures were filed with sundry tribunals in Switzerland and abroad – by the way without informing the tribunals about all relevant agreements between the parties! – with the objective of enjoining the Respondents from selling certain products with making reference to *Clinique La Prairie*.

72      Furthermore, A. Mattli had advertisements published in various countries in which Clinique La Prairie distanced itself from the Respondents' products.

      **BO:**    Circular letter to all La Prairie consignees in Germany      **enclosure 16**

73      In the course of this total confrontation, A. Mattli gave notice "for important reason" for the Cooperation Agreement (cf. RZ 50 ff.) as well as the Supply Agreement (cf. RZ 60), based on which the supply of the still very important living cell extract was owed - in spite of the above-mentioned reorientation. Furthermore, he even blocked corresponding supplies of this living cell extract immediately. Subsequently, CLP SA even filed criminal charges against the officers of the Respondent which, however, were later withdrawn without consequences. The Respondents had to defend themselves against all these attacks at very great expense and efforts, sometimes over several instances, also with time-consuming declaratory actions.

      **BO:**    Harald Stolzenberg, Dorfstrasse 34, 8835 Feusisberg, then CEO and
             Deputy Chairman of the Board of Respondents 1 and 2      **as a witness**

74      Besides the displeasure about the above-mentioned reorientation, a further reason for this frontal attack may have been the fact that A. Mattli, and/or *Clinique La Prairie*, respectively, began again to develop and distribute cosmetics of their own, which in their advertising referred directly to *Clinique La Prairie*. We may mention the cosmetics lines launched by the CLP SA or other companies controlled by A. Mattli under the names of "*Hair Basics*," "*Hydra Swiss*," "*Cellular Balancing Therapy*," "*Swissological*," "*Ecoswiss*," "*Swiss Perfection*," and "*Swiss Beauté*." It became evident that A.Mattli, encouraged by the great success of the La Prairie cosmetic line, in spite of the sale of the cosmetic line in

the year 1982, for which he had already obtained a considerable profit, and in spite of the above-mentioned guarantees given (by him) at that time, now wished to hop on the train himself once again, a train that is running ever more successfully due to the above-mentioned reorientation, wishing to cash up one more time for himself. The Respondents defended their interests against these activities with legal means.

| | | |
|---|---|---|
| **BO:** | Trademark registrations of Clinique La Prairie SA in the USA concerning SWISS PERFECTION of the year 1993 | **enclosure 17** |
| | Trademark registrations of Clinique La Prairie SA in the USA concerning SWISS BEAUTÉ of the year 1993 | **enclosure 18** |
| | Harald Stolzenberg, named above | **as a witness** |

75     At the end of 1994 there were some initial contacts between the parties with a view towards settling the numerous legal disputes between the parties.

76     After months of negotiations, the Agreement, which is of central importance for the current case, was signed on June 2, 1995, and which the Claimants have put on record as Claimants' enclosure K3.

## 2.     The Agreement between the Claimants and the Respondents of June 2, 1995

### 2.1     Preliminary remarks

77     For better understanding we wish to note that in recent times, there has been a shift in trademark law towards using the term *"product"* as the overarching term for goods and services. In the Agreement in question, however, the definition is still based on the earlier, colloquial use of the term *"product,"* namely as a synonym for "merchandise" (see e.g. item 1. lit. a of the Agreement).

78     For the subsequent assessment of the Agreement, the contractual definition of the parties is adopted. *"AM"* thus stands for all three Claimants and *"LP"* for the two Respondents, also jointly.

### 2.2     Grammatical interpretation of the Agreement

### 2.2.1     Re item 1.

79     Under item 1., the subject of the Agreement is being defined. To begin with, the list in item 1 exhibits the existing trademark applications and registrations. Item 1 lists the following seven trademark categories and refers to a total of seven annexes (Annexes A – G):

> *"a.    Product trademark "La Prairie" for cosmetic and related products (current list of registrations by LP in Annex A);*

b.  Product trademark "La Prairie" for foods, diet foods, and food supplements (current list of registrations by AM in Annex B);

c.  Service mark "Clinique La Prairie" for operating medical and health clinics (current list of registrations by AM Annex C);

d.  Service mark "CLP" for medical and health clinics (current list of registrations by AM in Annex D);

e.  Product trademark "CLP" for cosmetic and related products (current list of registrations by LP in Annex E);

f.  Device mark of the old Clinique La Prairie in the following forms:

  



for cosmetic and related products (current list of registrations by LP in Annex F),

g.  Product trademark "LP Cosmetique" for cosmetic and related products (current list of registrations by LP in Annex G)."

80  The list defined as Annex A is designated as the list of the "Product trademark "La Prairie" for cosmetic and related products." This is not correct since the list of Annex A, in addition to the trademarks demanding protection for goods, also contains some that demand protection for services, actually also some such as the IR trademark No. 601 820, which does not demand protection for services among other things, but alone and specifically for services. This has also been acknowledged by the Claimants (SK item 169 f; 173). The material contents of the list are relevant. These correspond to the actual givens, because the Respondents provided services under the trademark LA PRAIRIE, with the full knowledge of the Claimants, long before 1995 (cf. RZ 63 and 65 f in this context.).

**BO:**  Madrid-Express extract of the IR trademark No. 601 820    **enclosure 19**

Lynne Florio, Maike Kiessling, and Nadja Miller, named above    **as witnesses**

81  The letters b to d refer to the trademarks of AM. All of these trademarks were only registered after 1982, i.e. after the Claimants had sold Laboratoires La Prairie SA (that is the current Respondent 1) (cf. RZ 42 ff.).

82      Lit. b of item 1 lists six product trademarks *"La Prairie"* for foods, diet foods, and food supplements and in so doing refers to Annex B. In the document designated as Annex B, C and D, the trademarks listed are 1 – 6. The interesting part of Annex D is that the initialed copy contains handwritten notes to the agreed restriction of the trademarks for the purposes of item 2 of the Agreement (see RZ 97 f.).

83      Letter c of item 1 refers to the three service trademarks *"Clinique La Prairie,"* which claim protection for the "*operation of medical and health clinics.*" Reference is made to Annex C as the "*current list of registrations byAM.*" The trademarks listed in the document designated as Annex B, C, and D are the trademarks 7 – 9.

84      Finally, lit. d refers to the service trademark "*CLP*" for medical and health clinics (current list of registrations by AM in Annex D). The interesting part of Annex D is that the initialed copy contains handwritten notes to the agreed restriction of the trademarks for the purposes of item 3.1. of the Agreement (see RZ 91 and 97 f.).

85      Letters e to g then again refer to the trademarks of LP. Lit. e mentions the product trademark *"CLP"* for cosmetic and related products and refers to Annex E as *"the current list of registrations by LP."* Annex E is not an autonomous document, but in the list of Annex A, certain trademarks are marked with the handwritten letter "E."

86      Although lit. f of item 1 names the device mark of the old Clinique La Prairie for cosmetic and related products and in the process refers to a *"current list of registrations by LP"* attached as Annex F, there is no such Annex. According to the Agreement (item 1.f) the device marks in question are the following:

 

87      Finally, letter g refers to the "product trademark *"LP Cosmetique"* for cosmetic and related products" (current list of registrations by LP in Annex G)" which is not relevant in the present proceedings (because it is no longer being used).

## 2.2.2    Re item 2.

88      Item 2 of the Agreement reads as follows:

> "AM acknowledges LP's ownership of the product trademark "La Prairie" for cosmetic and related products in accordance with Annex A, of the device mark of the old clinic for cosmetic and related products in accordance with Annex F, and of the product trademark LP Cosmetique for cosmetic and related products in accordance

*with Annex G. LP covenants not to use the LP Cosmetique trademark according to Annex G without the consent of AM."*

89      This provision is, above all, a purely declaratory acknowledgment of the ownership of the LA PRAIRIE brand for cosmetic and related products (according to Annex A and thus - unlike the Claimants' view - (SK item 171), also to the service trademarks listed therein), of the device mark of the old clinic for cosmetic and related products (according to Annex F), and of the trademark LP COSMÉTIQUE for cosmetic and related products (according to Annex G).

90      Actually, the Claimants have never called into question the Respondents' ownership of the trademarks according to Annexes A, F, and G.

91      In addition to acknowledging the Respondents' ownership of the LA PRAIRIE trademark for cosmetic products, the Claimants covenanted to delete these products from their own LA PRAIRIE trademark registrations according to Annex B. This is also evident from the handwritten notes in Annex B where the terms *"Präparate zur Gesundheitspflege"* (for the Swiss trademark 379 859), *"healthcare preparations; namely"* (for the US trademark 1 779 993), and *"preparations for health care, namely"*) (for the Canadian trademark 411 988) are set in brackets and bear the note "to be deleted." Cf. also the comments below concerning item 3.1 of the Agreement (RZ 97). Contrary to the Agreement, however, the corresponding deletions were not carried out.

> **BO:**    Current extracts from the registers of the Swiss trademark 379 859 (extract Swissreg), of the US trademark 1 779 993 (excerpt SAEGIS), of the Canadian trademark 411 988 (extract SAEGIS)                    **enclosure 20**

92      Worth noting in this context is the fact that in May 2007, Claimant 3 had the Swiss trademark transferred to Clinique La Prairie Franchising SA (the transfer was registered in the Swiss Trademark Register on May 8, 2007). The US trademark 1 779 993 was also transferred. Quite obviously, this is a preventive measure for the arbitration initiated by the Claimants. Clinique La Prairie Franchising SA is a company that is also controlled by Armin Mattli who holds 100% of it.

> **BO:**    Teledata excerpt concerning Clinique La Prairie Franchising SA                    **enclosure 21**

93      Clinique La Prairie Franchising SA at present holds a trademark portfolio totalling 22 brands.

> **BO:**    SAEGIS Report on the search for the owner of Clinique La Prairie Franchising SA                    **enclosure 22**

94      The commitment concerning the LP Cosmétique trademark is irrelevant for the present case since the Respondents are not using the "LP Cosmétique" brand any more.

### 2.2.3    Re item 3.

95      Item 3 of the Agreement reads as follows (emphasis by the signors):

> *"3.1 LP acknowledges AM's ownership of the product trademark "La Prairie" for foods, diet foods, and food supplements according to Annex B and of the service trademarks "Clinique La Prairie" and "CLP" for the operation of medical and health clinics according to Annexes C and D. AM will delete "Application, administration, and distribution of medical-cosmetic preparations" from the services listing of the "CLP" brand.*
>
> *3.2 LP commits to transferring the "CLP" product trademark for cosmetic and related products according to Annex E to AM. AM covenants not to use this trademark for cosmetic products."*

96      The first sentence of item 3.1. is the reflected provision of item 2, i.e., equally a merely declaratory acknowledgment of AM's ownership of the trademarks by the Respondents. The Respondents have met their commitments resulting from this acknowledgment and not registered a single LA PRAIRIE trademark for "*foods, diet foods, and food supplements.*" Moreover, the Respondents have not registered any trademarks CLINIQUE LA PRAIRIE and/or CLP "*for operating medical and health clinics.*"

97      The additional commitment imposed on AM in the second sentence of item 3.1. to delete "*Application, administration, and distribution of medical-cosmetic preparations*" from the list of services of the "*CLP*" brand is, however, a clear indication that the Respondents did not want AM to offer and provide these services, i.e. "application, administration, and distribution of medical-cosmetic products" under the "*CLP*" trademark. This because - as indicated in RZ 65 - the Respondents themselves provided such services under the LA PRAIRIE brand prior to 1995 and wanted to continue to provide them. This provision was intended to assure that AM did not offer similar services under the "*CLP*" brand, i.e. a trademark that is confusingly similar to the LA PRAIRIE trademark.

98      This provision is clear proof of the fact that the Agreement does not in any way apportion the goods to the Respondents and services to AM, as the Claimants maintain in their main argument, but that the contractual arrangement contains a different solution. The agreed restriction of the product list of the CLP trademark is repeated by the handwritten notes in Annex D. The subjects of the agreed restrictions were the Swiss trademark CH-413 170, the international trademark IR 636 657 based on the Swiss trademark, and the US trademark US 1.362.585. Whereas the Swiss trademark was limited in accordance with the Agreement, the product listing of the international trademark has remained unchanged. This is a breach of item 3.1 of the Agreement.

**BO:**      Swissreg extract of the trademark CH-413 170 and Madrid-Express
extract of the international trademark IR 636 657
                                                                              **enclosure 23**

99      None of the three service trademarks CLINIQUE LA PRAIRIE listed in Annex C had to be adapted with regard to the product listings.

100     The transfer of the CLP brand foreseen in item 3.2, combined with the prohibition of use was based on defensive grounds. The CLP was to be maintained to have a certain "protective shield" against third parties around the brands LA PRAIRIE and CLINIQUE LA PRAIRIE, but was not to be used because of the closeness of the marks and the corresponding danger of confounding it with the LA PRAIRIE trademark. But since the CLP mark is the abbreviation of CLINIQUE LA PRAIRIE, it made sense to have it transferred to AM, but only with the unequivocal restriction of AM committing to abstain from using this trademark for cosmetic products.

101     The trademarks according to Annex E are the Swiss basic mark CH-399 215 and the allied international trademark IR 597 588. Not contained in the list but materially belonging to it is the Swiss trademark CH-P.428 173. All CLP trademarks for cosmetic and related products were transferred to A. Mattli, or one of the companies under his control, respectively.

> **BO:**   Swissreg extract of the trademarks CH-399 215 and CH-P-428 173, as well as Madrid-Express extract of the trademark IR 597 588          **enclosure 24**

## 2.3     Re item 4.

102     Item 4 of the Agreement reads as follows:

> "4.1    Both parties shall make every effort, each alone as well as jointly, to defend and increase the prestige and the worth of the La Prairie brand in every respect and not to jeopardize it in any way.
>
> 4.2     AM confirms LP's unlimited, worldwide, and exclusive right
>
> -   to refer to the name of Clinique La Prairie in its publicity for cosmetic products which are sold under the name of La Prairie;
>
> -   to point to the fact that living cell therapy was developed at Clinique La Prairie;
>
> -   to make the statement that La Prairie products for cosmetic purposes are being used at Clinique La Prairie; and
>
> -   to make the statement that the experience with living cell therapy at Clinique La Prairie leads to specific know-how for the extraction of cells.
>
> 4.3 The rights of LP according to item 4.2 shall be valid provided that

- *the references are rightful and correspond to the facts;*

- *the references do not affect the renown of Clinique La Prairie as a center of therapy and research;*

- *no association is established by these references between Clinique La Prairie and Beauty Products (products of decorative cosmetics such as lipsticks, make-up, eye shadows etc.) or with perfume. In general, in leaflets in which the Beauty Products are not predominant, the reference to Clinique La Prairie is admissible.*

*4.4 To the extent that, pursuant to a national or international goods or services list, ownership of one of the trademarks affected by this Agreement would correspond to both parties hereto, the proprietor of the trademark shall grant an unlimited, worldwide, and exclusive licence, free of cost, for the area corresponding to the other party."*

103    The mutual commitment foreseen in item 4.1. was intended to assure that the LA PRAIRIE trademark would not suffer any loss in value. Initially, the Respondents, as "newcomers," were probably more likely the ones with an open attitude to the trademark LA PRAIRIE. But since then – as indicated already in RZ 31 ff. – LA PRAIRIE products are sold practically worldwide and the trademark of the Respondents ("LA PRAIRIE") generates a substantial, more comprehensive esteem than the one of *Clinique La Prairie*, which is only known in Switzerland as well as in some scattered other countries. As it happens, in the interim it is now so that the Claimants' activities. e.g. competing appearances, might have a serious impact on the value of the Respondents' brand.

104    Contrary to the Claimants' opinion, however, no simple company can be interpreted into the above (SK item 255ff as well as item 344).

105    The enumeration in item 4.2. refers to the statement of the name and concrete advertising measures, but has nothing to do with trademark rights and/or a delimitation of trademark rights. Contrary to the Claimants' opinion (cf. SK items 229 – 238), this enumeration does not refer to cosmetic products alone, but also to services. Correspondingly, the Claimants' conclusion, namely that the device mark was to be used to designate cosmetic products, exclusively (SK item 245), is incorrect. In item 4.3, certain requirements for the rights listed under item 4.2 are specified. The Respondents have always adhered to these requirements stated in item 4.3.

106    The first two points of item 4.3. are a repetition or statement in greater detail of item 4.1., respectively. The last paragraph of item 4.3 is to be seen against the backdrop that, in view of the origin of the cosmetic business sold by A. Mattli to Respondent 2, a referenc to Clinique La Prairie was to be established for skin-care cosmetics, exclusively. For purely decorative products, such as lipsticks, make-up, eye shadow as well as perfume, the reference to Clinique La Prairie was to be possible only in the frame of reference of

collective publications that contain both skin-care as well as decorative products (e.g. general leaflets).

107  The formulation of item 4.4. is irrelevant insofar as no case of such "double" ownership of trademarks has arisen.

## 2.4  Re item 5.

108  Item 5 of the Agreement reads as follows:

> "5.1  *LP covenants to supply to Clinique La Prairie, at the latter's request, La Prairie cosmetic products for sale to guests of the clinics (but not for resale), at the same prices as the ones Laboratoires La Prairie grant their Dutch distributor.*
>
> 5.2  *AM will use La Prairie cosmetic products within the living cell therapy offered at Clinique La Prairie. LP will supply the products required for this purpose in the same volumes as before.*
>
> 5.3  *LP will inform AM in advance of any assignment envisaged of the "La Prairie" brand to third parties (be it directly or via the transfer of the controlling interest of the registered trademark bearer).*
>
> 5.4  *AM covenants not to change the name of Clinique La Prairie. In case the Clinique were to discontinue operations, the name and the goodwill of Clinique La Prairie will be assigned to LP without compensation.*
>
> 5.5  *AM covenants to use the trademark "La Prairie" or any derivative thereof or similar brand only to the extent that he has the right to do so pursuant to this Agreement (in particular item3), and in any case only in a manner which will not diminish the value of the "La Prairie" brand for LP, or the quality of the La Prairie products. Consequently, AM shall not use the "La Prairie" trademark for products other than foods, diet foods, and food supplements, nor for any other services than the operation of health clinics, and will thus not object to the registration and use of the La Prairie brand by LP."*

109  The provisions of items 5.1 and 5.2 are the continuation of the Cooperation Agreement of the year 1982 (cf. RZ 50, as well as Enclosure2, 2nd Recitals). They are the expression of the fact that the parties wanted a close, commercial cooperation and mutual obligation to promote each other, as already anchored in item 4.1 of the Agreement.

110  Items 5.3. and 5.4., too, are a clear expression of the fact that the parties wanted continuity and wanted to have safeguards against third parties disturbing this joint arrangement. Again, this arrangement is the logical consequence and continuation of the

previous, common business past of the parties. Correspondingly also the right of first refusal of item 5.7.

111    Item 5.5. limits the use of the "*La Prairie*" brand by AM by stipulating the following:

> "*AM covenants to use the „La Prairie" brand or any trademark derived therefrom or similar to it only to the extent that he has the right to do so pursuant to this Agreement (in particular according to item 3), and in any case only in a manner that will not diminish the value of the „La Prairie" trademark for LP or for the quality of the La Prairie products. AM will therefore not use the „La Prairie" brand for other goods, other than foods, diet foods, and food supplements, nor for other services except the operation of health clincis and will thus not oppose registration and use of the La Prairie trademark by LP.*"

112    Consequently, the use of the LA PRAIRIE trademark by AM is contractually limited to "*foods, diet foods, and food supplements*" in the area of goods, and to the "*operation of health clincis*" in the area of services. A definition of "*health clincis*" is absent in the Agreement.

113    Already prior to signing the Agreement, however,  – namely already since 1989 – the Respondents' side did have trademarks for the most diverse **services**, such as, for instance

> a. "*Cours d'instructions pour les soins du corps et de la beauté et l'utilisation des produits pour les soins du corps et de la beauté, cours d'instructions pour le personnel de vente du commerce, de détail concernant la connaissance des produits cosmétiques, arguments de vente et utilisation des produits cosmétiques dans le domaine des produits pour les soins du corps et de la beauté*",

> b. "*Services d'un institut de beauté, surtout la consultation dans le domaine des soins du corps et de la beauté ainsi que des traitements individuels cosmétiques*"

which claimed protection (cf. RZ 63 and eclosure 7 and RZ 80 and (cf. enclosure 19).

114    The obligations laid on the Claimants concerning services in items 3.1 and 5.5. arose against this backdrop. With these two provisions, it was clearly established that the Claimants were to limit themselves to the service of operating a health clinic (item 5.5) and that the definition of the health clinic was meant in the very strict sense and, in particular, cosmetic services, but also already medical-cosmetic services (i.e. "*Application, administration, and distribution of medical-cosmetic preparations*") are not covered by the term health clinic (item 3.1).

115    **Decisive**, finally, is the fact that the Agreement concerning the LA PRAIRIE brand does not foresee any restrictions for LP's use to certain goods or services. As owners of the trademark, the Respondents are entitled to the comprehensive use of said trademark,

unless they committed by contract to restrict the use of the brand. However, there is no such contractual commitment to be found in the Agreement.

116    In item 5.5, the Agreement merely grants AM a limited right to use the LA PRAIRIE trademark, without simultaneously prohibiting the Respondents from using the trademark correspondingly. Based solely on the circumstance that the Claimants were conceded a limited utilization of the trademark it cannot and must not be concluded that the right to use of the Respondents was thereby also restricted without further ado.

117    In keeping with the above, there is no contractual basis for the claims brought forth by the Claimants in the present procedure.

118    The obligation contained in item 5.5. of the Agreement is practically identical, both regarding the wording as well as its effect, with the declaration contained in the guarantee of December 3, 1982 (cf. RZ 53 ff).

"Guarantee" by Armin Mattli to Aviatrix Corp. of December 3 1982    (cf. enclosure 3)

119    This clearly shows that in 1995, the parties essentially did not wish to agree anything else than what had already been assured in 1982.

120    With item 5.5. par. 2, the Claimants accepted that they were not to manufacture and/or distribute any cosmetics using the La Prairie trademark, or derivative or similar brands (such as "*Clinique La Prairie*" or "*CLP*"), with paragraph 2 of item 5.5 stating that the Claimants shall not use the La Prairie brand indirectly, either, in the context of selling other cosmetics than the ones of the Respondents. In other words, the Claimants must not establish any reference between cosmetics (e.g. "*Dr. Paul Niehans*") and the Clinique La Prairie. The meaning of this provision is clear: The Respondents wanted to prevent the Claimants from competing with them with a new cosmetics line of their own, referring directly or indirectly to La Prairie.

121    The provision of item 5.6. is also essential since it foresees that the parties may only sell other goods or services and refer to the designation "*La Prairie*" or designations that might be confused with it (this also includes the designation "*Clinique La Prairie*") if such reference is not in contradiction to the Agreement. Consequently, this means that the restriction of use for AM also applies to other trademarks, insofar as they refer to LA PRAIRIE or CLINIQUE LA PRAIRIE. Thus, item 5.6 is a clarification of item 5.5. AM is thus contractually forbidden to refer directly or indirectly to La Prairie outside of the area defined in item 5.6 (i.e. with the exception of food, diet foods, food supplements and the operation of health clinics). Thus, marks such as SWISS PERFECTION and similar ones, may only be used for cosmetics if any reference to La Prairie is refrained from.

122    Thus, these two provisions are the contractual basis for the cross-action filed by the Respondents (regarding the corresponding facts of the case, see RZ 163 ff. hereinafter).

### 3. The period after June 2, 1995 to date

123    In the period of time after signing the Agreement, from 1995 to 2005, the relationship between the contracting parties was again quite harmonious, at least initially.

124    During that time, the parties cooperated loosely insofar as Respondent 1 regularly supplied LA PRAIRIE products to *Clinique La Prairie,* on favorable terms for the use on, and resale to, patients of Clinique La Prairie, as before 1995.

| | | |
|---|---|---|
| **BO:** | Maike Kiessling, named above | **as a witness** |
| | Facsimile letter of the Korean representative of Clinique La Prairie to Maike Kiessling, La Prairie, of December 4, 1995 | **enclosure 25** |
| | Facsimile letter from Peter Gantenbein, Clinique La Prairie, to Ms. Maike Kiessling, La Prairie, dated February 6, 1996 | **enclosure 26** |
| | Facsimile letter from Maike Kiessling to Peter Gantenbein and cc to Armin Mattli of December 6, 1996 | **enclosure 27** |
| | Facsimile letter from Peter Gantenbein, Clinique La Prairie, to Maike Kiessling, La Prairie, dated January 20, 1997 | **enclosure 28** |

125    Moreover, Respondent 1 gave support to *Clinique La Prairie* and its branch establishments that had been opened abroad in the interim by professionally training the latter's staff in the application of La Prairie products, applying in the process the "*The Art of Beauty*" services concept, which had been developed by the Respondents as early as 1993 (cf. RZ 65) and applied successfully worldwide. First contacts to this effect even took place prior to the signing of the 1995 Agreement! This is proof that the Respondents provided services under the LA PRAIRIE trademark even before the 1995 Agreement was signed, and subsequently continuously, not only with the Claimants being aware of this, but also in agreement with the Claimants (cf. also RZ 66).

| | | |
|---|---|---|
| **BO:** | Letter from Maike Kiessling LP SA to Mr. Gantenbein, Clinique La Prairie, dated May 19, 1995 | **enclosure 29** |
| | Circular letter of LP SA of June 22, 1995 | **enclosure 30** |
| | Facsimile letter from Clinique La Prairie to La Prairie of August 23, 1995 | **enclosure 31** |
| | Letter from LP SA to Clinique La Prairie, dated September 4, 1995 with enclosure, leaflet "Welcome to The Art of Beauty" | **enclosure 32** |
| | Facsimile letter from LP SA to Palace Hotel Gstaad (and cc to P. Gantenbein of Clinique La Prairie) dated October 11, 1995 | **enclosure 33** |

| | |
|---|---|
| Facsimile letter of Clinique La Prairie to a Korean partner dated September 18, 1995 | **enclosure 34** |
| Facsimile letter of the Korean representative of Clinique La Prairie to Peter Gantenbein, Managing Director, Clinique La Prairie, dated November 21, 1995 | **enclosure 35** |
| Facsimile letter from Maike Kiessling, LP SA, to the Korean representative of Clinique La Prairie, dated December 5, 1995 | **enclosure 36** |
| Facsimile letter from the reprensentative of Clinique La Prairie to Maike Kiessling, LP SA, of December 6, 1995 | **enclosure 37** |
| Memorandum from Maike Kiessling, LP SA, to Peter Gantenbein, Clinique La Prairie, of March 18, 1996 | **enclosure 38** |
| Facsimile letter from Peter Gantenbein, Clinique La Prairie, to Maike Kiessling, LP SA, of October 30, 1996 | **enclosure 39** |
| Facsimile letter from Peter Gantenbein, Clinique La Prairie, to Maike Kiessling, LP SA, of December 13, 1996 | **enclosure 40** |
| Facsimile letter from Pierre Martinet, Clinique La Prairie, to Maike Kiessling, La Prairie, of April 18, 1997 | **enclosure 41** |
| Facsimile letter from Maike Kiessling, LP SA, to Pierre Martinet, Clinique La Prairie, of April 22, 1997 | **enclosure 42** |
| Facsimile letter from Pierre Martinet, Clinique La Prairie, to Maike Kiessling, LP SA, of May 10, 1997 | **enclosure 43** |
| Facsimile letter from Dominique Bera, Clinique La Prairie, to Maike Kiessling, La Prairie, of June 24, 1997 | **enclosure 44** |
| Facsimile letter from Nina D. Dimoglou, Clinique La Prairie, to the Turkish distributor of LP SA, of November 27, 1997 | **enclosure 45** |
| Facsimile letter from Dominique Bera, Clinique La Prairie, to Maike Kiessling, LP SA, of December 5, 1997 | **enclosure 46** |
| Maike Kiessling, mentioned above | **as a witness** |

126    In the year 1997, CLP SA even proposed to LP SA a legal formalization of this cooperation. For this purpose, CLP SA presented to LP SA a corresponding draft agreement. But the negotiations to this effect came to nothing.

**BO:**  Draft agreement sent by Pierre Martinet, CLP SA, to LP SA, dated
December 2, 1997

**enclosure 47**

Harald Stolzenberg, mentioned above

Maike Kiessling, mentioned above

**as witnesses**

127    Subsequently, several La Prairie "*The Art of Beauty*"-establishments were opened, mostly
only in 5-star-luxury hotels, as a rule in the context of creating "*Wellness or Spa-facilities*"
for these hotels. Thus, for instance, such establishments were introduced in the following
hotels:

approx. 1996 Hyatt Regency Column, Queensland/Australia

1997    Hotel Byblos Anadaluz, Malaga/Spain

1998    Hotel Cavalieri Hilton, Rome/Italy

1998    Royal Park Hotel, Tokyo/Japan

1999    Maria Luxury Resort & Spa Mahey/Seychelles

1999    The Residence Mauritius, Belle Mare/Mauritius

1999    Residence Heinz Winkler, Ascham/Germany

1999    Park Hotel Adler, Hinterzarten/Germany

1999    Schlosshotel Bühlerhöhe, Baden-Baden/Germany

1999    Evian Royal Palace, Evian-les-Bains/France

1999    Hotel van Oranje, Noordwijk/Netherlands

1999    Burj al Arab, Dubai/United Arab Emirates

2000    Reid's Palace, Madeira/Portugal

2000    Villa Belrose, Saint-Tropez/France

**BO:**  Harald Stolzenberg, mentioned above

Nadja Miller, mentioned above

Maike Kiessling, mentioned above

**as witnesses**

128     Legally speaking, these establishments are, in most cases, operated by the corresponding hotels under their own management. As a rule, however, they are contractually tied via the La Prairie country distributors and supported and fostered by La Prairie Design and Training specialists.

**BO:**     Harald Stolzenberg, named above

Nadja Miller, named above

Maike Kiessling, named above                                    **as witnesses**

129     The common feature of all these establishments is the fact that they restrict themselves to cosmetic services and provide no medical services. This limitation, by the way, is not based on any commitment that might ensue from the above Agreement of 1995, because the latter - contrary to the Claimants' contention - specifically does not contain any such restriction (cf. RZ 115). Rather, it has been a business decision by the Respondents who do not wish to relate their luxury cosmetic brand to medical services, but want to offer high-quality, cosmetic services and applications, exclusively.

130     If the Respondents wished to provide also medical services, this would mean that in most countries additional permits would have to be applied for and additional, expensive demands regarding infrastructure would have to be met. Also, the professional qualifications of persons providing medical services would be substantially higher than for those who provide the cosmetic services and applications of the Respondents.

131     The services of the Respondents are primarily focused on winning additional customers for La Prairie products. The customers get to know the La Prairie products and their application and effect and then also buy them elsewhere. As it happens, the spas/wellness centers have become an important, additional sales channel for La Prairie products, besides the following distribution channels:

1. Department stores

2. Perfume shops

3. Chains (perfumery chains), and

4. Duty free/travel retail (incl. airlines).

132     Within this strategy, it would not make any sense for the Respondents to offer medical services.

**BO:**     Harald Stolzenberg, named above

Nadja Miller, named above

Maike Kiessling, named above                    **as witnesses**

133    It is to be pointed out that in none of the establishments mentioned in RZ 127 any of the services listed in the Claimants' claims for legal remedy are offered under the name of "La Prairie":

> *"medical and paramedical services "*
> *"health consultancy"*
> *"detoxification cures"*
> *"purification cures"*
> *"weight-reducing cures"*
> *"physiotherapy"*
> *"acupuncture"*
> *"UV-treatments"*

134    Since all these new openings were also regularly commented in the specialist press, it may be taken for granted that this development did not remain hidden to A. Mattli. In all these years, there was never any remonstration on the part of the Claimants with regard to these services effected in the context of the "LA PRAIRIE" brand.

**BO:**    Harald Stolzenberg, named above                    **as a witness**

135    In the period between 1996 and 2000, Clinique La Prairie tried to establish branches of its medical clinics also abroad, for instance in Bangkok, Seoul, and Istanbul. In so doing, CLP SA regularly availed itself of the services of LP SA, so as to benefit from the vast experience of LP SA in establishing and implementing the "The Art of Beauty" concept and to supplement the services of Clinique La Prairie - the core of which is medical - towards its patients also by certain cosmetic services with La Prairie products. All these projects abroad of CLP SA in the end failed shortly thereafter.

**BO:**    Harald Stolzenberg, named above                    **as a witness**

Maike Kiessling, named above                    **as a witness**

Facsimile letter from Peter Gantenbein, Clinique La Prairie, to Maike Kiessling, LP SA, of October 30, 1996                    (cf. enclosure 39)

Facsimile letter from Peter Gantenbein, Clinique La Prairie, to Maike Kiessling, LP SA, of December 6, 1996                    **enclosure 48**

Facsimile letter from Pierre Martinet, Clinique La Prairie, to Maike Kiessling, LP SA, of April 18, 1997                    (cf. enclosure 41)

Document "Profile of Services" of Clinique La Prairie Diagnostics, Health & Medical Center, Istanbul                    **enclosure 49**

136    Then, in the year 1998, for the first time cosmetic products appeared on the market which bore the name "*Clinique La Prairie.*" Evidently, in spite of the 1995 Agreement, A. Mattli again could not resist the remptation (as already prior to 1995, cf. RZ 74) of partaking of the success of the La Prairie line of cosmetics and entering this business himself once again. After LP SA defended itself, A. Mattli gave in - at least in appearance.

    **BO:**    Letter from Harald Stolzenberg, LP SA, to A. Mattli of June 22, 1998    **enclosure 50**

                Letter from A. Mattli to Harald Stolzenberg, LP SA, of June 26, 1998    **enclosure 51**

137    Unfortunately, however, A. Mattli subsequently did not stop the production and distribution of the cosmetics contrary to the agreement, in spite of his assurances. Rather, cosmetic products of Clinique La Prairie again appeared on the market under the CLP brand. Furthermore, products of the "*Swiss Perfection*" brand were distributed with reference to Clinique La Prairie. Only after having been confronted with clear proof of the violation did A. Mattli retreat - at least for a certain period of time.

    **BO:**    Letter from RA Martin Ammann to RA Walter König of November 09, 1999    **enclosure 52**

                Letter from RA Walter König to RA Martin Ammann of November 12, 1999    **enclosure 53**

                Letter from RA Martin Ammann to RA Walter König (with enclosures) of November 23, 1999    **enclosure 54**

                Letter from RA Walter König to RA Martin Ammann of November 30, 1999    **enclosure 55**

138    As of the year 2000, there were several minor disputes, which also had to do with the interpretation of the 1995 Agreement. This holds true for the "*Thalassomed Case*" mentioned in item 39 ff of the SK, the "*Gefecht um die Marke "La Prairie" für Getränke*" (Fight for the "La Prairie" trademark for beverages) mentioned in item 41 ff. of the SK, the case "*Beauty Salon in Mexico City*" mentioned in item 48 ff. of the SK, and the case "*Art of Beauty – La Prairie Switzerland Daily Spa*" in Athens mentioned in item 63 ff. of the SK. In all these cases, the parties initially made their positions known via their attorneys, but subsequently found common ground in dialogue without attorneys and decided to terminate the disputes.

    **BO:**    Harald Stolzenberg, named above    **as a witness**

                Maike Kiessling, named above    **as a witness**

139    In October of 2005, A. Mattli had a new escalation instituted. This time, the target was the "Opening and operation of spas" with reference to the "La Prairie" brand in the Ritz

Carlton Hotel in New York und in Grand Cayman, as well as in the Beverly Hills Hotel in California. The La Prairie Group was immediately available for the clarifying discussion requested by A. Mattli's representative, which then took place. While several representatives of the Management of the La Prairie Group showed for the discussion, on A. Mattli's/CLP AG's side, only their attorney attended. In this discussion, as well as in the subsequent exchange of correspondence, the La Prairie Group presented the arguments as they are being brought forth in the present statement of defense, and extensively proved that – contrary to A. Mattli's allegation and the ones of the companies under his control – the activities in these hotels do not represent any violation of the Agreement of the year 1995.

**BO:**    Letter from RA Walter König to RA Martin Ammann of October 5,
          2005                                                    **Claimants' enclosure 43**

**BO:**    Letter from RA Martin Ammann to RA Walter König of October 19, 2005    **enclosure 56**

          Letter from A. Mattli, Clinique La Prairie to representatives of the
          Management of the La Prairie Group and their parent company
          Beiersdorf of November 21, 2005                        **Claimants' enclosure 44**

          Letter from the La Prairie Group to A. Mattli of December 07, 2005
                                                                  **Claimants' enclosure 45**

140    The La Prairie Group was puzzled concerning the exact motives of the latest attack by A. Mattli, which found a certain explanation when, instead of a reply to the latest, extensive letter of the La Prairie Group, with detailed arguments, a letter was received on December 19, 2005 from attorney Walter König in representation of A. Mattli, wherein the former made known that they were in possession of an offer from a third party for buying CT Holding AG, the holding company of A. Mattli's sundry companies, at a price of CHF 140 million. This letter was to meet the commitment of item 5.7 of the Agreement of the year 1995, which grants a right of first refusal of A. Mattli's companies to the Respondents.

**BO:**    Letter from RA Walter König to LP SA and La Prairie Inc. of December
          19, 2005                                               **enclosure 57**

141    The Respondents could only interpret this offer in the sense that A. Mattli, in the interim over 80 years old, wanted to do his utmost to sell his life's work to the best bidder. Part of that was a recent, increased reorientation towards cosmetic and wellness services. It so happens that, exactly at that time, Clinique La Prairie opened a luxurious spa in Clarens, which is clear proof of its ambition to newly get a solid footing also in the area of cosmetic services on a large scale for the first time (for the previous activities of Clinique La Prairie were modest, contrary to the Claimants' claims), in addition to their former, purely medical activities, possibly motivated by the success of the Respondents in this area. Evidently, the already established activities of the Respondents in this field were bothersome in this context, wherefore the decision was probably taken to attack them frontally.

| BO: | Leaflet "Clinique La Prairie," Inside 44/Summer 2006 | **Claimants' enclosure 48** |
|-----|--------------------------------------------------------|-----------------------------|

142  Subsequently, the Respondents asked for further information on this alleged offer and told (the Claimants) that a purchase of the Claimants' holding company was not out of the question, but that such a decision could only be taken once the requested, detailed information was at hand.

143  The subsequent exchange of letters in this matter in which, by the way, a new legal representative of A. Mattli appeared, did not produce any result, which led the Respondents to conclude that there never had been such an offer of purchase as claimed by A. Mattli's proxies. Rather, there was reason to surmise that A. Mattli probably tried to build up pressure with various means, so as to win over the Respondents to accept a financially suitable solution for A. Mattli.

| BO: | Letter from LP SA to RA Walter König of January 16, 2006 | **enclosure 58** |
|-----|-----------------------------------------------------------|------------------|
|     | Letter from RA Markus Ineichen to LP SA of February 27, 2006, enclosing a purported buying offer | **enclosure 59** |
|     | Letter from RA Martin Ammann to RA Markus Ineichen of March 08, 2006 | **enclosure 60** |

144  There followed various, not very stylish, to put it mildly, direct attacks with wild accusations from A. Mattli against the Respondents, some of which were also made public in the marketplace.

| BO: | Letter from A. Mattli to a Korean hotel of June 13, 2006 | **enclosure 61** |
|-----|-----------------------------------------------------------|------------------|
|     | Letter from A. Mattli to Dirk Trappmann, LP SA, of October 26, 2006 | **enclosure 62** |
|     | Letter from A. Mattli to Dirk Trappmann, LP SA, of November 8, 2006 | **enclosure 63** |

145  In parallel to the above, A. Mattli tried to increase pressure on the Respondents with a view towards a takeover or some other financial arrangement.

| BO: | Letter from A. Mattli to Dirk Trappmann and Maike Kiessling, LP SA, of October 5, 2006 | **enclosure 64** |
|-----|-----------------------------------------------------------|------------------|
|     | Letter from Dirk Trappmann to A. Mattli of October 6, 2006 | **enclosure 65** |
|     | Letter from A. Mattli to Dirk Trappmann, LP SA, of October 10, 2006 | **enclosure 66** |
|     | Letter from Dirk Trappmann, LP SA, to A. Mattli of October 27, 2006 | **enclosure 67** |

146    A new attack by A. Mattli followed, with a series of accusations, which LP SA answered in detail. A. Mattli's reply, however, consisted of four lines, which meant a flat denial of any further talks.

> **BO:**    Letter from A. Mattli to Dirk Trappman and Maike Kiessling, LP SA, of
> November 22, 2006                                   **Claim enclosure 46**
>
> Letter from Dirk Trappmann and Maike Kiessling, LP SA, to A. Mattli of
> December 6, 2006                                    **Claim enclosure 47**
>
> Letter from A. Mattli to Dirk Trappmann and Maike Kiessling of December
> 12, 2006                                            **enclosure 68**

147    After that, there was broadcasting silence between the parties for some months, until April 2007, when a new, rather strange judicial attack was instituted by A. Mattli – which is not mentioned in the statement of claims, as already noted: He had the CLP SA take legal action before the Supreme Court of the State of New York, but this time not against the Respondents, but against "*The Ritz–Carlton Hotel Company, LLC.*" In it, he charged the Ritz Carlton with unlawfully operating a facility called "*The La Prairie Spa at the Ritz Carlton,*" demanded an injunction against the continuation of this establishment, as well as a corresponding surrender of profits.

> **BO:**    Plaintaiff's declaration of Clinique La Prairie SA versus The Ritz Carlton
> Hotel Company, LLC, filed on April 11, 2007           **enclosure 69**

148    The remarkable aspect of this lawsuit it the fact that the Agreement of the year 1995, which is of central importance in the present dispute, but also decisive for the correct juridical assessment in the above action, was kept secret. A. Mattli thus continued with an uncommendable manner of procedure, which he had already practiced in the above-mentioned juridical dispute in the years prior to 1995, and also practices in the present claim for arbitration (cf. RZ 71 and RZ 53).

149    It is further remarkable that Clinique La Prairie at once also used this action in the media and opened a separate Web site on this topic (www.clplawsuit.com), thereby causing a targeted insecurity in the market, which the Respondents also had to suffer. Subsequently, numerous press releases were published on this lawsuit.

> **BO:**    Press release and reference to the Web site www.clplawsuit.com     **enclosure 70**
>
> Sundry press releases on the lawsuit Mattli / CLP versus Ritz Carlton,
> New York                                             **enclosure 71**

150    Subsequently, however, Respondent 2 managed to introduce itself in this lawsuit in New York as an intervenient, next to The Ritz Carlton Hotel Company LLC, and in this manner to inform the court of the facts suppressed by the Claimant and, by referring to the present

arbitration procedure, which had been formally instituted in the interim, caused the New York court to adjourn the lawsuit pending the award in the present arbitral procedure. There is no need to explain to the court of arbitration in further detail that this legally strange side attack by A. Mattli again forced enormous expense and effort on the Respondents.

**BO:** Ordinance of the United States District Court Southern District of New York in the matter Clinique La Prairie SA against The Ritz-Carlton Hotel Company and La Prairie Inc. of October 11, 2007                    **enclosure 72**

## 4.    Facts of the case re the Respondents' contingent position

151    But even if the court of arbitration were to assume – contrary to expectations – that the Agreement supposedly contains an injunction against the Respondents using the La Prairie brand for the operation of health clinics, no prohibition can be derived therefrom for the Respondents to use the La Prairie trademark for services in the context of operating spas or wellness centers etc.

152    As already submitted, the spas operated in many hotels with reference to the La Prairie brand do not provide any medical services, i.e. there cannot be any question of any services for health clinics being provided under the La Prairie brand (cf. RZ 132 f.).

153    Contrary to the Claimants' statements in SK item 299 ff., in the context of this contingent position what is to be understood by a health clinic matters very much, indeed.

154    The activities of Clinique La Prairie in the wellness and fitness sector have only attained a high level since approximately 2005. Until some very few years ago, the activities of Clinique La Prairie were limited to a few services, which were offered to the medical patients, exclusively (cf. RZ 141).

155    The services described by the Claimants in SK item 23 f. (massages, electrotherapy, hydrotherapy) served for the rehabilitation of patients in the clinic. The same is true for the very modest "*swimming pool*," sauna and fitness room attached to the "*medical center*" in 1991 (cf. SK item 24).

156    To designate these services and installations as a spa or wellness center would be an exaggeration. They happened to be of absolutely subordinate importance for the operation of the clinic until 2005. Nobody went to Clinique La Prairie for these services and installations.

**BO:** Maike Kiessling, mentioned above                    **as a witness**

157    1995, i.e. when the Agreement was concluded, Clinique La Praire primarily and practically exclusively provided medical services. This was also the understanding of the parties when using the term health clinic in item 5.5. of the Agreement.

158     The fact that the parties expressly agreed in item 3.1 that the Claimants had to delete the "*application, administration, and distribution of medical/cosmetic preparations*" from the services listing of the "*CLP*" brand is a clear argument for this understanding of the term "*health clinic*" (cf. RZ 97).

159     The behavior of the Respondents was not "narrow-minded" but merely consistent when, in the context of the trademark "*Clinique La Praire and Diagnostic, Health and Beautymed Center*" in class 42 in Cyprus, they objected to the inclusion of the terms "*beauty clinic,*" "*beauty care,*" "*cosmetic treatment,*" "*beauty*" and "*beauty cures,*" but allowed the inclusion of the terms "*medical clinics*" and "*health clinics*" in the index of services of the brand (cf. SK item 319).

160     Contrary to the Claimants' statements in the petition for arbitration (cf. item 326), a spa or wellness center has the purpose to foster the wellbeing of the visitor. This includes, among other things, services in the cosmetic area, such as the Respondents have been offering for many years, and also prior to 1995. The Respondents insist that spas and wellness centers are important distribution channels for La Prairie products. In a spa, wellness center etc., the visitors do not expect any medical services.

161     A health clinic and a spa/wellness center are establishments that differ to an extent that they cannot both be subsumed under the term of health clinic. This applies even if the court of arbitration were to assume that the Clinique La Prairie also offered services, already in 1995, which are also offered in a spa/wellness center etc.

162     In the present arbitration procedure, the question as to whether the Claimants are entitled to provide services in the area of spas/wellness centers etc., is not to be examined (the Respondents reserve all rights in this context). Consequently, the decisive question is not whether the Claimants have the right, within the frame of reference of a health clinic, to provide services under the trademark La Prairie in the area of spas/wellness etc., but merely whether the Respondents may provide such services without thereby falling under the term "*operation of a health clinic.*" However, to equate a spa/wellness center with the "*operation of a health clinic*" is definitely going too far.

## 5.     Facts of the case concerning the cross-action

163     As already expounded, based on items 5.5 (2nd sentence) and 5.6 of the Agreement, the Claimants may only use trademarks such as SWISS PERFECTION or similar ones for cosmetics if any reference to La Prairie or designations that might be confounded with it (such as "*Clinique La Prairie*" or "*CLP*") is omitted. This obligation is confirmed by the arrangement in item 3.1 (2nd sentence) and in item 4.1 of the Agreement (cf. RZ 111 ff. and 102 ff. above).

164     The Claimants have violated this commitment in various cases.

165    In RZ 74 already, it was pointed out that the Claimants produced cosmetic products under the most diverse brands and designations and marketed them with reference to their origin from, and use in, Clinique La Prairie. Evidently, A. Mattli, or Clinique La Prairie, respectively, wanted to profit from this distribution and thus openly compete with the Respondents, in spite of the fact that A. Mattli had already sold the rights to the "*La Prairie*" trademark for cosmetic products (cf. RZ 42 ff). Therefore, the Respondents defended themselves against this behavior contrary to the Agreement with legal means.

166    Even after the conclusion of the 1995 Agreement, there were several attempts by A. Mattli, or the companies controlled by him, respectively, to again position cosmetic products with reference to Clinique La Prairie in the market (cf. RZ 136 ff to this effect). After the Respondents defended themselves against it, A. Mattli withdrew again - at least apparently.

167    Since approximately 2005 (cf. RZ 141), the Claimants again pushed the production of cosmetic products under the trademark "*SWISS PERFECTION*" and began again to market them with reference to Clinique La Prairie, thus for instance in the context of the opening of a "*Clinique La Prairie SPA*" in Seoul. They did not even shrink from presenting the SWISS PERFECTION products as the "genuine" cosmetic products of "Clinique La Prairie," thus discrediting the products of the Respondents.

|  |  |  |
|---|---|---|
| **BO:** | Extract from the Web site www.swissperfection.com | **enclosure 73** |
| | Picture of the "Swiss Perfection Clinique La Prairie SPA" opened in Seoul, South Korea, in April 2007 | **enclosure 74** |
| | Further pictures of Swiss Perfection stagings | **enclosure 75** |
| | Press release on the opening of "Swiss Perfection La Prairie SPA" in Seoul, South Korea, spring 2007 | **enclosure 76** |
| | Publicity of Swiss Perfection in Korea | **enclosure 77** |
| | Extracts from Information Placement on the "Swiss Perfection Clinique La Prairie SPA", in Seoul, South Korea, published in a South Korean Lifestyle magazine | **enclosure 78** |
| | Interview with A. Mattli, published in Magazin Galleria, edition 2006 | **enclosure 79** |
| | Report on Swiss Perfection at Clinique La Prairie, published in a Spanish Lifestyle press product | **enclosure 80** |

168    The SWISS PERFECTION products are produced and distributed by the company PP Products Prestige S.A. with registered office in Courgevaux (near Montreux). Its sole director and only person with authority to sign singly is A. Mattli. A. Mattli also has himself

called "*the Chairman of CLP, the Headquarter of Swiss Perfection.*" Thus there is absolutely no doubt that these products hail from the Claimants' sphere of influence. The formulation of the claims for legal remedy of the cross-action bears this fact in mind.

> **BO:**   Extract from the commercial register of PP Products Prestige S.A    **enclosure 81**

169    The Respondents have clearly defended themselves repeatedly, also against these violations of the Agreement (cf. already RZ 74 and RZ 136 f.), thus also in their letter dated December 7, 2005, item 12 (= enclosure to SK No. 45). It is worth noting that the Claimants filed this letter with the court of arbitration without the enclosures to said letter, which referred to this violation of the Agreement. These be herewith made good.

> **BO:**   Copies of the enclosures to the letter from La Prairie to A. Mattli of December 7, 2005    **enclosure 82**

170    The Respondents' claim to have this behavior of the Claimants in breach of the Agreement stopped once and for all by means of the injunction claimed by the cross-action is thus proven.

## IV.    Comments on individual points of the Claimants' statement of facts

171    Hereinafter, we shall comment on some isolated representations of the facts of the claim for arbitration (hereinafter "SK") and, if required, reference will be made to the present representation of facts in the statement of defense.

### Re item SK 2.1 ("Introduction")

172    The recital of this chapter is to be corrected in the following points:

173    It is correct that originally the "*La Prairie*" brand owed its strength to the reputation of Clinique La Prairie as a therapeutic and research establishment to which La Prairie cosmetics were related in the 80s and 90s. But since the Respondents' reorientation described in RZ 64, at the latest, which – as mentioned above – also entailed the renunciation to the living cell extract supplied by Clinique La Prairie, the significance of this renown for the "La Prairie" brand has decreased consistently. At present, it is without doubt the great renown of the La Prairie brand, which stands for high-quality, luxury cosmetics, which – as already pointed out in RZ 31 – in reverse substantially benefits Clinique La Prairie.

174    With this state of affairs, it is simply incomprehensible for the Respondents why the Claimants ultimately fight the La Prairie brand with their repeated, juridical attacks – a brand that is currently a rich source for their own reputation and could be even more so in a peaceful coexistence between Claimants and Respondents.

175     The summary representation of the interpretation of the Agreement of the year 1995 to be found in this chapter is also contested. In this context, we refer to item 2, RZ 77 ff., above.

### Regarding the sale of the cosmetics business of 03. Dec. 1982 (item 2.2.2 of the SK)

176     Decisive is what is suppressed here, in particular the guarantees attached to the sale. Cf. RZ 53, above.

### Regarding the period from 04. Dec. 1982 – 01. June 1995 (item 2.2.3 of the SK)

177     The activities of the Claimants listed here clearly have to be put in perspective. As already stated (cf. RZ 141 and 154 ff.), these were merely few and very modest, additional activities to be qualified almost exclusively as medical activities, offered solely to the medical patients of Clinique La Prairie, without any independent emanation beyond Clinique La Prairie.

178     As to the rest, we refer to the much more detailed account of this phase in RZ 38 ff., above.

### Regarding the Agreement of 02. June 1995 (item 2.2.4 of the SK)

179     The description in this chapter, practically void of content, must be supplemented by the comprehensive analysis of RZ 77 ff. above.

### Regarding the evolution of the relationship between the parties after 02. June 1995 (item 2.2.5 of the SK)

### Items 2.2.5.1 – 2.2.5.5 of the SK

180     All episodes mentioned herein, as stated by the Claimants themselves in SK 37, were *"nothing worth mentioning"*. As to the rest, reference is made to RZ 138 ff., above, and the statements made in the SK (statement of claim) are contested insofar as they are not expressly acknowledged in the corresponding Respondents' accounts.

181     Specifically contested are the conclusions drawn in items 62 and 70 of the SK.

### Regarding item 2.2.5.6 of the SK

182     This statement as a whole is contested for being incomplete. The complete representation of the facts of the case is to be found in RZ 139 ff. above.

183     In particular, the conclusion of item 99 of the SK is contested.

### Regarding item 2.2.5.7 of the SK

184     This account of the facts in the SK is clearly abbreviated. The comprehensive statement of facts is to be found in RZ 146 ff. above.

**Regarding the account of the current situation (item 2.3 of the SK)**

185     It is ascertained that in the RZ 113 – 119 of the SK, basically the statements in the RZ 141 and 154 ff. above are being confirmed, namely that the corresponding spa activities of Clinique La Prairie were practically purely of a medical kind until recently.

186     Clearly contested is the contention in RZ 122 of the SK, according to which the Respondents profited from the Claimants. At present, the situation is precisely the other way around (cf. RZ 31 f.)

187     Regarding the listing and the explanations in this chapter, we wish to state the following:

188     In view of the legal situation outlined in RZ 115 ff. according to which no restrictions are imposed on LP concerning the provision of services under the trademark *"La Prairie,"* a more detailed analysis of the services provided under this brand is superfluous.

189     As already shown in RZ 129 ff., we can affirm once more that basically only cosmetic services are being offered under the LA PRAIRIE trademark. Any affirmations by the Claimants deviating therefrom are contested.

190     The detailed legal and commercial ties to the establishments on the list are confidential. The Respondents see no reason to disclose their corresponding documents and books to the Claimants in this regard.

## V.     Legal aspects

### 1.     Protection of the name "Clinique La Prairie"

191     The Claimants cannot derive any rights of their own for protecting the "Clinique La Prairie" brand from item 4.1 of the Agreement (SK item 284).

192     The Claimants, together with Respondent 1, sold all rights to the trademark La Prairie to Respondent 2. Exceptions for the benefit of the Claimants to use the trademark of the designation La Prairie, or similar or derivative brands (among them also *"Clinique La Praire"*) were defined; the Claimants have no further rights. Correspondingly, they cannot infer anything, neither from the name and the firm *"Clinique La Praire,"* nor from a personal right, in their favor (cf. SK items 291 and 297 f., 387 ff. and 392 ff.).

2.      **Contractual obligations of the Respondents**

193     As outlined in the facts of the case, there is no contractual obligation by the Respondents to refrain from providing any services under the designation "La Prairie" (SK items 155 and 337).

194     Equally, there is no contractual obligation of the Respondents, not to provide any services in the area of health and mental and physical wellbeing (SK item 339).

195     The contractual obligation to loyalty within a simple company, as pretended by the Claimants (SK Ziff. 344) is contested.

196     The Claimants' allegation that there is an injunction against the use of the device of the old clinic La Prairie for services (SK p. 64 above) is incorrect and contested. In particular, it is not true that the list in item 4.2 of the Agreement refers to cosmetic products, exclusively.

197     Correspondingly, the Respondents have not violated the Agreement.

3.      **Unfair competition**

198     If the Respondents do not violate the Agreement, there can be no question of their behaving unfairly (SK Ziff. 354ff.). Correspondingly, there is no risk of confusion beyond the measure that is immanent to the Agreement (SK item 365).

199     The allegation that the Respondents' behavior causes a weakening of the reputation and position of Claimant 2 in competition is contested. The opposite is true (SK item 371).

4.      **Claimants' interest in a declaratory award**

200     The alleged interest of the Claimants in a declaratory decision is contested (SK item 397ff.). In particular, it is not to be comprehended why a publication of the award, which has not yet been requested, ought to justify such a declaratory interest (by publication of the award, the Claimants probably again understand the publication of the arbitral award in the Internet).

201     It is incomprehensible why the court in New York, where the Claimants have instituted the lawsuit against the Hotel Ritz Carlton, ought to give more weight to an arbitral award if such award also contains the requested declaratory statement in the dispositive. The same applies to the theoretical hypothesis that the award would have to be enforced in a country that has not ratified the New York Treaty.

202     The statements in SK item 406 f. are proof that, evidently, investors and experts have also concluded that the Claimants' understanding of the Agreement, as presented in the present proceedings, does not find any support in the wording of the Agreement. It is most

significant that the Claimants did not put the corresponding expert opinions on record. They must be supplied to the court by the Claimants.

### 5.     Claim to surrender of profits

203     Since the Respondents have not committed any violation of the Agreement, Claimant 2 has no claim to any surrender of profits, neither based on Art. 9, section 3 of the UWG (unfair competition act), nor on Art. 28a section 3 ZGB (Civil Code). Consequently, the Respondents are not obliged either to hand over these documents (furthermore, these documents are trade secrets of the Respondents, anyway).

With kind, respectful greetings

MEYER LUSTENBERGER

Martin Ammann                          Marcel Lustenberger

Enclosures according to a separate index of enclosures

In duplicate, incl. two sets of enclosures, to Dr. Bernhard F. Meyer (additional copy of the writ by e-mail as a Word file)
One original each, including enclosures, to Prof. Dr. Peter Nobel and Dr. Magda Streuli-Youssef
One original each, including enclosures, to RA Pierre Schifferli and RA Dr. Alexander Faber

# Index of enclosures

## in re

## Armin Mattli, Clinique La Prairie S.A. and CT-Holding SA
/
## Laboratoires La Prairie S.A. and La Prairie Inc.

---

Enclosure 1    Power of attorney of December 17, 2007

Enclsoure 2    Cooperation Agreement between Clinique La Prairie S.A. and Armin Mattli on the one hand and Aviatrix Corp. on the other of Dec. 3, 1982

Enclosure 3    "Guarantee" by Armin Mattli to Aviatrix Corp. of December 3, 1982

Enclosure 4    Stock Purchase Agreement between Armin Mattli and Aviatrix Corp. of December 3, 1982

Enclosure 5    Supply Agreement between Armin Mattli and Laboratoires La Prairie of December 3, 1982

Enclosure 6    Stock Purchase Agreement of June 12, 1991

Enclosure 7    Service marks of Laboratoires La Prairie SA up to June 17, 1991

Enclosure 8    Letter from La Prairie to the "Facial Clinique" in the Saks' department store, New York, dated February 10, 1986

Enclosure 9    Letter from La Prairie to the "Facial Clinique" in the Saks' department store, New York, dated February 10, 1986

Enclosure 10    Letter from La Prairie to a "Facial Clinique" in Chicago dated August 9, 1986,

Enclosure 11    Notes of proof and settlement of account of a La Prairie Facial Clinique dated May 17, 1986

Enclosure 12    "Clinique Feedback Report" of a La Prairie Facial Clinique of the year 1985

Enclosure 13    Documentation of the equipment of a La Prairie "Facial Clinique" of the year 1986

Enclosure 14    "La Prairie Promotional Manual" of 1991

Enclosure 15    Parfume shops that offer salon treatments with La Prairie products in Germany

Enclosure 16    Circular letter to all La Prairie

Enclosure 17  Trademark registrations of Clinique La Prairie SA in the USA concerning SWISS PERFECTION of the year 1993

Enclosure 18  Trademark registrations of Clinique La Prairie SA in the USA concerning SWISS BEAUTÉ of the year 1993

Enclosure 19  Madrid-Express extract of the IR trademark No. 601 820

Enclosure 20  Current extracts from the registers of the Swiss trademark 379 859 (extract Swissreg), of the US trademark 1 779 993 (excerpt SAEGIS), of the Canadian trademark 411 988 (extract SAEGIS)

Enclosure 21  Teledata excerpt concerning Clinique La Prairie Franchising SA

Enclosure 22  SAEGIS Report on the search for the owner of Clinique La Prairie Franchising SA

Enclosure 23  Swissreg extract of the trademark CH-413 170 and Madrid-Express extract of the international trademark IR 636 657

Enclosure 24  Swissreg extract of the trademarks CH-399 215 and CH-P-428 173, as well as Madrid-Express extract of the trademark IR 597 588

Enclosure 25  Facsimile letter of the Korean representative of Clinique La Prairie to Maike Kiessling, La Prairie, of December 4, 1995

Enclosure 26  Facsimile letter from Peter Gantenbein, Clinique La Prairie, to Ms. Maike Kiessling, La Prairie, dated February 6, 1996

Enclosure 27  Facsimile letter from Maike Kiessling to Peter Gantenbein and cc to Armin Mattli of December 6, 1996

Enclosure 28  Facsimile letter from Peter Gantenbein, Clinique La Prairie, to Maike Kiessling, La Prairie, dated January 20, 1997

Enclosure 29  Letter from Maike Kiessling LP SA to Mr. Gantenbein, Clinique La Prairie, dated May 19, 1995

Enclosure 30  Circular letter of LP SA of June 22, 1995

Enclosure 31  Facsimile letter from Clinique La Prairie to La Prairie of August 23, 1995

Enclosure 32  Facsimile letter from Clinique La Prairie to La Prairie of August 23, 1995

Enclosure 33  Facsimile letter from Clinique La Prairie to La Prairie of August 23, 1995

Enclosure 34    Facsimile letter of Clinique La Prairie to a Korean partner dated September 18, 1995

Enclosure 35    Facsimile letter of the Korean representative of Clinique La Prairie to Peter Gantenbein, Managing Director, Clinique La Prairie, dated November 21, 1995

Enclosure 36    Facsimile letter from Maike Kiessling, LP SA, to the Korean representative of Clinique La Prairie, dated December 5, 1995

Enclosure 37    Facsimile letter from the reprensentative of Clinique La Prairie to Maike Kiessling, LP SA, of December 6, 1995

Enclosure 38    Memorandum from Maike Kiessling, LP SA, to Peter Gantenbein, Cli-nique La Prairie, of March 18, 1996

Enclosure 39    Facsimile letter from Peter Gantenbein, Clinique La Prairie, to Maike Kiessling, LP SA, of October 30, 1996

Enclosure 40    Facsimile letter from Peter Gantenbein, Clinique La Prairie, to Maike      Kiessling, LP SA, of December 13, 1996

Enclosure 41    Facsimile letter from Pierre Martinet, Clinique La Prairie, to Maike Kiessling, La Prairie, of April 18, 1997

Enclosure 42    Facsimile letter from Maike Kiessling, LP SA, to Pierre Martinet, Clinique La Prairie, of April 22, 1997

Enclosure 43    Facsimile letter from Pierre Martinet, Clinique La Prairie, to Maike Kiessling, LP SA, of May 10, 1997

Enclosure 44    Facsimile letter from Dominique Bera, Clinique La Prairie, to Maike Kiessling, La Prairie, of June 24, 1997

Enclosure 45    Facsimile letter from Nina D. Dimoglou, Clinique La Prairie, to the Turkish distributor of LP SA, of November 27, 1997

Enclosure 46    Facsimile letter from Dominique Bera, Clinique La Prairie, to Maike Kiess-ling, LP SA, of December 5, 1997

Enclosure 47    Draft agreement sent by Pierre Martinet, CLP SA, to LP SA, dated December 2, 1997

Enclosure 48    Facsimile letter from Peter Gantenbein, Clinique La Prairie, to Maike Kiessling, LP SA, of December 6, 1996

Enclosure 49   Document "Profile of Services" of Clinique La Prairie Diagnostics, Health & Medical Center, Istanbul

Enclosure 50   Letter from Harald Stolzenberg, LP SA, to A. Mattli of June 22, 1998

Enclosure 51   Letter from A. Mattli to Harald Stolzenberg, LP SA, of June 26, 1998

Enclosure 52   Letter from RA Martin Ammann to RA Walter König of November 09, 1999

Enclosure 53   Letter from RA Walter König to RA Martin Ammann of November 12, 1999

Enclosure 54   Letter from RA Martin Ammann to RA Walter König (with enclosures) of November 23, 1999

Enclosure 55   Letter from RA Walter König to RA Martin Ammann of November 30, 1999

Enclosure 56   Letter from RA Martin Ammann to RA Walter König of October 19, 2005

Enclosure 57   Letter from RA Walter König to LP SA and La Prairie Inc. of December 19, 2005

Enclosure 58   Letter from LP SA to RA Walter König of January 16, 2006

Enclosure 59   Letter from RA Markus Ineichen to LP SA of February 27, 2006, enclosing a purported

Enclosure 60   Letter from RA Martin Ammann to RA Markus Ineichen of March 08, 2006

Enclosure 61   Letter from A. Mattli to a Korean hotel of June 13, 2006

Enclosure 62   Letter from A. Mattli to Dirk Trappmann, LP SA, of October 26, 2006

Enclosure 63   Letter from A. Mattli to Dirk Trappmann, LP SA, of November 8, 2006

Enclosure 64   Letter from A. Mattli to Dirk Trappmann and Maike Kiessling, LP SA, of October 5, 2006

Enclosure 65   Letter from Dirk Trappmann to A. Mattli of October 6, 2006

Enclosure 66   Letter from A. Mattli to Dirk Trappmann, LP SA, of October 10, 2006

Enclosure 67   Letter from Dirk Trappmann, LP SA, to A. Mattli of October 27, 2006

Enclosure 68   Letter from A. Mattli to Dirk Trappmann and Maike Kiessling of December 12, 2006

Enclosure 69   Plaintaiff's declaration of Clinique La Prairie SA versus The Ritz Carlton Hotel Company, LLC, filed on April 11, 2007


Enclosure 70   Press release and reference to the Web site www.clplawsuit.com

Enclosure 71   Sundry press releases on the lawsuit Mattli / CLP versus Ritz Carlton, New York

Enclosure 72   Ordinance of the United States District Court Southern District of New York in the matter Clinique La Prairie SA against The Ritz-Carlton Hotel Company and La Prairie Inc. of October 11, 2007

Enclosure 73   Extract from the Web site www.swissperfection.com

Enclosure 74   Picture of the "Swiss Perfection Clinique La Prairie SPA" opened in Seoul, South Korea

Enclosure 75   Further pictures of Swiss Perfection

Enclosure 76   Press release on the opening of "Swiss Perfection La Prairie SPA" in Seoul, South Korea, spring 2007

Enclosure 77   Publicity of Swiss Perfection in Korea

Enclosure 78   Extracts from Information Placement on the "Swiss Perfection Clinique La Prairie SPA", in Seoul, South Korea, published in a South Korean Lifestyle

Enclosure 79   Interview with A. Mattli, published in Magazin Galleria, edition 2006

Enclosure 80   Report on Swiss Perfection at Clinique La Prairie, published in a Spanish Lifestyle press

Enclosure 81   Extract from the commercial register of PP Products Prestige S.A

Enclosure 82   Copies of the enclosures to the letter from La Prairie to A. Mattli of December 7, 2005